**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Hyunhuy Nam,

                        Plaintiff,

            - against -

Permanent Mission of the Republic of Korea to the United Nations; Hyun Cho; Jinho Jo; and Daeyong Chung,

                      Defendants.

Case No.

**COMPLAINT AND JURY TRIAL DEMAND**

Plaintiff Hyunhuy Nam (hereafter, "Plaintiff") by and through his attorneys, Hang & Associates, PLLC, upon his knowledge and belief, files this Complaint against Defendants Permanent Mission of the Republic of Korea to the United Nations; Hyun Cho; Jinho Jo; and Daeyong Chung (collectively referred to as "Defendants"), and states as follows: alleges as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff brings this action pursuant to Section 1605(a) of the Foreign Sovereign Immunities Act (hereafter referred to as "FSIA") to obtain damages for having been subjected to Defendants' unlawful employment practices arising out of commercial activity performed and carried on by Defendants in the United States. The commercial activity includes Defendants' employment of Plaintiff to work for Defendants as a Chauffeur.

2.     Plaintiff seeks overtime compensation, spread of hours premium, damages arising out of the failure to provide pay stubs and wage notifications owed to Plaintiff for work performed for Defendants under Fair Labor Standards Act (hereinafter referred to as "FLSA") and New York Labor Law (hereafter referred to as "NYLL"). Plaintiff also seeks damages for Defendants' discriminatory conduct based on Plaintiff's age in violation of New York State Human Rights Law

(hereafter referred to as "NYSHRL") and New York City Human Rights Law (hereafter referred to as "NYCHRL") during the course of Plaintiff's employment.

## THE PARTIES

3.      At all times herein mentioned, Plaintiff was and is an alien domiciled and residing in the County of Bergen, State of New Jersey.

4.      At all times material hereto, the Defendant Permanent Mission of the Republic of Korea to the United Nations (hereafter, the "Permanent Mission"), was at all time hereafter and still is foreign mission and/or consulate located at 335 East 45th Street, New York, NY 10017.

5.      Defendant Permanent Mission was and still is a foreign state as defined as in 28 U.S.C. §1603.

6.      Defendant Permanent Mission was and still is a political subdivision of foreign state or agency or instrumentally of a foreign state as defined in 28 U.S.C. §1603 (b).

7.      Defendant Permanent Mission was and still is an organ of a foreign state or subdivision thereof, or a majority of those shares or other ownership interest is owned by a foreign state or political subdivision thereof.

8.      Defendants Hyun Cho; Jinho Jo; and Daeyong Chung; (collectively, "Individual Defendants) are members of a mission as defined as in 28 U.S.C. §1351.

9.      Upon information and belief, Defendant Hyun Cho (hereafter, "Defendant Cho" or "Ambassador Cho") is a Korean national served and serves as Ambassador of Permanent Mission and resides in the County of New York within the 10021 zip code area.

10.     Throughout Plaintiff's employment with Defendant Permanent Mission, commenting on or around June 28, 2016 until approximately June 30, 2021, Defendant Cho was the highest-ranking supervisor at the Permanent Mission.

11.     Upon information and belief, Defendant Permanent Mission's former and current Ministers and Counselors, including Defendants Jinho Jo and Dayong Chung, reported directly to Ambassador Cho.

12.     Upon information and belief, Defendant Jinho Jo (hereafter, "Defendant Jo" or "Counselor Jo") is a Korean national served and serves as Counselor of Permanent and resides in the County of New York within the 10016 zip code area.

13.     Upon information and belief, Defendant Jo was and remains Counselor, supervisor, and employee of the Permanent Mission. Defendant Jo has reported directly to Defendant Daeyong Chung, and Ambassador Cho, and was an immediate supervisor of the Permanent Mission staff, including Chauffeur.

14.     Upon information and belief, Defendant Daeyong Chung (hereafter, "Defendant Chung" or "Minister Chung") is a Korean national served and serves as Minister of Permanent Mission and resides at 14 Homestead Road, Tenafly, New Jersey 07670.

15.     Upon information and belief, Defendant Chung was and remains Minister, supervisor, and employee of the Permanent Mission since approximately November 2020 through the present. Through this time, Defendant Chung has reported directly to Ambassador Cho, worked as Ambassador Cho's "right-hand man," and remains Defendant Jo's immediate supervisor.

## JURISDICTION AND VENUE

16.     Plaintiff, repeats, reintegrates and realleges each and every allegation herein above in Paragraphs number "1 though 15" inclusive, with the same force and effect as though more fully set forth herein at length.

17.     This action is brought against Defendants, a foreign state and member of a mission, as defined in 28 U.S.C. §§1603(a) and 1351 pursuant the exceptions to the Foreign Sovereign

Immunities Act (hereafter referred to as the "FSIA") contained within 28 U.S.C. §§ 1602 and 1605 (a), and the Fair Labor Standards Act (hereafter referred to as the "FLSA"), 29 U.S.C. § 201 *et seq*., 29 U.S.C. § 216(b), and 28 U.S.C. §§ 1331 and 1337.

18.     In addition, the Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, because those claims arise out of the same common nucleus of operative fact as the federal claim.

19.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) and (f), because the events that give rise to this action occurred within this district.

20.     This action falls into one or more of the exceptions to the FSIA contained within 28 U.S.C. §§ 1602 and 1605(a).

21.     Defendants are not immune from the jurisdiction of the Courts of the United States in this action.

22.     Defendants are not immune from the jurisdiction of the Courts of the United States in this action pursuant to 28 U.S.C. §1602 as their commercial activities are concerned.

23.     Defendants are not immune from the jurisdiction of the Courts of the United States in this action pursuant to 28 U.S.C. 28 U.S.C. §1605 as this action is based upon commercial activity carried on in the United States by the foreign state or upon an act performed in the United Sates in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

24.     Defendants are not immune from the jurisdiction of the Courts of the United States in this action pursuant to 28 U.S.C. 28 U.S.C. §1605 as an employer of Plaintiff, who worked as

chauffeur to Defendants, was performing duties that were not governmental in nature and Defendants utilized Plaintiff's services to foster and/or to be engaged various commercial activities.

## STATEMENT OF FACTS

25.     Plaintiff is a 61year-old male, who resides in the State of New Jersey as a Permanent Resident of the United States, and was a former employee of Defendants from around June 28, 2016 to June 30, 2021.

26.     Upon information and belief, Defendant Permanent Mission employed or employs approximately 65 employees.

27.     Upon information and belief, Defendant Permanent Mission's employees are comprised of approximately 28 "non-diplomatic staff," at least 6 of whom are Korean-American who are citizens or permanent residents of the United States.

28.     Upon information and belief, Permanent Mission is managed by a handful of Korean national "diplomatic staff."

29.     Upon information and belief, Defendants often hire a chauffer(s) as "non-diplomatic staff" to provide transportation for the "diplomatic staff" to perform their duties as a member of Permanent Mission and as a personal driver to assist the staff and/or their family members with their personal affairs such as shopping and even, driving a staff member and his female companion to a discreet rondeau at her apartment.

**Defendants' Commercial Activity**

30.     Upon information and belief, Hey Korean's Website[1] provides services to private

---

[1]Hey Korean is an online website that allows its users to post an advertisement under separate categories in the website (i.g., Job Openings, Real Estate, Buying/Selling, etc.) to a target the audience who click on the relevant categories(s) and type their needs in the website's search engine. (website:  https://www.heykorean.com., Last accessed July 2, 2021).

individuals and corporate entities to engage in various types of commercial activities such as sale of goods, real estate transactions, and hiring employees, just like a "K-pop version of Craigslist."

31.    Upon information and belief, Defendant Permanent Mission often utilizes Hey Korean's website to hire its employees such as chauffeur, bilingual research assistant, and administrative assistant.

32.    Upon information and belief, Defendant Permanent Mission posts its phone number (i.e.,   1-212-439-4025)   and   email   address(es)   (i.e.,   Bandal2182@gmail.com   and korea.mission.un2@gmail.com) to receive potential employees' resumes and inquiries relating to the job opportunities.

33.    Upon information and belief, Defendant Permanent Mission, through its diplomatic staff, conducts an interview of a potential employee inside Permanent Mission's building located at 335 East 45th Street, New York, NY 10017 once the potential employee reaches out to Defendant Permanent Mission via making a phone call or sending an email.

34.    Upon information and belief, Defendant Permanent Mission hires a chauffeur as a "non-diplomatic staff" to make deliveries and provide transportation on behalf of Permanent Mission and for certain diplomatic employee(s) who serves as a Minister at Permanent Mission.

35.    In around 2016, Plaintiff learned the Permanent Mission hiring advisement on Hey Korean's website to work as a chauffeur. Plaintiff reached out to Defendant Permanent Mission by telephone after learning of the job opportunity.

36.    Upon information and belief, Plaintiff had an interview with one of the Permanent Mission's diplomatic staff at the building and eventually employed by Defendants to work as a chauffeur.

37.     Although Plaintiff was hired as a chauffeur and performed his duties as a chauffeur, Defendants gave Plaintiff a job title as Chauffeur/Administrative Assistant.

38.     Defendants assigned Plaintiff to drive the Permanent Mission's vehicle, a Hyundai 2015 GN3 model sedan with Plate No. 0265WDD to provide transportation for its "diplomatic employees" including Individual Defendants.

39.     Upon information and belief, Permanent Mission owns/maintains/controls at least one residential property located at 14 Homestead Road, Tenafly, New Jersey 07670 also known as the "Official Residence."

40.     Upon information and belief, Permanent Mission provides the Official Residence to the staff who serves as a Minister.

41.     Throughout Plaintiff's employment, Plaintiff was primarily responsible for providing transportation for the Minister who resided in the Official Residence and Permanent Mission's Counselors, whenever Defendants required regardless of its/his/her/their purpose(s).

42.     Plaintiff regularly drove his own vehicle to the Official Residence, switched his car to the Permanent Mission's Hyundai sedan, and drove the Minister who resided in the Official Residence to the Permanent Mission.

43.     If no one requested for transportation upon arrival or any one of the Defendants requested Plaintiff to stand-by in the Permanent Mission's building, he had to temporarily stay in the Room 815 at the Permanent Mission, until any one of the Defendants gave him further instructions.

44.     At first, Permanent Mission requested Plaintiff primarily provide transportation for Bong-Woo Ko (hereafter, "Minister Ko") for his work performed on behalf of Permanent Mission as a Minister from approximately June 2016 to October 2017. During this period, Plaintiff's duties

included but were not limited to, driving Minister Ko from the Official Residence to Permanent Mission, providing transportation for him to attend meetings at restaurants, standing-by in the car near the meeting locations until he finished his business, and driving him back to Permanent Mission or his residence at the Official Residence.

45.     Upon information and belief, Minister Kyungyul Han (hereafter, "Minister Han") served as Minister at Permanent Mission and moved in to the Official Residence in or around October 2017, after Minister Ko returned back to Korea.

46.     Starting from around October 21, 2017, Permanent Mission required Plaintiff to primarily provide transportation for Minister Han until around May 22, 2018.

47.     Since Plaintiff started providing transportation for Minister Han, he utilized Plaintiff's service as a Permanent Mission's chauffeur and also his personal driver to run him and his family member(s)' personal errands, providing free transportation services for his daughters/spouse/ acquaintances and driving him and his female companion(s) to a discreet rondeau at her apartment.

48.     For instance, on or about October 21, 2017, Minister Han requested Plaintiff to drive him to Lynwood Plaza, a shopping mall located in Fort Lee and required him to stand by until he finished shopping at the mall and visiting a Lexus dealer on the way back to the Official Residence.

49.     For instance, on or about February 22, 2018, Minister Han requested Plaintiff to drive him to a restaurant, Casa Mono, and stand-by until he finished a meeting with a real-estate agent and requested Plaintiff to drop off the real-estate agent near the Chelsea Art building located in W. 25th Street.

50.     For instance, on or about March 27, 2018, Minister Han requested Plaintiff to drive him to a restaurant, Gaonnuri, located on 32nd street between 5th & Broadway in Manhattan and required Plaintiff to wait for him until he finished lunch with his female companion. After Minister Han finished lunch with the female companion, he directed Plaintiff to drive both of them to her apartment located on 11 Howard Street. While Plaintiff was driving them to her apartment, they were sitting in the back seat of the Hyundai sedan side-by-side and had continuous physical interaction until Plaintiff arrived at the location. Even after Plaintiff arrived at the location, Minister Han did not allow him to go home, but required Plaintiff to wait for him in the car until Minister Han returned back from his female companion's apartment because he needed to "check-out" her place.

51.     Additionally, on numerous occasions, Minister Han requested Plaintiff to pick-up/drop-off his daughters from/to her residence located at 867 Metropolitan Ave. Brooklyn, 11211 and a JFK airport terminal to/from the Official Residence to save his daughters' transportation expenses.

52.     Plaintiff complained to Permanent Mission and its staff members, including Ambassador Cho, regarding Minister Han's personal use of Plaintiff's service and the Permanent Mission's sedan requiring Plaintiff to work longer hours, despite that Minister Han personally owned an automobile and was able to drive. However, Defendants did not do anything to remedy the situation.

53.     Upon information and belief, Minister Han returned back to Korea on or around May 22, 2018. Since then, Plaintiff worked as a chauffeur for Permanent Mission and its other diplomatic staff members to perform his regular duties until a new Minister moved in to the Official Residence.

54.     Upon information and belief, Minister Jungjae Lee (hereafter, "Minister Lee") served as Minister at Permanent Mission and moved in to the Official Residence in or around July 2018, after Minister Han returned back to Korea.

55.     Starting from around July 30, 2018, Permanent Mission required Plaintiff to primarily provide transportation for Minister Lee until around April 27, 2020.

56.     Again, since Plaintiff started providing transportation for Minister Lee, he utilized Plaintiff's service as a Permanent Mission's chauffeur and also his personal driver to run his and his family member(s)'s personal errands, and providing free transportation services for his family members/friends/acquaintances to purchase luxury handbags, play golf, and watch Broadway shows.

57.     For instance, on or about August 1, 2018, Minister Lee requested Plaintiff to drive him and his family members to a Korean market located in Fort Lee to grocery shop and automobile dealers such as Lexus and Honda Dealers located in Englewood and Tenafly to purchase a private automobile.

58.     For instance, on or about October 16, 2018, Minister Lee requested Plaintiff to drive him and his wife to a hotel to meet their friends visiting the State from Los Angeles. Minister Lee required Plaintiff to drive to Roosevelt hotel to pick up their friends and drive them to a restaurant. Plaintiff was required to stand-by for 3-4 hours until they finished eating dinner and then, was required to drop-off Minister Lee's friends to the hotel before Plaintiff drove Minister Lee and his wife to the Official Residence at night after 11:00 pm on that day.

59.     For instance, on or about October 17, 2018 and October 22, 2018, Minister Lee requested Plaintiff to provide transportation for his acquaintances. On the way to work at Permanent Mission, Minister Lee requested Plaintiff to pick up his acquaintances near their hotel

or at a certain location. Then, Minister Lee directed Plaintiff to drop him off at Permanent Mission and required Plaintiff to provide transportation for his acquaintances to a golf course, restaurant, and grocery market by driving the Permanent Mission's Hyundai sedan. On those days, Minister Lee's acquaintances used Plaintiff's service as a personal driver/butler and the Permanent Mission's sedan as free transportation and required Plaintiff to stand-by in the sedan for hours while they were engaged in their personal business.

60.     On numerous occasions, Minister Lee requested Plaintiff to drive him along with his friends, sister-in-law, or acquiesces, to various hotels, restaurants, and shopping malls. Upon information and belief, the purpose for Minister Lee's use of Plaintiff's service and the Permanent Mission's sedan with his friends and acquiesces was to foster their commercial activities as well as for personal purposes .

61.     For instance, when Minister Lee requested Plaintiff to drive his wife and her friend, visiting him from Los Angeles, to a shopping mall and wait there until they finish shopping at the mall. After they returned back to the car with a luxury bag, Plaintiff was requested to drive to a location to pick up Minister Lee and his other friend. In the presence of Minister Lee and Plaintiff, Minister Lee's wife told the other friend that Minister Lee let he use tax exemption card to purchase the bag on behalf of his friend at a tax-free price to save her money.

62.     On numerous occasions, Minister Lee requested Plaintiff to pick-up/drop-off his daughters from/to Penn Station and a JFK airport terminal to/from the Official Residence (sometimes to a dentist for his daughter's brace) to save the transportation cost.

63.     On a few occasions, Minister Lee requested Plaintiff to provide transportation for his daughter's boyfriend and their other friends using the same sedan free of charge.

64.     Again, Plaintiff complained to Permanent Mission and its staff members, including Ambassador Cho, regarding Minister Lee's personal use of Plaintiff's service and the Permanent Mission's sedan requiring Plaintiff to work longer hours, despite that Minister Lee personally owned an automobile and was able to drive. However, Defendants did not provide any meaningful responses to Plaintiff. Instead, Ambassador Cho stated to Plaintiff that he could not do anything to remedy the situation since the Permanent Mission's staff members were controlled by a foreign government entity in Korea and Plaintiff's compensation was also paid by the same entity. Defendants, again, failed to remedy the situation.

65.     Upon information and belief, Minister Lee returned back to Korea on or around April 27, 2020. Since then, Plaintiff worked as a chauffeur for Permanent Mission and its other diplomatic staff member primarily, Counselor Jo until a new minister moved in to the Official Residence in November 2020.

66.     Starting from around November 2020 to June 30, 2021, Permanent Mission required Plaintiff to primarily provide transportation for Minister Chung until the end Plaintiff's employment with Defendants.

**Plaintiff's Work Schedule and Pay**

67.     Throughout Plaintiff's employment with Defendants, he worked approximately for 52 hours to 62 hours per week and received around $5,020.00 - $6,550.00 per month (calculated weekly rate at $1,158.46 - $1,511.54) in cash, regardless of how many hours he actually worked.

68.     From around June 28, 2016 to June 30, 2017,  Plaintiff stared his work as early as 6:10 am until as late as 12:30 am on the next day for four (4) to six (6) days per week generally, but not always, from Monday to  Friday (sometimes, Monday to Thursday and any day(s) on the weekend) and worked sixty-two (62) hours per week on average. During this period, Plaintiff

received approximately $5,020.00 per month. Accordingly, he essentially received approximately $1,158.46 per week or $18.68 per hour, despite that his actual hourly rate was $28.96 during this period.

69.     From around July 1, 2017 to June 30, 2018,  Plaintiff stared his work as early as 6:40 am until as late as 12:30 am on the next day for three (3) to six (6) days per week generally, but not always, from Monday to  Friday (sometimes, Monday to Thursday and any day(s) on the weekend) and worked fifty-eight (58) hours per week on average. During this period, Plaintiff received approximately $5,227.00 per month. Accordingly, he essentially received approximately $1,206.23 per week or $20.80 per hour despite that his actual hourly rate was $30.16 during this period.

70.     From around July 1, 2018 to June 30, 2019,  Plaintiff stared his work as early as 4:00 am until as late as 12:45 am on the next day for three (3) to seven (7) days per week generally, but not always, from Monday to  Friday (sometimes, Monday to Thursday and any day(s) on the weekend) and worked fifty-six (56) hours per week on average. During this period, Plaintiff received approximately $6,550.00 per month. Accordingly, he essentially received approximately $1,511.54 per week or $26.99 per hour despite that his actual hourly rate was $37.79 during this period.

71.     From around July 1, 2019 to June 30, 2020,  Plaintiff stared his work as early as 6:40 am until as late as 12:00 am on the next day for two (2) to seven (7) days per week generally, but not always, from Monday to  Friday (sometimes, Monday to Thursday and any day(s) on the weekend) and worked fifty-two (52) hours per week on average. During this period, Plaintiff received approximately $5,300.00 per month. Accordingly, he essentially received approximately

$1,223.08 per week or $23.52 per hour despite that his actual hourly rate was $30.58 during this period.

72.     From around July 1, 2020 to June 30, 2021,  Plaintiff stared his work as early as 6:40 am until as late as 12:20 am on the next day for two (2) to six (6) days per week generally, but not always, from Monday to  Friday (sometimes, Monday to Thursday and Saturday on the weekend) and worked fifty-three (53) hours per week on average. During this period, Plaintiff received approximately $5,300.00 per month. Accordingly, he essentially received approximately $1,223.08 per week or $23.08 per hour despite that his actual hourly rate was $30.58 during this period.

73.     Upon information and belief, Defendants failed to keep any records reflecting Plaintiff's working hours and the amount of pay nor did they require Plaintiff to record his working hours such as requiring him to punch-in and/or punch-out.

74.     Defendants did not compensate Plaintiff for overtime compensation according to state and federal laws.

75.     Plaintiff was not compensated for New York's "spread of hours" premium for shift that lasted longer than ten (10) hours.

76.     Defendants did not provide Plaintiff with a wage notices at the time of his hiring. Instead, Permanent Mission, through its staff member(s), required Plaintiff to sign an agreement written in Korean labeled as "Contract for Employing a Chauffeur *[English translation]*" (hereafter, the "Agreement"), on yearly basis in every July (or April only in 2021) throughout Plaintiff's employment.

77.     Although Plaintiff actually started working for Permanent Mission as a chauffeur on or around June 28, 2016, Permanent Mission required Plaintiff to sign the 1st Agreement on

14

July 1, 2016 subject to an automatic renewal of his employment on yearly basis. Permanent Mission signed the Agreement through its diplomatic staff members: On July 1, 2016 and July 1, 2017, Permanent Mission signed the Agreement through Minister Ko, on July 1, 2018 and July 1, 2019, Permanent Mission signed the Agreement through Minister Lee; On July 1, 2020, Permanent Mission signed the Agreement through Counselor Jo; On April 1, 2021, Permanent Mission signed the Agreement through Minister Chung.

78.     The content in the Agreements specified Plaintiff regular working hours as from 9:00 am to 6:00 pm with a "base" monthly compensation in the amount $1,900.00 (from 2016 through 2019) or $1,710 (in 2020 and 2021), in addition to other compensations under the name of housing allowance, health insurance, bonus, and severance pay. However, none of the Agreements reflected Plaintiff's actual working hours nor did it reflect the accurate amount of compensation Plaintiff actually received. Moreover, Plaintiff never received any severance pay even after termination of Plaintiff's employment with Defendants in June 2021 despite that Defendants utilized Plaintiff's service for 5 years.

79.     Specifically when Permanent Mission, through Minister Chung, required Plaintiff to sign the Agreement in 2021, Minister Chung advised Plaintiff that the Agreement was a "Down Contract." It reflected further reduced and inaccurate amount of the "base" monthly compensation in the amount of $1,710.00 instead of $1,900.00 because Plaintiff passed the "retirement" age of 60, but Defendants could not find a younger alternative chauffeur immediately due to the Covid pandemic. Regardless of the type(s) and content(s) of the Agreement(s), none of the documents reflected Plaintiff's actual working schedules and accurate rate of pay. Additionally, all of the Agreements reflected the sort of practices which the FLSA and NYLL were intended to prohibit such as limiting the amount of employee's overtime compensation regardless of his actual regular

hourly rate and the total number of overtime hours the employee could be paid regardless of how many overtime hours the employee actually worked.

80.     Throughout Plaintiff's employment with Defendants, Defendants paid Plaintiff in cash and did not provide Plaintiff with any paystub.

81.     Upon information and belief, Defendants delivered Plaintiff's compensation in cash to a staff who served as a Second Secretary at Permanent Mission. Throughout Plaintiff's employment, Plaintiff picked up the cash in the Second Secretary's office at Permanent Mission.

82.     Defendants committed the following alleged acts knowingly, intentionally and willfully.

83.     Defendants knew that the nonpayment of overtime and the "spread of hours" premium would economically injure Plaintiff by their violation of federal and state laws.

84.     While employed by Defendants, Plaintiff was not exempt under federal and state laws requiring employers to pay employees overtime.

85.     Plaintiff's workdays frequently lasted longer than 10 hours.

86.     Defendants did not pay Plaintiff's "spread of hours" premium for every day in which he worked over 10 hours.

87.     Defendants did not provide Plaintiff with accurate written notice about the terms and conditions of his employment upon hire in relation to his actual rate of pay, regular pay cycle, and rate of overtime pay.

**Age Discrimination and Hostile Environment**

88.     Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

89.     Before Plaintiff turned the age of 60 in or around April 2020, Permanent Mission, through Minister Lee, first informed to Plaintiff that **"he needed to retire when he reached the age of 60."**

90.     As soon as Plaintiff turned 60-year-old on April 9, 2020, Minister Lee told him that **"he should get out because his age reached the Korean retirement age of 60"** and asked Plaintiff to resign until the expiry of his term as to serve Permanent Mission as a minister and returned back to Korea.

91.     Since April 9, 2020, Defendants Counselor Jo and Minister Chung continuously asked Plaintiff to resign because of Plaintiff's age and told Plaintiff that Defendants were unwilling to continue (or renew) Plaintiff's employment because he reached the "retirement age."

92.     Plaintiff verbally objected to the Defendants' forced and discriminatory termination and pleaded to the Defendants, including Ambassador Cho, to allow Plaintiff remain his position as a chauffeur and the compensation he was to receive.

93.     On or around July 1, 2020, Counselor Jo told Plaintiff that Permanent Mission was having hard time finding an alternative younger chauffeur due to the Covid pandemic. Defendants permitted Plaintiff to temporality stay until the pandemic situation eased so that they could find a suitable younger chauffeur.  Around that time and again, in the beginning of October 2020, Defendants advised Plaintiff that if Defendants decided to keep Plaintiff until the following year 2021, Plaintiff would be required to sign a "Down Contract" reflecting 20% reduction in monthly "base" pay because he already passed the retirement age.

94.     On or around September 1, 2020, Counselor Jo, acting at the direction of Permanent Mission, prepared a one-page document written in Korean labeled as "Agreement [*English translation*]" to prevent Plaintiff from brining a civil or criminal claim action relating to

termination of Plaintiff's employment with Defendants on June 30, 2021.  Counselor Jo presented the document to Plaintiff and demanded him to sign. Under emotional and financial pressure, Plaintiff reluctantly capitulated to Counselor Jo's demand and signed the Agreement. At the moment Plaintiff signed the document, he felt that he had no choice but to agree with Counselor Jo to maintain his position as Plaintiff did not have any other financial resources specifically, during the pandemic.

95.     On or around April 1, 2021, Minister Chung, acting at the direction of Permanent Mission, presented the "Down Contract" reflecting the 20% reduction in monthly "base" pay to Plaintiff. Since none of the previous Agreements Defendants required Plaintiff annually to sign reflected Plaintiff's actual working schedule and his rate of pay, he signed the "Down Contract" reflecting the reduction, for the second time since July 1, 2020.

96.     Since Plaintiff turned 60 on April 9, 2020, Defendants Counselor Jo and Minister Chung continued to force Plaintiff to resign and his working conditions became intolerable even though Defendants forced Plaintiff to sign the "Down Contract(s)."

97.     For instance, starting from approximately the 4th day of Minister Chung's term as Minister at the Permanent Mission, he directly and indirectly forced Plaintiff to retire because of his age. Minister Chung frequently made negative and unreasonable comments to Plaintiff regarding his driving that Plaintiff drove too fast (although Plaintiff drove within the speed limit for the whole time) or Plaintiff changed the lane (although Plaintiff was required to change the lane to arrive at the location). On a few occasions, Minister Chung asked Plaintiff, "*where are you going after your retirement [with Defendants]*."

98.     Approximately in the beginning of May 2021, Ambassador Cho requested Plaintiff to come in to his office to investigate and penalize Plaintiff for reporting Ambassador Cho for

using the cook as his personal chef and mistreating his maid. The investigatory conversation lasted about 40 minutes. (i.g., who did Plaintiff tell, how did Plaintiff learn such facts, to whom did Plaintiff disclose such facts, etc.). Thereafter, Defendants did not give Plaintiff almost any work to do, but made him to just sit in the office at the Permanent Mission and do nothing.

99.     In or around June 2021, Plaintiff asked Minister Chung whether he could keep his position until the Permanent Mission found an alternative chauffeur. On the same day, Minister Chung responded to Plaintiff that he **"must leave"** by the end of June 2021 **"because he already passed the retirement age of 60"** and the Permanent Mission was not willing to keep a chauffeur over 60 years old.

100.     Since Plaintiff reached the Korean retirement age of 60, Defendants made it clear that they wanted Plaintiff to retire, and Plaintiff began feeling increasingly insecure, unappreciated, and unwelcome at work until Defendants actually terminated Plaintiff on June 30, 2021.

*Commercial Activity Exception Under 28 U.S.C. §1605*

101.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

102.     CPLR 1601 does not apply in the present case based upon the exception set forth in Section 1605 of the CPLR including but not limited to by reason of commercial activity that was not governmental in nature and the activity Plaintiff performed as a chauffeur, specifically for the Individual Defendants, is one which normally could be engaged in by any private party.

### **STATEMENT OF CLAIM**

**COUNT I**
**[The Fair Labor Standard Act – Unpaid Overtime]**

103.    Plaintiff repeats and realleges all preceding paragraphs above as though fully set forth herein.

104.    Defendants willfully failed to pay Plaintiff overtime at a rate of at least one-and-a-half times her regular hourly rate for every hour Plaintiff worked above forty (40) hours in a work week. This failure violates the Fair Labor Standards Act, 29 U.S.C. § 207(a) and its implementing regulations.

105.    Defendants also violated the FLSA  by failing to properly keep records as required by statute,  29 U.S.C. § 211(c).

106.    Plaintiff is entitled to her unpaid wages, plus an additional equal amount in liquidated damages, as a consequence of Defendants' unlawful actions and omissions, in accordance with 29 U.S.C. § 216(b).

107.    Plaintiff is also entitled to costs of Court, pursuant to 29 U.S.C. § 216(b)

108.    Plaintiff seeks, and is entitled to, attorneys' fees incurred by his counsel, pursuant to 29 U.S.C. § 216(b).

## COUNT II
### [New York Labor Law – Unpaid Promised Wage]

109.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

110.    Defendants willfully failed to pay Plaintiff his wages weekly at the $28.96 – $37.79 hourly rates as he was promised, in violation of N.Y. Lab. Law § 191(a).

111.    Defendants' failure to pay the required wages as set forth above was willful within the meaning of NYLL §§ 198, 663, and 681.

112.    Plaintiff is entitled to his unpaid wages as mandated by NYLL, plus an additional 100 percent as liquidated damages, as a consequence of the Defendants' unlawful actions and omissions in accordance with NYLL §§ 198, 663, and 681.

113.    Plaintiff also seeks, and is entitled to, attorneys' fees incurred by his counsel, costs of Court, and interest.

**COUNT III**
**[New York Labor Law – Unpaid Overtime]**

114.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

115.    Defendants willfully failed to pay Plaintiff overtime at a rate of at least one-and-a-half times his regularly hourly rate for every hour he worked above forty (40) hours in a single work week.

116.    96. Defendants' failure to pay the required wages as set forth above was willful within the meaning of NYLL §§ 198, 663, and 681.

117.    97. Plaintiff is entitled to his unpaid wages mandated by NYLL, plus an additional 100 percent as liquidated damages, as a consequence of the Defendants' unlawful actions and omissions in accordance with NYLL §§ 198, 663, and 681.

118.    98. Plaintiff also seeks, and is entitled to, attorneys' fees incurred by his counsel, costs of Court, and interest.

**COUNT IV**
**[New York Labor Law – Spread of Hours]**

119.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

120.     Plaintiff regularly worked days in which the end of his work shift was more than ten (10) hours from the beginning of his work shift.

121.     Defendants, in violation of 12 N.Y.C.R.R. § 146-1.6, never paid Plaintiff an additional hour of pay at the minimum wage rate for every day in which the interval between the beginning and the end of Plaintiff's work day was more than ten (10) hours.

122.     Plaintiff is entitled to his unpaid spread of hour pay as mandated by NYLL, plus an additional 100 percent as liquidated damages, as a consequence of the Defendants' unlawful actions and omissions, in accordance with NYLL §§ 198, 663, and 681.

123.     Plaintiff also seeks, and is entitled to, attorneys' fees incurred by his counsel, costs of Court, and interest.

**COUNT V**
**[New York Labor Law – Wage Notice and Wage Statement Violations]**

124.     Plaintiff repeats and realleges all preceding paragraphs above as though fully set forth herein.

125.     Defendants failed to provide Plaintiff, at the time of his hiring or thereafter, accurate wage notices in English or Korean (Plaintiff's primary language) containing his rates of pay and other information as required by NYLL § 195(1).

126.     Defendants also failed to provide Plaintiff with accurate wage statements with every payment of wages which provided all of the information required under NYLL § 195(3).

127.     For Defendants' violation of NYLL § 195(1), Plaintiff is entitled to $50 for each work day in which this violation continued to occur, in an amount not to exceed $5,000, pursuant to NYLL §198(1-b).

128.     For Defendants' violation of NYLL § 195(3), Plaintiff is entitled to $250 for each work day in which this violation continued to occur, in an amount not to exceed $5,000, pursuant to NYLL §198(1-d).

129.     Plaintiff also seeks, and is entitled to, attorneys' fees incurred by her counsel, costs of Court, and interest.

## COUNT VI
### [Violation of the New York State Human Rights Law – Age Discrimination]

130.     Plaintiff repeats and realleges all preceding paragraphs above as though fully set forth herein.

131.     The NYSHRL provides that it shall be an unlawful discriminatory practice for an employer to discharge or discriminate against an employee because of his age. See, N.Y. Executive Law §296(1)(a).

132.     Plaintiff is qualified to work as an employee for Defendants and he has satisfactorily performed the duties required by the position he held at the Permanent Mission.

133.     Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

134.     From June 28, 2016 to June 30, 2021, Plaintiff was employed by Defendant Permanent Mission located at 335 East 45th Street, New York, NY 10017, through its diplomatic staff to work as a chauffeur.

135.     Upon information and belief, individual Defendants Ambassador Cho, Counselor Jo, and Minister Chung serve as diplomatic staff at the Permanent Mission.

136.    Before Plaintiff turned the age of 60 in or around April 2020, Permanent Mission, through Minister Lee, first informed to Plaintiff that **"he needed to retire when he reached the age of 60."**

137.    As soon as Plaintiff turned 60-year-old on April 9, 2020, Minister Lee told him that **"he should get out because his age reached the Korean retirement age of 60"** and asked Plaintiff to resign until the expiry of his term as to serve Permanent Mission as a minister and returned back to Korea.

138.    Since April 9, 2020, Defendants Counselor Jo and Minister Chung continuously asked Plaintiff to resign because of Plaintiff's age and told Plaintiff that Defendants were unwilling to continue (or renew) Plaintiff's employment because he reached the "retirement age."

139.    On or around July 1, 2020 and again, in October 2020, Defendants Counselor Jo and Minister Chung advised Plaintiff that if Defendants decided to keep Plaintiff until the pandemic situation eased so that they could find a suitable younger chauffeur (i.g., until the following year 2021), Plaintiff would be required to sign a "Down Contract" reflecting 20% reduction in monthly "base" pay because he already passed the retirement age.

140.    On or around September 1, 2020, Counselor Jo, acting at the direction of Permanent Mission, prepared a one-page document written in Korean labeled as "Agreement [*English translation*]" to prevent Plaintiff from brining a civil or criminal claim action relating to termination of Plaintiff's employment with Defendants on June 30, 2021.  Counselor Jo presented the document to Plaintiff and demanded him to sign. Under emotional and financial pressure, Plaintiff reluctantly capitulated to Counselor Jo's demand and signed the Agreement. At the moment Plaintiff signed the document, he felt that he had no choice but to agree with Counselor

Jo to maintain his position as Plaintiff did not have any other financial resources specifically, during the pandemic.

141.    On or around April 1, 2021, Minister Chung, acting at the direction of Permanent Mission, presented the "Down Contract" reflecting the 20% reduction in monthly "base" pay to Plaintiff. Since none of the previous Agreements Defendants required Plaintiff annually to sign reflected Plaintiff's actual working schedule and his rate of pay, he signed the "Down Contract" reflecting the reduction, for the second time since July 1, 2020.

142.    Since Plaintiff turned 60 on April 9, 2020, Defendants Counselor Jo and Minister Chung continued to force Plaintiff to resign and his working conditions became intolerable even though Defendants forced Plaintiff to sign the "Down Contract(s)."

143.    For instance, starting from approximately the 4th day of Minister Chung's term as Minister at the Permanent Mission, he directly and indirectly forced Plaintiff to retire because of his age. Minister Chung frequently made negative and unreasonable comments to Plaintiff regarding his driving that Plaintiff drove too fast (although Plaintiff drove within the speed limit for the whole time) or Plaintiff changed the lane (although Plaintiff was required to change the lane to arrive at the location). On a few occasions, Minister Chung asked Plaintiff, "*where are you going after your retirement [with Defendants]*."

144.    Approximately in the beginning of May 2021, Ambassador Cho requested Plaintiff to come in to his office to investigate and penalize Plaintiff for reporting Ambassador Cho for using the cook as his personal chef and mistreating his maid. The investigatory conversation lasted about 40 minutes. (i.g., who did Plaintiff tell, how did Plaintiff learn such facts, to whom did Plaintiff disclose such facts, etc.). Thereafter, Defendants did not give Plaintiff almost any work to do, but made him to just sit in the office at the Permanent Mission and do nothing.

25

145. In or around June 2021, Plaintiff asked Minister Chung whether he could keep his position until the Permanent Mission found an alternative chauffeur. On the same day, Minister Chung responded to Plaintiff that he **"must leave"** by the end of June 2021 **"because he already passed the retirement age of 60"** and the Permanent Mission was not willing to keep a chauffeur over 60 years old.

146. Since Plaintiff reached the Korean retirement age of 60, Defendants made it clear that they wanted Plaintiff to retire, and Plaintiff began feeling increasingly insecure, unappreciated, and unwelcome at work until Defendants actually terminated Plaintiff on June 30, 2021.

147. Plaintiff verbally objected to the Defendants' forced and discriminatory termination and pleaded to the Defendants, including Ambassador Cho, to allow Plaintiff remain his position as a chauffeur and the compensation he was to receive. However, Ambassador Cho failed to take adequate measure to remedy the discrimination and/or harassment suffered by Plaintiff.

148. As Defendants Jo and Chung continuously pressured Plaintiff to retire, his stress about his situation grew. In almost every morning when Plaintiff got ready to go to work, he started feeling knots in his stomach in anticipating the start of his workday, and the sense of feeling unwanted, pushed aside, and on his way to being terminated.

149. Defendants Jo and Chung's age-based discrimination and/or harassment caused Plaintiff substantial emotional distress and embarrassment.

150. Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's legally protected rights, which supports an award of punitive damages.

151. Moreover, Defendant Permanent Mission ratified and condoned the unlawful acts of its staff including, its Ministers and Counselors.

152.    But for Defendants' unlawful discriminatory actions herein alleged, Plaintiff would be employed as a chauffeur for the Permanent Mission.

153.    As a result of Defendants' unlawful employment practices Plaintiff has suffered extreme mental anguish, outrage severe anxiety, painful embarrassment among his friends and co-workers, and the loss of employment of the ordinary pleasures of everyday life.

154.    As a further result of Defendants' unlawful employment practices, Plaintiff has suffered and continue to suffer substantial damages, including back pay and reinstatement or front pay, other employment benefits, and damages for emotional pain and mental anguish in amounts to be determined at trial.

155.    By the acts and practices described above, including without limitation the disparate treatment, assignment of his duties to a younger employee, and the creation of a hostile work environment, Defendants discriminated against Plaintiff in the terms and conditions of his employment and terminated him in violation of the NYSHRL.

156.    Defendants' conduct was done in conscious disregard of and reckless indifference to Plaintiff's rights.

157.    Plaintiff therefore seeks compensatory damages, emotional and physical damages, reasonable attorneys' fees, the costs and disbursements of this action, punitive damages, interest, and any other damages permitted by law in an amount to be determined at trial.

## COUNT VII
### [Violation of the New York State Human Rights Law - Hostile Work Environment]

158.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein

159.    Plaintiff is qualified to work as an employee for Defendants and he has

satisfactorily performed the duties required by the position he held at the Permanent Mission.

160.   Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

161.   From June 28, 2016 to June 30, 2021, Plaintiff was employed by Defendant Permanent Mission located at 335 East 45th Street, New York, NY 10017, through its diplomatic staff to work as a chauffeur.

162.   Upon information and belief, individual Defendants Ambassador Cho, Counselor Jo, and Minister Chung serve as diplomatic staff at the Permanent Mission.

163.   Before Plaintiff turned the age of 60 in or around April 2020, Permanent Mission, through Minister Lee, first informed to Plaintiff that **"he needed to retire when he reached the age of 60."**

164.   As soon as Plaintiff turned 60-year-old on April 9, 2020, Minister Lee told him that **"he should get out because his age reached the Korean retirement age of 60"** and asked Plaintiff to resign until the expiry of his term as to serve Permanent Mission as a minister and returned back to Korea.

165.   Since April 9, 2020, Defendants Counselor Jo and Minister Chung continuously asked Plaintiff to resign because of Plaintiff's age and told Plaintiff that Defendants were unwilling to continue (or renew) Plaintiff's employment because he reached the "retirement age."

166.   On or around July 1, 2020 and again, in October 2020, Defendants Counselor Jo and Minister Chung advised Plaintiff that if Defendants decided to keep Plaintiff until the pandemic situation eased so that they could find a suitable younger chauffeur (i.e., until the following year 2021), Plaintiff would be required to sign a "Down Contract" reflecting 20% reduction in monthly "base" pay because he already passed the retirement age.

167.    On or around September 1, 2020, Counselor Jo, acting at the direction of Permanent Mission, prepared a one-page document written in Korean labeled as "Agreement [*English translation*]" to prevent Plaintiff from brining a civil or criminal claim action relating to termination of Plaintiff's employment with Defendants on June 30, 2021.   Counselor Jo presented the document to Plaintiff and demanded him to sign. Under emotional and financial pressure, Plaintiff reluctantly capitulated to Counselor Jo's demand and signed the Agreement. At the moment Plaintiff signed the document, he felt that he had no choice but to agree with Counselor Jo to maintain his position as Plaintiff did not have any other financial resources specifically, during the pandemic.

168.    On or around April 1, 2021, Minister Chung, acting at the direction of Permanent Mission, presented the "Down Contract" reflecting the 20% reduction in monthly "base" pay to Plaintiff. Since none of the previous Agreements Defendants required Plaintiff annually to sign reflected Plaintiff's actual working schedule and his rate of pay, he signed the "Down Contract" reflecting the reduction, for the second time since July 1, 2020.

169.    Since Plaintiff turned 60 on April 9, 2020, Defendants Counselor Jo and Minister Chung continued to force Plaintiff to resign and his working conditions became intolerable even though Defendants forced Plaintiff to sign the "Down Contract(s)."

170.    For instance, starting from approximately the 4th day of Minister Chung's term as Minister at the Permanent Mission, he directly and indirectly forced Plaintiff to retire because of his age. Minister Chung frequently made negative and unreasonable comments to Plaintiff regarding his driving that Plaintiff drove too fast (although Plaintiff drove within the speed limit for the whole time) or Plaintiff changed the lane (although Plaintiff was required to change the

lane to arrive at the location). On a few occasions, Minister Chung asked Plaintiff, "*where are you going after your retirement [with Defendants].*"

171.    Approximately in the beginning of May 2021, Ambassador Cho requested Plaintiff to come in to his office to investigate and penalize Plaintiff for reporting Ambassador Cho for using the cook as his personal chef and mistreating his maid. The investigatory conversation lasted about 40 minutes. (i.g., who did Plaintiff tell, how did Plaintiff learn such facts, to whom did Plaintiff disclose such facts, etc.). Thereafter, Defendants did not give Plaintiff almost any work to do, but made him to just sit in the office at the Permanent Mission and do nothing.

172.    In or around June 2021, Plaintiff asked Minister Chung whether he could keep his position until the Permanent Mission found an alternative chauffeur. On the same day, Minister Chung responded to Plaintiff that he **"must leave"** by the end of June 2021 **"because he already passed the retirement age of 60"** and the Permanent Mission was not willing to keep a chauffeur over 60 years old.

173.    Since Plaintiff reached the Korean retirement age of 60, Defendants made it clear that they wanted Plaintiff to retire, and Plaintiff began feeling increasingly insecure, unappreciated, and unwelcome at work until Defendants actually terminated Plaintiff on June 30, 2021.

174.    Plaintiff verbally objected to the Defendants' forced and discriminatory termination and pleaded to the Defendants, including Ambassador Cho, to allow Plaintiff remain his position as a chauffeur and the compensation he was to receive. However, Ambassador Cho failed to take adequate measure to remedy the discrimination and/or harassment suffered by Plaintiff.

175.    As Defendants Jo and Chung continuously pressured Plaintiff to retire, his stress about his situation grew. In almost every morning when Plaintiff got ready to go to work, he started feeling knots in his stomach in anticipating the start of his workday, and the sense of feeling

unwanted, pushed aside, and on his way to being terminated.

176.    As Defendants Jo and Chung continuously pressured Plaintiff to retire, his stress about his situation grew. In almost every morning when Plaintiff got ready to go to work, he started feeling knots in his stomach in anticipating the start of his workday, and the sense of feeling unwanted, pushed aside, and on his way to being terminated.

177.    Upon information and belief, the Ministers and Counselors of the Permanent Mission made their personnel and other decisions in consultation with Defendant Cho, who served Ambassador of Permanent Mission.

178.    Individual Defendants served as an Ambassador, Minister and Counselor of Permanent Mission and directly supervised Plaintiff as well as the Permanent Mission's other staff.

179.    Defendant Permanent Mission and failed to take adequate measures to remedy the discrimination and/or harassment suffered by Plaintiff. Instead, Defendant Permanent Mission further discriminated against Plaintiff by requiring Plaintiff to work as a butler/personal driver of its staff members and their family members for increased working hours to assist them with performing various types of commercial activities.

180.    Defendants engaged in a course of unlawful conduct, as stated above, which created a hostile work environment in violation of the NYSHRL.

181.    As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff suffered the indignity of discrimination, the invasion of his rights to be free from discrimination which has manifested in physical and emotional distress.

182.    As a further direct proximate result of Defendants' unlawful employment practices, Plaintiff suffered extreme mental anguish, outrage severe anxiety, painful embarrassment among his friends and co-workers, and the loss of employment of the ordinary pleasures of everyday life.

183.    Defendants' conduct was done in conscious disregard of Plaintiff's rights.

184.    Plaintiff therefore seeks compensatory damages, emotional and physical damages, reasonable attorneys' fees, the costs and disbursements of this action, punitive damages, interest, and any other damages permitted by law in an amount to be determined at trial.

## COUNT VIII
**[Violation of the New York City Human Rights Law – Age Discrimination]**

185.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

186.    The NYCHRL provides that it shall be an unlawful discriminatory practice for an employer or agent thereof to, because of the actual or perceived age of any person, discriminate against such person in the terms and conditions of employment or terminate such person. See, NYC Administrative Code §8-107(a).

187.    Plaintiff is a "person" under the New York City Human Rights Law, §8-102(1).

188.    Defendants are an "employer or an employee or agent thereof" under the New York City Human Rights Law, §8-102 and §8-107(1)(a).

189.    Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

190.    Plaintiff is qualified to work as an employee for Defendants and he has satisfactorily performed the duties required by the position he held at the Permanent Mission.

191.    Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

192.    From June 28, 2016 to June 30, 2021, Plaintiff was employed by Defendant Permanent Mission located at 335 East 45th Street, New York, NY 10017, through its diplomatic

staff to work as a chauffeur.

193.    Upon information and belief, individual Defendants Ambassador Cho, Counselor Jo, and Minister Chung serve as diplomatic staff at the Permanent Mission.

194.    Before Plaintiff turned the age of 60 in or around April 2020, Permanent Mission, through Minister Lee, first informed to Plaintiff that **"he needed to retire when he reached the age of 60."**

195.    As soon as Plaintiff turned 60-year-old on April 9, 2020, Minister Lee told him that **"he should get out because his age reached the Korean retirement age of 60"** and asked Plaintiff to resign until the expiry of his term as to serve Permanent Mission as a minister and returned back to Korea.

196.    Since April 9, 2020, Defendants Counselor Jo and Minister Chung continuously asked Plaintiff to resign because of Plaintiff's age and told Plaintiff that Defendants were unwilling to continue (or renew) Plaintiff's employment because he reached the "retirement age."

197.    On or around July 1, 2020 and again, in October 2020, Defendants Counselor Jo and Minister Chung advised Plaintiff that if Defendants decided to keep Plaintiff until the pandemic situation eased so that they could find a suitable younger chauffeur (i.g., until the following year 2021), Plaintiff would be required to sign a "Down Contract" reflecting 20% reduction in monthly "base" pay because he already passed the retirement age.

198.    On or around September 1, 2020, Counselor Jo, acting at the direction of Permanent Mission, prepared a one-page document written in Korean labeled as "Agreement [*English translation*]" to prevent Plaintiff from brining a civil or criminal claim action relating to termination of Plaintiff's employment with Defendants on June 30, 2021.  Counselor Jo presented the document to Plaintiff and demanded him to sign. Under emotional and financial pressure,

Plaintiff reluctantly capitulated to Counselor Jo's demand and signed the Agreement. At the moment Plaintiff signed the document, he felt that he had no choice but to agree with Counselor Jo to maintain his position as Plaintiff did not have any other financial resources specifically, during the pandemic.

199.    On or around April 1, 2021, Minister Chung, acting at the direction of Permanent Mission, presented the "Down Contract" reflecting the 20% reduction in monthly "base" pay to Plaintiff. Since none of the previous Agreements Defendants required Plaintiff annually to sign reflected Plaintiff's actual working schedule and his rate of pay, he signed the "Down Contract" reflecting the reduction, for the second time since July 1, 2020.

200.    Since Plaintiff turned 60 on April 9, 2020, Defendants Counselor Jo and Minister Chung continued to force Plaintiff to resign and his working conditions became intolerable even though Defendants forced Plaintiff to sign the "Down Contract(s)."

201.    For instance, starting from approximately the 4th day of Minister Chung's term as Minister at the Permanent Mission, he directly and indirectly forced Plaintiff to retire because of his age. Minister Chung frequently made negative and unreasonable comments to Plaintiff regarding his driving that Plaintiff drove too fast (although Plaintiff drove within the speed limit for the whole time) or Plaintiff changed the lane (although Plaintiff was required to change the lane to arrive at the location). On a few occasions, Minister Chung asked Plaintiff, "*where are you going after your retirement [with Defendants].*"

202.    Approximately in the beginning of May 2021, Ambassador Cho requested Plaintiff to come in to his office to investigate and penalize Plaintiff for reporting Ambassador Cho for using the cook as his personal chef and mistreating his maid. The investigatory conversation lasted about 40 minutes. (i.e., who did Plaintiff tell, how did Plaintiff learn such facts, to whom did

Plaintiff disclose such facts, etc.). Thereafter, Defendants did not give Plaintiff almost any work to do, but made him to just sit in the office at the Permanent Mission and do nothing.

203.     In or around June 2021, Plaintiff asked Minister Chung whether he could keep his position until the Permanent Mission found an alternative chauffeur. On the same day, Minister Chung responded to Plaintiff that he **"must leave"** by the end of June 2021 **"because he already passed the retirement age of 60"** and the Permanent Mission was not willing to keep a chauffeur over 60 years old.

204.     Since Plaintiff reached the Korean retirement age of 60, Defendants made it clear that they wanted Plaintiff to retire, and Plaintiff began feeling increasingly insecure, unappreciated, and unwelcome at work until Defendants actually terminated Plaintiff on June 30, 2021.

205.     Plaintiff verbally objected to the Defendants' forced and discriminatory termination and pleaded to the Defendants, including Ambassador Cho, to allow Plaintiff remain his position as a chauffeur and the compensation he was to receive. However, Ambassador Cho failed to take adequate measure to remedy the discrimination and/or harassment suffered by Plaintiff.

206.     As Defendants Jo and Chung continuously pressured Plaintiff to retire, his stress about his situation grew. In almost every morning when Plaintiff got ready to go to work, he started feeling knots in his stomach in anticipating the start of his workday, and the sense of feeling unwanted, pushed aside, and on his way to being terminated.

207.     Defendants Jo and Chung's age-based discrimination and/or harassment caused Plaintiff substantial emotional distress and embarrassment.

208.     Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's legally protected rights, which supports an award of punitive damages.

209.    Moreover, Defendant Permanent Mission ratified and condoned the unlawful acts of its staff including, its Ministers and Counselors.

210.    But for Defendants' unlawful discriminatory actions herein alleged, Plaintiff would be employed as a chauffeur for the Permanent Mission.

211.    As a result of Defendants' unlawful employment practices Plaintiff has suffered extreme mental anguish, outrage severe anxiety, painful embarrassment among his friends and co-workers, and the loss of employment of the ordinary pleasures of everyday life.

212.    As a further result of Defendants' unlawful employment practices, Plaintiff has suffered and continue to suffer substantial damages, including back pay and reinstatement or front pay, other employment benefits, and damages for emotional pain and mental anguish in amounts to be determined at trial.

213.    Defendants' conduct was done in conscious disregard of and reckless indifference to Plaintiff's rights.

214.    Plaintiff therefore seeks compensatory damages, emotional and physical damages, reasonable attorneys' fees, the costs and disbursements of this action, punitive damages, interest, and any other damages permitted by law in an amount to be determined at trial.

### COUNT IX
### [Violation of the New York City Human Rights Law - Hostile Work Environment]

215.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

216.    Defendants engaged in a course of unlawful conduct, as stated above, which created a hostile work environment in violation of the NYCHRL.

217.    Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

218.    Plaintiff is qualified to work as an employee for Defendants and he has satisfactorily performed the duties required by the position he held at the Permanent Mission.

219.    Plaintiff is a 61-year-old male and was 56 years of age when Plaintiff first started working for Defendants on June 28, 2016.

220.    From June 28, 2016 to June 30, 2021, Plaintiff was employed by Defendant Permanent Mission located at 335 East 45th Street, New York, NY 10017, through its diplomatic staff to work as a chauffeur.

221.    Upon information and belief, individual Defendants Ambassador Cho, Counselor Jo, and Minister Chung serve as diplomatic staff at the Permanent Mission.

222.    Before Plaintiff turned the age of 60 in or around April 2020, Permanent Mission, through Minister Lee, first informed to Plaintiff that **"he needed to retire when he reached the age of 60."**

223.    As soon as Plaintiff turned 60-year-old on April 9, 2020, Minister Lee told him that **"he should get out because his age reached the Korean retirement age of 60"** and asked Plaintiff to resign until the expiry of his term as to serve Permanent Mission as a minister and returned back to Korea.

224.    Since April 9, 2020, Defendants Counselor Jo and Minister Chung continuously asked Plaintiff to resign because of Plaintiff's age and told Plaintiff that Defendants were unwilling to continue (or renew) Plaintiff's employment because he reached the "retirement age."

225.    On or around July 1, 2020 and again, in October 2020, Defendants Counselor Jo and Minister Chung advised Plaintiff that if Defendants decided to keep Plaintiff until the

pandemic situation eased so that they could find a suitable younger chauffeur (i.g., until the following year 2021), Plaintiff would be required to sign a "Down Contract" reflecting 20% reduction in monthly "base" pay because he already passed the retirement age.

226.    On or around September 1, 2020, Counselor Jo, acting at the direction of Permanent Mission, prepared a one-page document written in Korean labeled as "Agreement [*English translation*]" to prevent Plaintiff from brining a civil or criminal claim action relating to termination of Plaintiff's employment with Defendants on June 30, 2021.   Counselor Jo presented the document to Plaintiff and demanded him to sign. Under emotional and financial pressure, Plaintiff reluctantly capitulated to Counselor Jo's demand and signed the Agreement. At the moment Plaintiff signed the document, he felt that he had no choice but to agree with Counselor Jo to maintain his position as Plaintiff did not have any other financial resources specifically, during the pandemic.

227.    On or around April 1, 2021, Minister Chung, acting at the direction of Permanent Mission, presented the "Down Contract" reflecting the 20% reduction in monthly "base" pay to Plaintiff. Since none of the previous Agreements Defendants required Plaintiff annually to sign reflected Plaintiff's actual working schedule and his rate of pay, he signed the "Down Contract" reflecting the reduction, for the second time since July 1, 2020.

228.    Since Plaintiff turned 60 on April 9, 2020, Defendants Counselor Jo and Minister Chung continued to force Plaintiff to resign and his working conditions became intolerable even though Defendants forced Plaintiff to sign the "Down Contract(s)."

229.    For instance, starting from approximately the 4th day of Minister Chung's term as Minister at the Permanent Mission, he directly and indirectly forced Plaintiff to retire because of his age. Minister Chung frequently made negative and unreasonable comments to Plaintiff

regarding his driving that Plaintiff drove too fast (although Plaintiff drove within the speed limit for the whole time) or Plaintiff changed the lane (although Plaintiff was required to change the lane to arrive at the location). On a few occasions, Minister Chung asked Plaintiff, "*where are you going after your retirement [with Defendants]*."

230.    Approximately in the beginning of May 2021, Ambassador Cho requested Plaintiff to come in to his office to investigate and penalize Plaintiff for reporting Ambassador Cho for using the cook as his personal chef and mistreating his maid. The investigatory conversation lasted about 40 minutes. (i.g., who did Plaintiff tell, how did Plaintiff learn such facts, to whom did Plaintiff disclose such facts, etc.). Thereafter, Defendants did not give Plaintiff almost any work to do, but made him to just sit in the office at the Permanent Mission and do nothing.

231.    In or around June 2021, Plaintiff asked Minister Chung whether he could keep his position until the Permanent Mission found an alternative chauffeur. On the same day, Minister Chung responded to Plaintiff that he **"must leave"** by the end of June 2021 **"because he already passed the retirement age of 60"** and the Permanent Mission was not willing to keep a chauffeur over 60 years old.

232.    Since Plaintiff reached the Korean retirement age of 60, Defendants made it clear that they wanted Plaintiff to retire, and Plaintiff began feeling increasingly insecure, unappreciated, and unwelcome at work until Defendants actually terminated Plaintiff on June 30, 2021.

233.    Plaintiff verbally objected to the Defendants' forced and discriminatory termination and pleaded to the Defendants, including Ambassador Cho, to allow Plaintiff remain his position as a chauffeur and the compensation he was to receive. However, Ambassador Cho failed to take adequate measure to remedy the discrimination and/or harassment suffered by Plaintiff.

234.    As Defendants Jo and Chung continuously pressured Plaintiff to retire, his stress

about his situation grew. In almost every morning when Plaintiff got ready to go to work, he started feeling knots in his stomach in anticipating the start of his workday, and the sense of feeling unwanted, pushed aside, and on his way to being terminated.

235.     Upon information and belief, the Ministers and Counselors of the Permanent Mission made their personnel and other decisions in consultation with Defendant Cho, who served Ambassador of Permanent Mission.

236.     Individual Defendants served as an Ambassador, Minister and Counselor of Permanent Mission and directly supervised Plaintiff as well as the Permanent Mission's other staff.

237.     Defendant Permanent Mission and failed to take adequate measures to remedy the discrimination and/or harassment suffered by Plaintiff. Instead, Defendant Permanent Mission further discriminated against Plaintiff by requiring Plaintiff to work as a butler/personal driver of its staff members and their family members for increased working hours to assist them with performing various types of commercial activities.

238.     Defendants engaged in a course of unlawful conduct, as stated above, which created a hostile work environment in violation of the NYCHRL.

239.     As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff suffered the indignity of discrimination, the invasion of his rights to be free from discrimination which has manifested in physical and emotional distress.

240.     As a further direct proximate result of Defendants' unlawful employment practices, Plaintiff suffered extreme mental anguish, outrage severe anxiety, painful embarrassment among his friends and co-workers, and the loss of employment of the ordinary pleasures of everyday life.

241.     Defendants' conduct was done in conscious disregard of Plaintiff's rights.

242.     Plaintiff therefore seeks compensatory damages, emotional and physical damages,

reasonable attorneys' fees, the costs and disbursements of this action, punitive damages, interest, and any other damages permitted by law in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants, both jointly and severally as follows:

a) assuming jurisdiction over this action as this action falls into one or more of the exceptions to the FSIA;

b) declaring Defendants violated the FLSA, the NYLL, the New York Executive Law, and the New York City Human Rights Law;

c) permanently enjoining Defendants from further violations of the FLSA, NYLL, NYSHRL, and NYCHRL;

d) granting judgment to Plaintiff on his FLSA claims and awarding Plaintiff his unpaid wages and an equal amount in liquidated damages;

e) granting judgment to Plaintiff on his NYLL claims and awarding Plaintiff his unpaid wages, spread of hours compensation, applicable statutory damages, and liquidated damages as provided for by statute;

f) granting judgment to Plaintiff on his NYSHRL claims and awarding Plaintiff appropriate damages and fines and penalties as provided for by statute;

g) granting judgment to Plaintiff on his NYCHRL claims and awarding Plaintiff appropriate compensatory and punitive damages as provided for by statute;

h) awarding Plaintiff all damages sustained as a result of Defendants' conduct, including damages for emotional distress, embarrassment, and anguish;

i) awarding Plaintiff prejudgment and postjudgment interest as allowed by law;

j)   awarding Plaintiff his costs and reasonable attorneys' fees; and

k)   granting such further relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues.

Dated:  July 19, 2021                                HANG & ASSOCIATES, PLLC.

                                                   /S/ *DIANA SEO*
                                                   Diana Y. Seo, Esq.
                                                   136-20 38th Ave., Suite 10G
                                                   Flushing, New York 11354
                                                   Tel: 718.353.8588
                                                   dseo@hanglaw.com
                                                   *Attorneys for Plaintiff*

## CONSENT TO SUE UNDER
## FEDERAL FAIR LABOR STANDARDS ACT

I am an employee currently or formerly employed by _Permanent Mission of the Republic of Korea to the united Nations_ and/or related entities. I consent to be a plaintiff in an action to collect unpaid wages. I agree that I am bound by the terms of the Contingent Fee Retainer signed by the named plaintiff in this case.

_Hyunhuy Nam_
Full Legal Name (Print)

_[signature]_
Signature

_06/05/2021_
Date