# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HYUNHUY NAM,<br><br>                    Plaintiff,<br><br>          v.<br><br>PERMANENT MISSION OF THE<br>REPUBLIC OF KOREA TO THE UNITED<br>NATIONS;<br><br>                    Defendant. | Case No.: 1:21-cv-06165-RA<br><br><br>CIVIL ACTION |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT PURSUANT TO FRCP 56

Kim, Cho & Lim, LLC
163-10 Northern Boulevard, Suite 202
Flushing, New York 11358-2652
T: 718-539-7400
F: 201-585-7422

On the brief:  Joshua S. Lim, Esq.
              Nicholas J. DuBois, Esq.
              Sean S. Kwak, Esq.
              Power J. Chen, Esq.

## TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................. ii

I.    PRELIMINARY STATEMENT ................................................................................. 1

II.   RELEVANT PROCEDURAL HISTORY .................................................................. 2

III.  RELEVANT FACTS .................................................................................................. 3

   **A.    Introduction** ....................................................................................................**3**

   **B.    Application of ROK's Laws and Regulations** ..............................................**3**

   **C.    Plaintiff's Duties and Tasks; Exposure to Classified Information** ...........**3**

   **D.    Security Measures Required of Plaintiff for High-Level Clearance** ........**4**

   **E.    Safety as Another Primary Concern/Duties of Plaintiff** ...........................**6**

   **F.    Plaintiff Was Assigned Diplomatic Duties under "Uei-Jeon" Protocol** ...........**7**

   **G.    Plaintiff's Retirement** .....................................................................................**8**

IV.  LEGAL ARGUMENT ............................................................................................... 8

   **A.    STANDARD FOR RELIEF** ...........................................................................**8**

   **B.    APPLICABLE LAW – the Foreign Sovereign Immunities Act** ...............**10**

   **C.    U.S. Courts Lack Personal and Subject-Matter Jurisdiction** ................**11**

      i.    The Mission and Diplomats Are Entitled to, and Have Not Waived, Immunity ....... 12

      ii.   Defendant DOES NOT Meet the Criteria for Exception under the FSIA ................. 13

      iii.  Plaintiff's Employment Lacks "Substantial Contact" with the United States ........... 25

   **D.    Plaintiff's Claims Have Been Settled** ..........................................................**27**

V.    CONCLUSION ......................................................................................................... 30

**TABLE OF AUTHORITIES**

## Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ................................................... 9

Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428 (1989) ............................. 11

Bardales v. Consulate General of Peru in New York,
490 F.Supp.3d 696 (S.D.N.Y 2020)........................................................................ 22, 23, 24

Butters v. Vance Int'l, Inc., 225 F.3d 462, 465 (4th Cir. 2000)....................................... 19, 21, 22

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ............................................................. 8

Crum v. Kingdom of Saudi Arabia, 2005 WL 3752271 (E.D. Va. Jul. 13, 2005) ................ 21, 22

Dewey v. PTT Telecom Netherlands, US, Inc., 94-cv-5983,
1995 WL 542447 (S.D.N.Y. Sept. 12, 1995)................................................................ 27

Difilippo v. Barclays Capital, Inc., 552 F. Supp. 2d 417 (S.D.N.Y. 2008) ................................ 27

Figueroa v. Ministry for Foreign Affairs of Sweden,
222 F.Supp.3d 304 (S.D.N.Y. 2016)..................................................................... passim

Harrison v. Republic of Sudan, 838 F.3d 86, 94 (2d Cir. 2016).................................................... 11

Hijazi v. Permanent Mission of Saudi Arabia to U.N.,
689 F. Supp. 2d 669 (S.D.N.Y. 2010), aff'd, 403 F.App'x 631 (2d Cir. 2010).......................... 14

Hummel v. AstraZeneca LP, 575 F. Supp. 2d 568 (S.D.N.Y. 2008)..................................... 27, 29

Kato v. Ishihara, 360 F.3d 106 (2d Cir. 2004) .......................................................... 12, 14

Kim v. Korea Trade Promotion-Investment Agency, 51 F.Supp.3d 279 (S.D.N.Y. 2014)...... 8, 12

Kowalchuk v. Stroup, 61 A.D.3d 118 (App. Div. 1st Dept. 2009)................................................ 27

Laramee v. Jewish Guild for the Blind, 72 F.Supp.2d 357 (S.D.N.Y.1999) ............................. 29

Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc., 354 F.Supp.2d 293 (S.D.N.Y. 2004) .... 27

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) .................................. 9

Moers v. Moers, 229 N.Y. 294 (1920)........................................................................ 27

Mourmouni v. Permanent Mission of Republic of S. Sudan to U.N.,
No. 20-cv-3603, 2021 WL 4461829 (S.D.N.Y. Sept. 28, 2021) ...................................... 2, 15, 24

OBB Personenverkehr AG v. Sachs, 577 U.S. 27 (2015)........................................................ 11, 14

Pablo Star Ltd. v. Welsh Gov't, 961 F.3d 555, 564 (2d Cir. 2020),
cert. denied, 141 S. Ct. 1069 (2021) ................................................................... 14, 25

Rukoro v. Federal Rep. of Germany, 976 F.3d 218 (2d Cir. 2020), cert. denied sub nom.
Rukoro v. Germany, --- U.S. ---, No. 20-1454, 2021 WL 2301990 (U.S. June 7, 2021)....... 10, 14

Saudi Arabia v. Nelson, 507 U.S. 349 (1993) ................................................................ 11, 14, 19

<u>Shapiro v. Republic of Bolivia</u>, 930 F.2d 1013 (2d Cir. 1991)....................................................... 25

<u>Simel v. JP Morgan Chase</u>, 05-cv-9750, 2007 WL 809689 (S.D.N.Y. Mar. 19, 2007) ............... 27

<u>Skluth v. United Merchs. & Mfrs., Inc.</u>, 559 N.Y.S.2d 280 (App. Div. 1st Dep't 1990)....... 27, 29

<u>Volk v. Liggett Group Inc.</u>, 96-cv-1921, 1997 WL 107458 (S.D.N.Y. Mar. 11, 1997)............... 27

**Statutes**

28 U.S. Code § 1603(b) ...................................................................................................... 12

28 U.S.C. § 1603(a) ............................................................................................................ 12

28 U.S.C. § 1603(e) ...................................................................................................... 10, 24

28 U.S.C. § 1604.............................................................................................................. 9, 12

28 U.S.C. § 1605(a)(2)............................................................................................... 10, 21, 24

28 U.S.C. §§ 1602, et seq.......................................................................................................... 1

**Other Authorities**

23 U.S.T. 3227 ........................................................................................................................ 1

**Rules**

Fed. R. Civ. P. 56(e) ............................................................................................................. 9

**Treatises**

14 Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 3662, at 393 (2d ed. 1985) ..... 11

The Permanent Mission of the Republic of Korea to the United Nations (hereinafter, the "Mission" or "Defendant"), by and through its counsel, the law offices of Kim, Cho & Lim, LLC, hereby respectfully submits this memorandum of law in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

I.   **PRELIMINARY STATEMENT**

The instant lawsuit, which plaintiff Hyunhuy Nam ("Nam" or "Plaintiff") couches in terms of a conventional labor dispute, is not susceptible to the jurisdiction of this Court pursuant to any exception provided by the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602, to -11, or universally accepted principles of international law under the United Nations Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227 (entered into force in the United States Dec. 13, 1972) (the "VCDR"), and no waiver applies.

In this action, Plaintiff asserts nine causes of action against the Mission: one cause of action under the federal Fair Labor Standards Act of 1938 ( "FLSA"), 29 U.S.C. §§ 203, to -262 (Count I); four under various sections of New York Labor Law ("NYLL") §§ 1 to -1200; (Counts II-V); and two causes of action under each: the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290, to -297; and New York City Human Rights Law ( "NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq. (Counts VI-IX).

In a tacit concession to the Mission's sovereign immunity, much of Nam's Complaint is devoted to asserting that it engaged in "commercial" activity by hiring Plaintiff as a chauffeur, and that (predominantly upon "information and belief") Defendant thereby engaged in commercial activity. This is an effort to shoehorn this case into the FSIA's very narrow exception for commerce. In his effort, Plaintiff conflates Defendant's consular functions with those of commercial actors. In addition, the subtext of the Complaint appears to wield the litigation privilege as a sword, not a shield, to besmirch, defame and denigrate the character of the Mission's former diplomats.

1

Despite Plaintiff's efforts, the Complaint must be dismissed on two simple grounds. First, the Court lacks subject matter jurisdiction over this matter because the Mission is an instrumentality of a foreign sovereign state, did not waive its sovereign immunity, and does not fall under any of the exceptions specified by the FSIA. Second, Plaintiff duly released the Defendant from any employment-related claims.

## II.   **RELEVANT PROCEDURAL HISTORY**

Plaintiff filed this action on July 19, 2021, asserting various claims against the Mission and three (3) of its diplomats arising from his employment there. On September 30, 2021, Defendant and its diplomats moved to dismiss the action in its entirety pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) on grounds akin to those set forth herein. On January 21, 2022, the Honorable Allison J. Nathan, U.S.D.J. granted in part and denied in part that motion, dismissing all claims against the individual diplomats based on the VCDR. The parties thereafter stipulated to amend the caption to delete these dismissed dignitaries.

However, Judge Nathan's decision declined to dismiss Nam's remaining claims based on then-underdeveloped facts at the pre-answer stage and relying on an unpublished and non-binding decision in Mourmouni v. Permanent Mission of Republic of S. Sudan to U.N., No. 20-cv-3603, 2021 WL 4461829 (S.D.N.Y. Sept. 28, 2021), primarily reasoning that "Defendants have not proffered that Nam had responsibilities beyond chauffeuring." Ex. 38, p. 1. Through written discovery and several depositions, the parties have since developed facts of record demonstrating that Plaintiff's responsibilities and requisite qualifications encompassed much more than that of any ordinary chauffeur, thus falling outside the limited exception under the FSIA for "commercial activity".

2

III.   **RELEVANT FACTS**

**A.  Introduction**

The Mission is a constituent part of the Government of the Republic of Korea (the "ROK" or "South Korea") responsible for South Korean diplomatic interests at the United Nations since the ROK became a member of the United Nations in September of 1991 (as successor to the 1951 Observer Mission of the Republic of Korea to the U.N). That the Mission is an instrumentality of a sovereign state is not in dispute. Defendant's Statement of Material Facts ("DSMF"), ¶ 1. As such, Defendant is exempt from paying any federal, state, and local tax in the United States. Id., ¶¶ 48-49. Plaintiff is a South Korean national living in New Jersey as a permanent U.S. resident. Id. ¶ 2. Nam was employed as a chauffeur for the Mission for about five years until June of 2021. Id. ¶ 3.

**B.  Application of ROK's Laws and Regulations**

All aspects of employment at the Mission – from the amount of compensation to the duration, retirement and severance provisions – are determined by the laws of the Republic of Korea, more particularly the regulations promulgated by its Ministry of Foreign Affairs (similar to how U.S. diplomats' and foreign service officers' terms of employment are pursuant rules and regulations promulgated by the U.S. Department of State). Id., ¶¶ 32-38. These regulations include the hiring processes, employment conditions, work schedules, employment benefits, and terms of employment. Id., ¶¶ 34-37, 50.

**C.  Plaintiff's Duties and Tasks; Exposure to Classified Information**

Plaintiff was hired as the designated chauffeur for the Ministers at the Mission (the "Ministers") and was provided a designated vehicle that no other chauffeurs were permitted to drive. See id., ¶¶ 54-56. Plaintiff was consistently assigned to support the Ministers in managing

3

tasks relating to foreign affairs and working with the Minister and Counsellor as a "team." Id., ¶¶ 51-53.

The Ministers at the Mission are very important and high-level officials of the ROK government. Id., ¶ 48, 60. Accordingly, the Ministers' work requires high-level security clearance. Id., ¶ 59. The identity of individuals with whom the Ministers meet and any discussions the Ministers have with them are top secret and classified information under ROK law. Id., ¶¶ 24, 61. The transportation routes, destinations, and whereabouts of any high-level government officials are similarly treated as national secrets of South Korea and vital to the safety and well-being of their diplomats. Id., ¶¶ 63-64. In fact, even the list of such high-level officials visiting the United States is confidential. Id., ¶ 68.

Mr. Nam drove these high-level officials around, including the Ministers and other individuals such as the secretary of U.N. secretary-general and the national security advisor to the president of the ROK when such individuals visited the Mission as its guests. Id., ¶¶ 66-69. In the course of his employment, Plaintiff became privy to highly sensitive information including South Korea's aforesaid top-secret and/or classified information. Id., ¶¶ 62, 65. Given the inevitable exposure to such confidences, the responsibilities assigned to Plaintiff as the designated chauffeur for the Minister were unique among the Mission's drivers, as were the requirements for his post. Id., ¶ 57.

In sum, Plaintiff was responsible for serving the national interest of the ROK. Id., ¶ 23.

**D. Security Measures Required of Plaintiff for High-Level Clearance**

To protect the interests of the ROK and its confidential/classified information, additional measures were followed in Plaintiff's hiring process to ensure that such confidential/classified information would remain secure. Id., ¶¶ 4-10. First, the Minister personally interviewed Plaintiff. Id., ¶¶ 5-6. Plaintiff was then required to, and did consent and submit to, background checks for

4

security clearance in both the United States and the ROK. Id., ¶ 7. And with his consent, Defendant did perform a detailed background check for that purpose. Id., ¶ 8. Finally, the Minister made the final decision to hire Plaintiff. Id., ¶ 9.

Second, once Defendant decided to hire Plaintiff, Plaintiff was required to sign, and did sign, certain Pledge Agreements at the time of hire, and then annually throughout his term of employment. Id., ¶¶ 10, 15. Each Pledge Agreement provides:

> I[, Plaintiff,] hereby acknowledge that knowledge of all matters that I will acquire in the course of performing my duties as a chauffeur at the Permanent Mission of the Republic of Korea to the United Nations is deemed nationally classified information of the Republic of Korea, and I shall not divulge it to anyone.

Id., ¶ 11. Each Pledge Agreement was written in Korean. Id., ¶12. Plaintiff can read Korean. Id., ¶13. And Plaintiff was provided a copy of each Pledge Agreement. Id., ¶14. Plaintiff acknowledges that the foregoing pledge is "critically important" to the nature and duties of his post. Id., ¶ 17.

To further ensure Plaintiff's compliance, each Employment Contract required Plaintiff to submit to a polygraph test, if requested by the Mission. Id., ¶ 16. No other non-diplomatic staff member at the Mission is required to qualify for and/or subject to as high-level a security clearance as Plaintiff. Id., ¶ 18.

In addition to the Pledge Agreements, Plaintiff was still annually required to sign an Employment Contract at the time of hire which required, among other things, the Plaintiff to maintain secrecy and ensure confidentiality in the course of performing his duties and responsibilities. Id., ¶¶ 19-23. These Employment Contracts too were written in Korean, and a copy of each agreement was provided to Plaintiff. Id., ¶¶ 21-22. Pursuant to these Employment Contracts, Plaintiff was evaluated on, inter alia, his "ability to keep matters secret." Id., ¶ 25. Any failure to abide by the security guidelines or to maintain secrecy was grounds for immediate

termination, an act for which Plaintiff agreed to be punished under ROK law. Id., ¶¶ 26, 38. These Pledge Agreements and Employment Contracts were designed to - and in fact did - remind Plaintiff of how critical it was (and still is) to keep ROK's classified information secret. Id., ¶ 27. Further evidencing its concern for security, the Employment Contract also required Plaintiff to inform Defendant immediately of any changes in his status, including any marriage to a foreign national. Id., ¶ 28.

Only with such tight security measures could Plaintiff be deemed reliable and qualified to be entrusted with the duties of his post. Notably, Nam had advance access to the routes, destinations, and whereabouts of the ROK's high-level government officials which is deemed the ROK's national secret for such officials' safety. Id., ¶¶ 63-65. Plaintiff also worked in conjunction with local law enforcement in compliance with the Mission's security protocol. Id., ¶ 69.

Every year (except 2020), the U.N. holds an event called the "high-level week." Id., ¶¶ 77, 79. This is an official occasion for high-level officials from each member-state of the U.N., such as government cabinet members, to congregate and participate in-person at the General Assembly of the United Nations. Id., ¶ 78. For obvious security reasons, the neighborhoods around the U.N. headquarters in Manhattan are locked down during this period. Id., ¶ 80. But given the nature of Plaintiff's duties and his high-level security clearance, Plaintiff was granted a pass for admission through the security barricades around the U.N. headquarters. Id., ¶ 81.

### E.  Safety as Another Primary Concern/Duties of Plaintiff

While the security of information was considered paramount in Plaintiff's post, the safety and well-being of his passengers were also a primary concern. Id., ¶ 72. This is expected as Plaintiff was continually driving diplomats and high-level officials of both the ROK and other U.N. member-states (when visiting as the Mission's invitees), as well as their respective family members or guests. See Id., ¶ 74. This too, is another reason that the principal Minister interviewed

Plaintiff personally to ensure Plaintiff would be a discreet and reliable driver. Id., ¶¶ 7-9. Even still, the Mission conducted a thorough background check on Plaintiff prior to his hiring. Id., ¶¶ 8, 12.

### F. Plaintiff Was Assigned Diplomatic Duties under "Uei-Jeon" Protocol

As set forth in the Employment Contracts, Plaintiff was assigned other duties in the Mission described as "the administration of diplomatic protocol." Id., ¶ 75. That phrase in the Korean language differs slightly in meaning from its English counterpart in that it is more expansive. The term is pronounced "Uei-Jeon" in Korean, which is defined in an encyclopedia as follows:

> [This term] is a method of etiquette performed at various events organized with courtesy and refers to "the standard and procedures to make peace in the relationship between individuals." When manners are applied in regulating the relationship between individuals, it is called "etiquette" and when applied to formal relationship between national or international setting or between organizations, it is called [this term] or protocol. Today, [this term] is used not only in such events but its broad term also includes the Pledge of Allegiance and flag raising.

Id., ¶ 76. In fact, Plaintiff was required to adhere to Uei-Jeon protocol, including by participating in motorcades when high-ranking government officials visited the United States and according them the appropriate etiquette, deference, and other formalities. See id., ¶ 70. In other words, Plaintiff was responsible for ensuring his charges were provided the most pleasant experience possible in conjunction with maintaining their security. In connection with such security-related duties, Plaintiff was provided advance notice of, for example, how a given motorcade would proceed, classified information as to the routes, destinations, and whereabouts of high-ranking government officials. Id., ¶¶ 65, 71.

Plaintiff explicitly acknowledges that he was "helping the national interest" of the ROK by operating the official car of the Mission, and that he has not done anything contrary to the national interest of the ROK. Id., ¶¶ 30-31.

7

### G. **Plaintiff's Retirement**

Retirement at age 60 is unquestionably the norm[1] – and required by law in certain circumstances – in the ROK. Id., ¶¶ 39-40. In accordance with the established norm and ROK law, the Mission informed Plaintiff that he must retire when he turned 60. Id., ¶ 33. Notwithstanding the recognized retirement age, Plaintiff requested Defendant to extend his employment because his wife lost her job due to the COVID-19 pandemic. Id., ¶ 42. To grant such extension of employment beyond 60 years old, Defendant had to seek approval from the ROK government. Id., ¶ 43. Recognizing the extraordinary circumstance of the global pandemic, Defendant did seek and eventually obtain the approval and extended Plaintiff's employment until he was 61 years old. Id., ¶ 44.

In consideration therefor, Nam and the Mission signed a voluntary settlement agreement concerning his employment including its term and termination, whereby Plaintiff "agreed not to assert any claims with respect to [Plaintiff's] termination as [Plaintiff's] employment ends on June 2021." See id. ¶¶ 46, 82.

### IV.    **LEGAL ARGUMENT**

### A. **STANDARD FOR RELIEF**

A court may grant summary judgment pursuant to Fed. R. Civ. P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Summary Judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather an

---

[1] This fact was acknowledged by Second Circuit Judge Richard J. Sullivan while still a trial judge in this District. See Kim v. Korea Trade Promotion-Investment Agency ("KOTRA"), 51 F.Supp.3d 279, 282 (S.D.N.Y. 2014) (plaintiff, a former marketing consultant, was asked to resign at age 60 "like most people in Korea do") (granting motion to dismiss all claims for lack of subject matter jurisdiction based on sovereign immunity).

integral part of the Federal Rules as a whole which are designed to secure the just, speedy and inexpensive determination of every action." Ibid.

In determining whether a factual dispute warranting trial exists, the court must view the record evidence and the summary judgment submissions in the light most favorable to the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Issues of material fact are those "that might affect the outcome of the suit under the governing law." Id. at 248. An issue is genuine when it is "triable," that is, when reasonable minds could disagree on the result. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. at 587 (quoting Fed. R. Civ. P. 56(e)). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586 (citations omitted). A party may not defeat a motion for summary judgment unless it sets forth specific facts, in a form that "would be admissible in evidence," establishing the existence of a genuine issue of material fact for trial. Fed. R. Civ. P. 56(e) (providing that in response to a summary judgment motion the "adverse party may not rest upon the mere allegations or denials of [its] pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial"). If the non-moving party's evidence is a mere scintilla or is not "significantly probative," the court may grant summary judgment. Liberty Lobby, 477 U.S. at 249–50. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita, 475 U.S. at 587 (internal quotation omitted).

9

The facts and law here demonstrate there is no triable issue of fact and, therefore, summary judgment should issue in favor of the Mission.

**B.  APPLICABLE LAW – the Foreign Sovereign Immunities Act**

"Subject to existing international agreements to which the United States is a party at the time of enactment of [the FSIA,] a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607[2] of this chapter." 28 U.S.C. § 1604. Congress permitted a very limited exception for actual commercial activity conducted by a foreign sovereign that is not applicable here:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
> * * *
> (2) in which the action is <u>based upon a commercial activity carried on in the United States by the foreign state</u>; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2) (emphasis added). Plaintiff pleads several isolated occurrences of chauffeuring diplomats, Mission staff, family, and guests to locations alleged to be for non-diplomatic purposes. However, Plaintiff fails to recognize that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." <u>Rukoro v. Federal Rep. of Germany</u>, 976 F.3d 218, 226 (2d Cir. 2020) (quoting 28 U.S.C. § 1603(d)), <u>cert. denied sub nom. Rukoro v. Germany</u>, --- U.S. ---, No. 20-1454, 2021 WL 2301990 (U.S. June 7, 2021). To maneuver into the commercial exception, the Complaint absurdly alleges, in effect, that the Mission was running a taxi service with Plaintiff as its cabbie. <u>See e.g.</u>, Compl., ¶ 34. Case law makes clear that the

---

[2] 28 U.S.C. § 1607 concerns counterclaims asserted against the foreign state and is not applicable here.

Mission and its diplomats comported themselves in a conventional, generally accepted practice of such envoys' use of a dedicated driver. Nowhere is it alleged that the Mission charged its passengers a fare for transportation ancillary to the Mission's consular functions.

Significantly, the FSIA's drafters, in its "Definitions" section, went out of their way to heighten the standard for showing an exemption from FSIA protections by defining not only the term "commercial activity" but specifically "commercial activity carried on in the United States by a foreign state" (the standard set forth under 28 U.S.C. § 1605(a)(2)) which they define as "commercial activity carried on by [a foreign] state and having substantial contact with the United States.'" 28 U.S.C. § 1603(e) (emphasis added); see also 28 U.S.C. § 1603(d) (separately defining "a 'commercial activity'").

### C. U.S. Courts Lack Personal and Subject-Matter Jurisdiction

The sole basis for jurisdiction over any foreign state in the federal or state courts of the United States is the FSIA. See Harrison v. Republic of Sudan, 838 F.3d 86, 94 (2d Cir. 2016) (citing Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989)). Indeed, instrumentalities of the ROK such as the Mission are "'presumptively immune from the jurisdiction of United States courts' unless one of the [FSIA]'s express exceptions to sovereign immunity applies." OBB Personenverkehr AG v. Sachs, 577 U.S. 27, 31 (2015) (emphasis added) (quoting Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993)).

It is important to note that Nam, like other Mission personnel, worked under South Korean employment rules and guidelines, with which the Mission asserts it adopts and complies. DSMF, ¶¶ 32-41. Imposition of the domestic labor law of a host country would, of course, seriously

infringe upon and impair the normal diplomatic balance honored by member states.[3] Defendant respectfully postulates that the United States would understandably object were the ROK to override American norms of civil service by ousting embassy personnel in Seoul once they reached sixty years of age "like most people in Korea do." See KOTRA, 51 F.Supp.3d at 282; see, e.g., Figueroa v. Ministry for Foreign Affairs of Sweden, 222 F.Supp.3d 304, 312 (S.D.N.Y. 2016) (Koeltl, J.) ("assessment of an employee's status as a civil servant . . . should focus on the contemporary norms associated with civil service in the sovereign country at issue") (citing Kato v. Ishihara, 360 F.3d 106, 112 (2d Cir. 2004)[4]); see also 14 Charles Alan Wright et al., Federal Practice and Procedure § 3662, at 393 (2d ed. 1985) (the FSIA was "not[ ] intended to alter either diplomatic or consular immunity"). No evidence emerged in discovery to the effect that similar missions and consulates routinely utilize, for instance, Lyft® or Uber® to transport diplomatic and high-level officials by way of "contemporary norms".

Nevertheless, Plaintiff is not without recourse for his grievances. Plaintiff's claims, if any, can – and should – be brought in the ROK, the proper forum for any alleged remedy owed him from that foreign, sovereign state.

i.     **The Mission and Diplomats Are Entitled to, and Have Not Waived, Immunity**

Again, the FSIA provides that "foreign state[s] shall be immune from the jurisdiction of the courts of the United States and of the States[.]" 28 U.S.C. § 1604 (emphasis added). "A 'foreign state' […] includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a).

---

[3] "Indeed, it is hard to imagine a purer embodiment of a foreign state than that state's permanent mission to the United Nations." Gray v. Permanent Mission of People's Rep. of Congo to U.N., 443 F.Supp. 816, 820 (S.D.N.Y.), aff'd, 580 F.2d 1044 (2d Cir. 1978).

[4] Kato holds that in this Circuit, "the category of 'civil service' should be interpreted to include the broad range of civil service employment relationships used by countries other than the United States." Ibid. (emphasis added).

The FSIA further defines an "agency or instrumentality of a foreign state" as any entity:

    (1) which is a separate legal person, corporate or otherwise, and

    (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

    (3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (e) of this title,[5] nor created under the laws of any third country.

28 U.S.C. § 1603(b). Here, the Mission is a 1) separate legal entity, which 2) is an organ/political subdivision of a foreign state (ROK), and 3) is not a citizen of a State of the United States nor created under the laws of a third country. It is undisputed and indisputable that the Mission is an instrumentality of the ROK. DSMF, ¶ 1.

Therefore, the Mission is accorded sovereign immunity, unless it waived such immunity or falls into one of the narrow exceptions provided by the FSIA. Plaintiff does not and cannot establish that the Mission waived its sovereign immunity. See generally, Compl. Neither the ROK nor its Mission waived or implied a waiver of sovereign immunity by the customary diplomatic practice of hiring a national or resident in the host country (who is familiar with the locale and conversant in the native language) to transport diplomatic staff and their families safely to their activities.

    **ii.**    **Defendant DOES NOT Meet the Criteria for Exception under the FSIA**

    **a.**    **Plaintiff's Duties Did Not Involve any "Commercial Activity"**

Plaintiff seeks to squeeze within FSIA's commercial activity exception by irrelevant, sometimes, scurrilous allegations of driving officials, their family members, and colleagues to

---

[5] These concern citizenship of corporations and insurers and the inclusion of the U.S. Territories, the District of Columbia, and the Commonwealth of Puerto Rico as "States". 28 U.S.C. §1332(c) and (e).

stores or restaurants, and being required to await their return.[6] But these alleged duties, even if true, do not amount to "commercial activities" because "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." Rukoro, 976 F.3d at 226 (quoting 28 U.S.C. § 1603(d)). Rukoro reiterated that "[c]ourts must 'zero[ ] in on the core of [the] suit: the . . . sovereign acts that actually injured [plaintiff]." Id. at 227 (citing Sachs, 577 U.S. at 28) (alterations in original). The Second Circuit in Pablo Star clarified the distinction:

> Whether an activity is deemed "commercial" under the FSIA depends on its "nature" rather than its "purpose," 28 U.S.C. § 1603(d), where "purpose" is "the reason why the foreign state engages in the activity" and "nature" is "the outward form of the conduct that the foreign state performs or agrees to perform,"

Pablo Star Ltd. v. Welsh Gov't, 961 F.3d 555, 564 (2d Cir. 2020) (quoting Nelson, 507 U.S. at 361), cert. denied, 141 S. Ct. 1069 (2021). Not inconsistent with the Pablo Star decision, this Court ruled in Hijazi by reiterating its ruling in Kato that "the focus of the inquiry ought to be the employer's general actions rather than the specific employment contract at issue." Hijazi v. Permanent Mission of Saudi Arabia to U.N., 689 F.Supp.2d 669, 674 (S.D.N.Y. 2010), aff'd, 403 F.App'x 631 (2d Cir. 2010) (citing Kato, 360 F.3d at 112).

Accordingly, the specific purpose or reasons Plaintiff argues he was caused to drive for the Mission – such as to shopping for groceries or gifts – are not the relevant issues here. Instead, the Court must look to the outward form of the relationship between Plaintiff and the Mission and its overarching motif. Indisputably, Plaintiff was employed as the designated chauffeur for the

---

[6] Even assuming Plaintiff's allegations of driving to stores and restaurants to be true, such duties were not per se for personal and non-diplomatic purposes. Ex. 3, 27:7- 28:9 ("Ministers have their own private vehicles... [T]he meetings and discussions with high level counterpart takes place not only outside, but also in the house. In such cases, in the preparation for such an important meeting, Mr. Nam was asked to purchase some gift for the counterpart Minister or he also did perform the task of shopping in case there is some meal preparation required for the purposes of foreign affairs... I've never heard of such personal use") (quoted subject to objections made during the deposition as to translation).

Ministers – high ranking governmental officials of ROK. His duties included driving a designated vehicle of the Mission, for the safety of the passengers – who were dignitaries of ROK and other U.N. member-states visiting as invitees of the Mission – and security of ROK's national secrets and classified information. DSMF, ¶¶ 54-68, 72-75. There is simply no rational way these can be construed as commercial activities.

Recently, the Honorable Paul Oetken, U.S.D.J. issued an unpublished opinion in Mourmouni, 2021 WL 4461829. Judge Nathan, while assigned to this action, heavily relied on the Mourmouni decision to deny, in part, Defendant's prior motion to dismiss. Judge Oetken, "as a general matter … disagree[d]" with the characterization that chauffeurs fall outside the category of the commercial exception. Id. at *2. He did note, however, that there are exceptions, such as the fact pattern in Figueroa, observing that the Figueroa chauffeur had responsibility for "chauffeuring the Swedish Ambassador and the Ambassador's family, Swedish diplomats and their families, and members of the Royal Family of Sweden", which sufficed to fall within that "exception." Id. at *3. In the decision Mourmouni distinguished, the Hon. John G. Koeltl, U.S.D.J., further explained:

> The defendants' employment of the plaintiff as a full-time chauffeur for the Mission entrusted the plaintiff with the safe transport of Swedish dignitaries, an activity integral to effecting the governmental function of the Mission. A sovereign's decision on how best to address the safety concerns of government officials are peculiarly sovereign because the failure to protect or safeguard a sovereign representative, such as an ambassador or a titular head of state, can have extremely adverse consequence for the sovereign nation.

and that "the activity to which the plaintiff's employment was directed is undoubtedly governmental." Figueroa, 222 F.Supp.3d at 313-15. Here, the Mission similarly entrusted Plaintiff with the safeguarding of ROK's dignitaries, as the "Mission" in Figueroa did to the plaintiff there. Moreover, the Mission further entrusted Plaintiff with its classified information and national

15

secrets relating to the national security of ROK, rendering his function even more sovereign in nature. The case at bar is a fact pattern virtually identical to that in <u>Figueroa</u>, minus the Royal Family and with additional concerns of national security.

Consistent with the highly classified and governmental nature of Plaintiff's employment at the Mission, the Minister personally conducted Plaintiff's interview and reviewed his file before deciding to employ him. <u>Id.</u>, ¶¶ 5-9. Plaintiff was also subject to additional policies and procedures, including the execution of his yearly Employment Contracts and Pledge Agreements and compliance with the terms thereof, and was thus granted high-level security clearance. <u>Id.</u>, ¶¶ 4-10. No other chauffeurs or drivers employed at the Mission were subject to any similar security clearance or requirement to sign additional agreements with similar provisions. <u>Id.</u>, ¶ 18. Notably, each agreement emphasizes the importance of information security:

> [Plaintiff] shall not disclose, during his employment and after the termination thereof, any classified information and facts acquired during his employment.

<u>Id.</u>, ¶ 20; and the Pledge Agreements further provide,

> I[, Plaintiff,] hereby acknowledge that knowledge of all matters that I will acquire in the course of performing my duties as a chauffeur at the Permanent Mission of the Republic of Korea to the United Nations is deemed nationally classified information of the Republic of Korea, and I shall not divulge it to anyone.

<u>Id.</u>, ¶ 11. Plaintiff admits this:

> Q.     **In fact, during the course of employment at the Mission you're not allowed to tell anyone where the [M]inisters went, who the [M]inisters met and what they discussed in the car or outside of the car, correct?**
> A.     Correct**.**
> [….]
> Q.     **And you're not supposed to divulge any information that you learned or acquired during the course of your employment to anyone because this is a secret, correct?**
> A.     Correct.
> Q.     **And classified information, correct?**

16

A.    Correct.

Ex. 2 (Transcript of deposition of Plaintiff), 50:4-9; 61:4-10.

Only with such pledges to maintain secrecy and abide by the security guidelines was Plaintiff granted a pass to enter the vicinity of the U.N. building in Manhattan each year[7] during the "high-level week" during which the head of each U.N. member-states gathered. Additionally, Plaintiff was entrusted with chauffeuring <u>ROK's national security advisor</u> and <u>the secretary to the U.N.'s Secretary General</u> (as guests of the Mission)—a task any Uber or Lyft driver could not perform for obvious security reasons, and the content of the discussions exchanged between such individuals and the Ministers is considered highly classified information. <u>Id.</u>, ¶¶ 61-69.

The rules and laws applied to and governed Plaintiff's employment are also indicative of its governmental nature. Throughout Plaintiff's tenure his schedules, employment conditions, and benefits, including the amount of stipend he received, calculation of severance pay, and other benefits, were entirely governed and dictated by the laws of South Korea as applicable to its public servants. <u>Id.</u>, ¶¶ 32-36. In case of a breach of confidentiality, Plaintiff even <u>agreed</u> to be subject to punishment under the laws of the ROK. <u>Id.</u>, ¶ 38. Tellingly, even Plaintiff's counsel argued that ROK's law on overtime applied in this matter. <u>Id.</u>, ¶ 33.[8]

While the purpose of every single trip Plaintiff made while employed at the Missions is not necessarily relevant, the overall and overarching goal of Plaintiff's employment is demonstrative

---

[7] With the exception of 2020, because the high-level week was canceled due to the COVID-19 pandemic.
[8] Q (by Plaintiff's counsel): In 2017, there was some change from South Korean law regarding working hours called capped 52 hours that applies to all organization in Korea?
….
Mr. Lim (Defense counsel): What do you mean by organization?
Mr. Bae (Plaintiff's counsel): Whether government or private entity. Missions shouldn't be applied (sic) at 52 hours. That's the reason why 52 hours capped.
Mr. Lim: There are exceptions, you know that, right? That law doesn't apply.
Mr. Bae: <u>But here it applies.</u>
Ex. 3, 76:8-20 (emphasis added).

by the governmental functions he served as a public servant of the ROK. His duties involved not only driving to a destination as a cab driver would, but also (1) maintaining the secrecy of information to which he had access – a matter that cannot be entrusted to an ordinary taxi or ride-share driver or foreign (from the perspective of ROK) nationals, (2) ensuring the safety of the Minister, his family, acquaintances, and other U.N. states' counterparts, as well as (3) performing "diplomatic protocol", "Uei-Jeon" in the native Korean language, which amounts to more than simply following a guideline. Id., ¶¶ 72-76.

Plaintiff's secret-keeping obligation lies at the core of the parties' relationship and relates directly to the trust that ROK had placed in its citizen to serve its national interest, as reinforced by Plaintiff's contractual obligation to do so. Id., ¶ 23. Plaintiff's duty to perform the "diplomatic protocol" is also a governmental function that Plaintiff was required to observe. As explained above, the connotation of this historically and culturally significant Korean term gets lost in translation but is expansively defined to encompass the manners or the decorum standardized in the Korean culture that any high-level officials of the Korean government visiting the United States would expect and appreciate, as well as the practices and behaviors that are the "norm" in the conservative and traditional "government" or "official" settings when interacting with foreign dignitaries. See id., ¶ 78.

Safety concerns were another major aspect of Plaintiff's duties. Any significant injury sustained by a dignitary of ROK in the United States would surely make headlines in all the major Korean newspapers. Worse yet, any casualty to a foreign official while visiting the Mission and while traveling in the Mission's vehicle may lead to an international incident. Before being offered such a critical post, Plaintiff was screened for his employment, family, and educational background through background check for security clearance and interviewed by the Minister himself to ensure

that he was a discreet and safe driver, and able to follow the Mission's security guidelines and protocols. Id., ¶¶ 4-17. To prevent any tampering, Plaintiff was assigned a designated vehicle solely for the Minister, and no other drivers at the Mission chauffeured the Minister or his guests; additionally, Plaintiff routinely inspected the said vehicle to ensure it was in good and safe condition. Id., ¶¶ 54-56, 73.

The U.S. District Court has held a sovereign's decision as to how best to protect its diplomats, dignitaries, and their family and guests are peculiar to sovereignty. See Figueroa, 222 F.Supp.3d at 315; see also Butters v. Vance Int'l, Inc., 225 F.3d 462, 465 (4th Cir. 2000). Its decision as to how best to protect its secrets and classified information, too, comfortably fall within the sovereignty's power to police its own interests that "has long been understood for the purposes of [the commercial activity exception] as peculiarly sovereign in nature." Nelson, 507 U.S. at 361.

For all the foregoing reasons, Defendant respectfully submits that the Court should find that the commercial activities exception does not apply to the Mission and, accordingly, that the Court lacks personal and subject matter jurisdiction over the Mission.

**b.  Comparison With and Distinction From Precedents Involving Chauffeurs**

1.  Figueroa v. Ministry of Foreign Affairs of Sweden (2016)

As discussed above, Figueroa is a case involving a fact pattern substantively identical to this matter. The matter before the court in Figueroa was a motion to dismiss pursuant to FRCP 12(b)(1), but the facts are clear. In both Figueroa and this matter, defendants are instrumentalities of a foreign sovereign state. Figueroa, 222 F.Supp.3d at 308; DSMF ¶ 1. The plaintiffs in both matters were hired as chauffeurs. Ibid.; DSMF ¶ 3.

In his capacity as a chauffeur, the Figueroa plaintiff transported the Swedish Ambassador and the Ambassador's family, Swedish diplomats and their families, and the Royal Family of Sweden. Id. at 315. He was entrusted with the safe transport of Swedish dignitaries. Here, Plaintiff

19

transported the South Korean Minister and the Minister's family, as well as other high-level government officials of ROK, such as the national security advisor to the president of ROK, as well as other high-ranking officers of the United Nations, such as the secretary to the secretary general of the U.N., while visiting the Mission. DSMF ¶¶ 66-69. The Mission likewise entrusted Plaintiff with the safe transport of the ROK's (and also other U.N. member nations') dignitaries.

In fact, Figueroa represents a lower standard than the facts at bar, as the plaintiff there was hired as an "Office Clerk" as well as a chauffeur. Figueroa, 222 F.Supp.3d at 308. Moreover, the grounds for the Figueroa plaintiff's claims involve, in part, his injuries sustained while assembling wardrobes purchased from IKEA®, with no relevance to his duties as a chauffeur. Id. at 309. Notwithstanding facts diverting the plaintiff's duties away from governmental tasks, the Figueroa court analyzed and focused on that plaintiff's governmental duties – chauffeuring the dignitaries – and ruled "[a] sovereign's decision on how best to address the safety concerns of government officials are peculiarly sovereign," finding no FSIA exception applies to the Swedish Mission. Id. at 315. The Figueroa court added that the plaintiff's "transportation responsibilities at the Mission were sufficiently intertwined with the diplomatic functions of the Mission such that the employment itself was part of the defendants' sovereign function." Ibid. Still further, Figueroa gave weight, "while not outcome determinative, [to] the existence of a Swedish statutory scheme for the [Swedish Mission]'s employees . . . in support of the conclusion that the plaintiff's employment [as an office clerk/chauffeur] was intertwined with the governmental function of the [Swedish Mission]." Id. at 316 (citation omitted).[9]

Here, Defendant presents additional undisputed facts to further support that Plaintiff's employment was indeed governmental in nature. First, as the Figueroa court made clear, the

---

[9] The Figueroa court did find a limited waiver under a separate tolling and confidentiality agreement between the parties, because a "tolling agreement is plainly not the product of an act peculiar to a sovereign." Id. at 317.

Mission's decisions on how best to address the safety concerns of its Minister, his family, and his diplomatic contacts are sovereign matters and undoubtedly governmental. Second, the Mission's decisions on how best to secure its national secrets and classified information, whether by hiring a South Korean national or by implementing multiple layers of security measures including the detailed background check by the ROK government prior to hire for security clearance and demand of a polygraph test by way of a pledge agreement, are also peculiar to a sovereign and undoubtably governmental. Third, the Mission assigned to Plaintiff the tasks of "diplomatic protocol" which, even more so than his chauffeuring duties are clearly governmental in nature. Lastly, the Mission complies with the diplomatic employment bylaws and guidelines referenced that the ROK's Ministry of Foreign Affairs promulgates and enforces (see e.g., Ex. 31, internal exhibit A). In view of the foregoing, Defendant respectfully submits the Court's ruling in this matter should be consistent with Figueroa and find no "commercial activity" exception under the FSIA applies here.

### 2.   Crum v. Kingdom of Saudi Arabia (2005)

Crum is an unpublished decision from the Eastern District of Virginia, cited in Figueroa as "an essentially identical case," wherein the court declined jurisdiction over a claim against the Saudi Arabian Embassy by its limousine driver. Crum v. Kingdom of Saudi Arabia, 2005 WL 3752271 (E.D. Va. Jul. 13, 2005). Though this unreported opinion is non-binding, it is persuasive, and its reasoning is consistent with that in Figueroa.

In reaching its decision, the Crum court relies upon another decision from the Fourth Circuit, Butters v. Vance International, involving a security agent's claim that the Saudi Arabian government's decision to hire her was a commercial activity. The Butters court found the "relevant act" to be the "foreign sovereign's decision as to how best to secure the safety of its leaders" and further found it to be "quintessentially an act 'peculiar to sovereigns'" 225 F.3d at 465. In turn, the Crum court ruled, simply and clearly: "being employed as a chauffeur for the Saudi Arabian

21

Embassy does not constitute a 'commercial activity.'" <u>Crum</u>, 2005 WL 3752271 at \*3 (quoting 28 U.S.C. § 1605(a)(2)) (noting an employment decision directed at security is "not a commercial act in which the state was acting in the manner of a private player within the market," and therefore could not trigger the FSIA's commercial activity exception.") (quoting <u>Butters</u>, 225 F.3d at 465) (internal quotation omitted).

Further consistent with the rulings in <u>Butters</u>, <u>Crum</u>, and <u>Figueroa</u>, the sole fact that the Mission entrusted Plaintiff with safeguarding the security of the Ministers and their families, their acquaintances, and their visitors and guests, alone suffices to exempt the Mission from the "commercial activity" exception under the FSIA.

### 3.  <u>Bardales v. Consulate General of Peru in New York (2020)</u>

<u>Bardales</u> also involves a fact pattern similar to that of <u>Figueroa</u> and the instant matter. <u>Bardales v. Consulate General of Peru in New York</u>, 490 F.Supp.3d 696 (S.D.N.Y 2020). As was the case in <u>Figueroa</u>, the plaintiff in <u>Bardales</u> spent the majority of his time chauffeuring a high-ranking diplomat, the Consul General of Peru – though arguably a "lower" position than the Ambassador in <u>Figueroa</u>. <u>Id.</u> at 699. Also similar to the within matter, the <u>Bardales</u> plaintiff alleged he spent some time chauffeuring the Consul General for personal matters, as Plaintiff alleges he has done for ROK's Ministers' family and other acquaintances. <u>Id.</u> at 704.

Simply stated, <u>Bardales</u> relied on <u>Kato</u> and its progeny in focusing on the "bigger picture," ruling "there is no basis to segregate the portions of the plaintiff's employment that could be characterized as purely clerical … because the commercial activity jurisdictional assessment must be made with reference to the plaintiff's course of conduct with the defendants <u>as a whole</u>." <u>Ibid.</u> (emphasis added) (citing <u>Figueroa</u>, 222 F.Supp.3d at 315). The <u>Bardales</u> court, in fact, analyzed the list of "personal" matters proffered as evidence; finding that plaintiff:

> worked a total of 380 days during [his employment]. On 324 of those days, Bardales drove to exclusively official destinations. On only 56 days did Bardales drive to destinations that were arguably personal.

Ibid. (internal citations to records omitted). That is about 17% of the Bardales plaintiff's workdays allegedly involving the Consul General's personal matters, which the Bardales Court found negligible. During discovery in this instant case, in support of his claim, Plaintiff produced what appears to be a "summary" of his personal "diary" recording his alleged driving for the Ministers' personal matters. See Ex. 33, 20:4-30:5. This purported "summary" shows he drove for the Ministers' "personal" matters 144 days[10] out of the five-year employment (approximately 1,200 days excluding holidays and weekends). Assuming *arguendo* his allegations are correct--which is not, the amount of time he allegedly spent driving for the Ministers' personal matters is only 12%, which the Court should likewise find to be negligible in determining whether Plaintiff's duties were governmental and non-commercial in nature. Given the *de minimis* percentage, it is clear that Defendant is not subject to the "commercial activities" exception under the FSIA.

### 4. Mourmouni v. Permanent Mission of Republic of South Sudan to the United Nations (2021)

Lastly, Mourmouni is the most recent case involving a chauffeur claiming inclusion under the "commercial activity" exception under the FSIA. Mourmouni, 2021 WL 4461829. As explained above, Judge Nathan heavily relied on this unpublished opinion in denying, in part, Defendant's FRCP 12(b)(1) and (6) motion to dismiss. While Defendant respectfully disagrees

---

[10] This is the number of days appearing on Plaintiff's purported summary of his "diary," discussed during the deposition of the Second Secretary of the Mission. See Ex. 33, 20:4-30:5. Both the diary and the purported summary have been designated as confidential because they contain what is deemed the ROK's national secret and/or classified information. Accordingly, there are not submitted herewith.

with Judge Oetken's significant deviation from the holdings of <u>Figueroa</u> and its progeny, <u>Mourmouni</u> is certainly distinguishable from the case at bar.[11]

Importantly, the <u>Figueroa</u>-line of cases involve chauffeurs for the Ambassador (<u>Figueroa</u>), the Consul General (<u>Bardales</u>), or other facts sufficient for the court to hold that the chauffeur-plaintiffs were involved in the safety of the diplomats (<u>Crum</u> and <u>Butters</u>), which are regarded as "undoubtedly governmental" and matters "peculiar to sovereigns." <u>See</u> <u>Figueroa</u>, 222 F.Supp.3d at 315; <u>see</u> <u>also</u> <u>Bardales</u>, 490 F.Supp.3d at 701. No such facts are present in the <u>Mourmouni</u> decision. <u>See</u> <u>generally</u>, <u>Mourmouni</u>, 2021 WL 4461829. Judge Oetken notes this distinction as well – describing <u>Figueroa</u> as an "exception"[12] – and concedes that <u>Figueroa</u> "may have been" correctly decided. <u>Id.</u> at *3. It is most respectfully submitted that the decision in <u>Mourmouni</u> is an outlier and/or confined to its unique and dissimilar facts.

Here, the "exceptional facts" exist that would group this matter with <u>Figueroa</u> even under the more expansive application of the "commercial activities" exception under <u>Mourmouni</u>. These facts substantially parallel those of <u>Figueroa</u> and, to the extent Plaintiff was not required to chauffeur the Royal Family as Mr. Figueroa was, Plaintiff's duties to maintain the ROK's national secrets and classified information, and further, his additional duties to perform the "diplomatic protocol", compensates for the same. As such, the Court should find that the "commercial activities" exception under the FSIA does not apply, even under <u>Mourmouni's</u> most liberal standard of applying said exception.

As detailed above, all precedents are consistent in their analysis that the employment of a chauffeur having the duties assigned to Plaintiff is governmental in nature. As such, Defendant

---

[11] Defendant maintains that the Court must adopt the more restrictive reading of the FSIA's commercial activity exception consistent with the holdings in <u>Figueroa</u> and <u>Bardales</u>, both published opinions, as opposed to the holding in <u>Mourmouni</u>, an unpublished opinion.
[12] Judge Oetken expressly notes that <u>Bardales</u> "lack its exceptional facts."

respectfully requests that the Court find Defendant is immune from suit in the United States to the extent it relates to Plaintiff's employment at the Mission and dismiss this action in its entirety.

### iii. Plaintiff's Employment Lacks "Substantial Contact" with the United States

The FSIA exception applies in a specific manner where the action is based upon a "commercial activity carried on in the United States by the foreign state[,]" 28 U.S.C. § 1605(a)(2), a term specifically defined in § 1603(e). It is insufficient to merely allege "commercial activity"; a plaintiff must also meet the heightened standard that such activity had "substantial contact with the United States." Id. § 1603(e) (emphasis added). "The exact contours of this standard are 'poorly defined.'" Ex. 38, Opin. (Nathan, J) (citing Pablo Star, 961 F.3d at 564) but "it is clear that Congress intended a tighter nexus than the 'minimum contacts' standard for due process." Pablo Star, 961 F.3d at 565 (citing Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1019 (2d Cir. 1991)).

Here, Plaintiff cannot present any facts showing "substantial contact with the United States" because, frankly, there are none. Plaintiff's employment related solely to chauffeuring for the Ministers and their families and guests and did not involve any acts that would otherwise have any impact on the United States. For instance, Plaintiff's security-related duties could have been performed in a foreign land, whether it be South Korea or otherwise. The factors obviating the application of the commercial activity exception against the Mission, including the concerns for physical safety and information security, also do not amount to a "substantial contact with the United States." Plaintiff was responsible for the safeguarding of the diplomats of the ROK and to maintain the secrecy of ROK's classified information; these acts, at most, maintain the status quo and integrity of ROK's governmental infrastructure.

In contrast, in Pablo Star the Second Circuit found the Welsh Government did have the required substantial contact with the United States, and reasonably so. Id. at 566. There, the Welsh Government distributed copyrighted photographs and contacted private businesses to assist in the

same. Id. at 565. The Welsh Government provided an exhibition for display in American venues, and moreover, it was necessary that such acts be done within the United States. Id. at 566. The Pablo Star court further noted that the Welsh Government's conduct "reached beyond the confines of its consular office."

Here, concededly, Plaintiff's duties did take place outside the confines of the Korean embassy but were confined to designated official vehicles that only Plaintiff drove. DSMF ¶ 56. Moreover, Plaintiff's responsibility had no connection to the locale of its performance; as Plaintiff admits, he "just drove when [he] was asked to drive." Ex. 2, 94:2-3. There are no acts or transactions involving other U.S. private businesses or distribution of any information that affects the United States.[13] In fact, Plaintiff was specifically required not to disseminate any information, whether in the United States or elsewhere. DSMF ¶¶ 10-27. Plaintiff was even required to inform the Mission if he marries a non-ROK national, so the Mission may limit Plaintiff's duties if it decided necessary to. Id., ¶ 28.

Though not relevant to Plaintiff's employment duties and the nature thereof, Plaintiff alleges Defendant's use of "www.heykorean.com" for posting "help wanted" notices constitute a commercial activity. Ex. 1, ¶¶ 30-33. But this too does not rise to the level of "substantial contact" with the United States. The Mission's online presence had no connection with the United States, except to cause Plaintiff and perhaps other applicants to visit the Korean Embassy for an interview. If using an online portal would be deemed "substantial contact" with the U.S., a simple search on Google® would too be deemed one and that would simply read the "substantial contact" language out of the statute.

---

[13] Plaintiff does allege that he drove his passengers to car dealers, malls, and markets, but any transactions involved therein are the transactions between the Minister and/or his family member, not relevant to Plaintiff's chauffeuring.

Plaintiff fails to establish that Defendant engaged in any commercial activity with respect to Plaintiff's employment let alone that his duties had any "substantial contact" with the United States. For all the foregoing reasons, Defendant respectfully requests that the Court dismiss this action in its entirety for lack of personal and subject matter jurisdiction.

**D. <u>Plaintiff's Claims Have Been Settled</u>**

Prior to initiating this action, Plaintiff already released all claims, including his claims under the NYLL, NYCHRL, and NYSHRL by signing a settlement agreement with the Mission in return for his employment being extended through June 2021. The law on this issue is well-settled. "Agreements that purportedly release employers from liability for claims arising under the New York Labor Law overtime requirements are generally valid and enforceable [...] Courts have repeatedly upheld the validity of broadly-worded releases with respect to claims brought pursuant to New York employment statutes." <u>Hummel v. AstraZeneca LP</u>, 575 F.Supp. 2d 568, 570 (S.D.N.Y. 2008) (citing <u>Simel v. JP Morgan Chase</u>, 05-cv-9750, 2007 WL 809689, at *4-5 (S.D.N.Y. Mar. 19, 2007); <u>Difilippo v. Barclays Capital, Inc.</u>, 552 F.Supp. 2d 417, 426 (S.D.N.Y. 2008); <u>Dewey v. PTT Telecom Netherlands, US, Inc.</u>, 94-cv-5983, 1995 WL 542447, at *2-3 (S.D.N.Y. Sept. 12, 1995); <u>Skluth v. United Merchs. & Mfrs., Inc.</u>, 559 N.Y.S.2d 280, 281-82 (1st Dept. 1990); <u>Volk v. Liggett Group Inc.</u>, 96-cv-1921, 1997 WL 107458, at *4-6 (S.D.N.Y. Mar. 11, 1997); <u>but</u> <u>see</u> <u>Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.</u>, 354 F.Supp.2d 293, 298 (S.D.N.Y. 2004) (refusing to enforce a non-specific release that failed to identify any particular universe of claims)).

"To establish the existence of an enforceable agreement, [the proponent] must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound (22 N.Y. Jur.2d, <u>Contracts</u> § 9). That meeting of the minds must include agreement on all essential terms (<u>Id.</u> at § 31)". <u>Kowalchuk v. Stroup</u>, 61 A.D.3d 118, 121 (App. Div. 1st Dept. 2009) (parenthetical

in original). "[T]he consideration for a bilateral contract […] in which promises are exchanged [ ] consists of the acts mutually promised" Id. at 125 (citing Moers v. Moers, 229 N.Y. 294, 301 (1920) (internal citation to 1 Williston on Contracts, § 103(f)).

Here, Plaintiff acknowledges that he signed such a valid and enforceable contract for the release of the claims brought herein. DSMF ¶ 45. Pursuant to the ROK's rules and regulations, "[t]he retirement age is 60." Id. ¶ 39. According to their terms, Plaintiff should have retired in June of 2020, but he pleaded with the Mission for an extension, citing the extraordinary circumstances of the global pandemic, which the Mission granted– but could do so only after obtaining the additional special approval of the government of ROK. Id. ¶¶ 43-44. However, such extension was conditioned on the Plaintiff's signing a settlement agreement including a release of his claims relating to his employment and more particularly the extended termination date of the same. Id. ¶¶ 45-46. By presenting the release and promising to extend his employment through June 2021, Defendant made an offer; by signing, Plaintiff accepted that offer. The consideration here includes the release and the extension of Plaintiff's employment beyond Korea's normal retirement age. Importantly, the parties specifically agreed that Plaintiff will release his claims concerning his employment. A translation of the release, originally written in Korean is as follows:

> The above two sides execute this agreement because they have agreed not to assert civil and criminal claims in the future with respect to the termination of the employment relationship of the local employee (Hyun-Hee Nam) as of June 30, 2021

Id. ¶¶ 46, 82. [14] Regardless of the emotional and financial circumstances Plaintiff alleges experiencing, Plaintiff did assent to be bound by the terms of this release. The parties have a valid

---

[14] As explained in the foregoing sections of this memorandum, this release form, too, is pursuant to the laws and regulations of the ROK, and Defendant has no discretion or authority to modify the same.

28

and enforceable contract for Plaintiff's release of claims asserted in this action, independent of Defendant's immunity.

The language of the release is permissibly broad, and certainly covers claims relating to Plaintiff's employment and the termination thereof. Hence, Plaintiff's release of his claims under the NYLL, NYSHRL, and NYCHRL is valid and enforceable in favor of Defendant.

Plaintiff's only avenue for invalidating this agreement would arise under contract law. "Courts applying New York law will enforce valid releases that are clear and unambiguous on their face and which were knowingly and voluntarily entered into and were not 'the product of fraud, duress, or undue influence.'" Hummel, 575 F.Supp.2d at 570 (citing Skluth, 559 N.Y.S.2d at 282; Laramee v. Jewish Guild for the Blind, 72 F.Supp.2d 357, 359 (S.D.N.Y.1999)). This is inapplicable here. Plaintiff alleges no facts that plausibly infer any circumstances amounting to "fraud, duress, or undue influence" but, rather the opposite; Plaintiff acknowledges that he knowingly and voluntarily, and upon giving painstaking and due consideration of his foreseeable circumstances, agreed to and did sign the release.

By Plaintiff's own admission, he duly released Defendant from his employment-related claims - if any – in return for the extension of his employment until June 2021, to which he would otherwise not have been entitled. Hence, his claims under the New York Labor Law, New York State Human Rights Law, and New York City Human Rights Law must all be dismissed with prejudice.

Notwithstanding the foregoing settled law and the absence of sufficient, plausible facts alleged in Plaintiff's favor, Judge Nathan denied Defendant's FRCP 12(b)(6) motion to dismiss based on this settlement agreement, narrowly construing the language thereof. Defendant respectfully resubmits to the Court that the language of the settlement agreement is sufficiently

and permissibly broad to cover Plaintiff's wage-related and discrimination-related claims as a matter of law. At the very minimum, however, Plaintiff's discrimination-related claims were released, as the settlement agreement specifically notes that he agreed "not to assert civil … claims in the future with respect to the termination of the employment relationship[.]" DSMF ¶ 83.

For the foregoing reason, in addition to or as an alternative to Defendant's immunity under the FSIA, Defendant respectfully submits Plaintiff's claims must be dismissed in their entirety for accord and satisfaction.

V.    **CONCLUSION**

For the foregoing reasons, it is respectfully requested the Court grant Defendant's motion for summary judgment and dismiss each of the claims asserted in the Complaint.

Respectfully submitted,

Dated: July 28, 2022                     _/s/ Joshua S. Lim_____
                                         Joshua S. Lim, Esq.
                                         **Kim, Cho & Lim, LLC**
                                         460 Bergen Boulevard, Suite 305
                                         Palisades Park, New Jersey 07650
                                         T: 201-585-7400
                                         F: 201-585-7422
                                         joshualim@kcllawfirm.com
                                         *Attorneys for Defendant*

30