UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HYUNHUY NAM,

                                    Plaintiff,

                    -against-

PERMANENT MISSION OF THE REPUBLIC OF
KOREA TO THE UNITED NATIONS,

                                    Defendant.

---

21-cv-06165 (JLR)

**<u>OPINION & ORDER</u>**

JENNIFER L. ROCHON, United States District Judge:

Plaintiff Hyunhuy Nam ("Plaintiff or "Nam") brings this suit against his former employer, the Permanent Mission of the Republic of Korea to the United Nations ("Permanent Mission," the "Mission," or "Defendant"), alleging various employment law claims.  ECF Nos. 1, 11 ("Compl.").  The Permanent Mission moves for summary judgment claiming it is immune from jurisdiction pursuant to the Foreign Sovereign Immunities Act ("FSIA") as an instrumentality of the Republic of Korea and because Plaintiff released Defendant from any employment claims.  *See generally* ECF No. 78-1 ("Def. SJ Mot.").[1]  Plaintiff opposes the motion and cross moves for partial summary judgment on some of his claims; namely, he seeks judgment against Defendant as a matter of law for failure to pay appropriate overtime wages under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"); for failure to pay spread of hours premiums under NYLL; and for failure to provide accurate wage notices and wage statements under NYLL.  *See generally* ECF No. 79-1 ("Pl. SJ Mot.").[2]  He also

---

[1] Defendant's summary judgment motion is filed at ECF No. 78, but the Court refers to the substantial arguments made in the Memorandum of Law attached at ECF No. 78-1.

[2] Plaintiff's summary judgment motion is filed at ECF No. 79, but the Court refers to the substantial arguments made in the Memorandum of Law attached at ECF No. 79-1.

seeks liquidated damages, prejudgment interest, and attorneys' fees and costs. *Id.* For the

reasons stated below, the Court DENIES Defendant's motion for summary judgment and

GRANTS in part and DENIES in part Plaintiff's motion for partial summary judgment.

## I.  **BACKGROUND**

### A.  FACTUAL BACKGROUND

For purposes of the parties' motions for summary judgment, the facts will be taken

from the Rule 56.1 statements and the underlying evidentiary record presented.  Local Civil

Rule 56.1 requires that a party submitting a motion for summary judgment include a statement

of numbered paragraphs "of the material facts as to which the moving party contends there is

no genuine issue to be tried."  Local Civil Rule 56.1(a).  The opposing party shall include with

their opposition papers a statement responding to each paragraph and including additional

material facts.  *Id.* at 56.1(b).  Each numbered paragraph of material facts will "be deemed to

be admitted for purposes of the motion" unless the opposing party "controvert[s] the

statement."  *Id.* at 56.1(c).  Both parties must cite to admissible evidence to support their

statements of material fact or their statements controverting any statement of material fact.  *Id.*

at 56.1(d).  "The local rule does not absolve the party seeking summary judgment of the burden

of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is

not itself a vehicle for making factual assertions that are otherwise unsupported in the record."

*Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001); *see also id.* at 73 ("[W]here there

are no[] citations or where the cited materials do not support the factual assertions in the

Statements, the Court is free to disregard the assertion." (internal quotation marks and citation

omitted)).

Plaintiff's Rule 56.1 Statement of Material Facts does not comply with Local Rule

56.1's requirement that each statement be "followed by [a] citation to evidence which would be

admissible." Rule 56.1(d).  The Court will not disregard Plaintiff's Rule 56.1 statement in total, but will only consider facts that are not followed by a citation to evidence for the purposes of the motion if there is evidentiary support for the fact in the record elsewhere.  *See Holtz*, 258 F.3d at 73 (citation omitted) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.").

Plaintiff has also submitted two sworn declarations in opposition to Defendant's motion for summary judgment and in support of Plaintiff's partial motion for summary judgment.  *See* ECF Nos. 79-3, 87-2.  Defendant argues that Plaintiff's declarations, which are in English, should be disregarded because Plaintiff, a "ROK [Republic of Korea] national" and non-native English speaker who used an interpreter at his deposition, did not provide sufficient documentation to establish that he understood what he was signing.  ECF No. 91 ("Def. Reply") at 5-6.  In the case of non-native English speakers, it is a declarant's obligation to "submit documents sufficient to establish that [the declarant] understood what he was signing." *Mendez v. MCSS Rest. Corp*., 564 F. Supp. 3d 195, 210 (E.D.N.Y. 2021) (quoting *Heredia v. Americare, Inc*., No. 17-cv-06219 (RWL), 2020 WL 3961618, at *4 (S.D.N.Y. July 13, 2020)).

The Court will consider the declarations.  Plaintiff's declaration dated July 28, 2022 expressly states "under the penalty of perjury" that Plaintiff "read[s] and understand[s] English" and that the "above [declaration] is true and correct to the best of [his] knowledge." ECF No. 79-3 ("Nam's July 28, 2022 Decl."), at 4.  The record also contains further evidence that Plaintiff understands English, even if there are some limitations.  *See* ECF No. 78-5 ("Pl. Depo. Tr.") at 6:1-3; 17:18-24 ("Q: Do you speak some English?; A: Just enough to get by as a truck driver.; Q: Would you say that your English is a conversational level?; A: Well, I wouldn't say perfect, however, I am able to take job instructions.").  Further confirming Plaintiff's English language abilities, Plaintiff notes that the Permanent Mission's posting for

3

Plaintiff's role "required English-Korean bilingual skill."  Nam's July 28, 2022 Decl. ¶ 5.  The fact that the plaintiff was more comfortable with an interpreter during a fast-paced and stressful deposition does not mean that he was unable to write, read, and understand a declaration that he could spend time reviewing.

This is unlike the cases relied upon by Defendant, where there was no indication that the declarants could read and understand English.  *See Mendez*, 564 F. Supp. 3d at 210 (rejecting declarations of declarants who were not "fluent in English" because they did not submit documents sufficient to show that the declarants knew what they were signing); *Heredia*, 2020 WL 3961618, at *3 (noting that contested declarations stated that the declarants' first language is Spanish and that they "do not speak English"); *Sicom S.P.A. v. TRS Inc*., 168 F. Supp. 3d 698, 709-10 (S.D.N.Y. 2016) (evaluating whether declarant submitted documents "sufficient to establish that he understood what he was signing" assuming that declarant does not "speak or read English").

Given Plaintiff's attestation under penalty of perjury that he reads and understands English and his verification of the truth of the declarations, the Court will consider his July 28, 2022 and August 29, 2022 Declarations.  ECF No. 79-3; ECF 87-2 ("Nam's August 29, 2022 Decl.").

## 1.  The Parties

Plaintiff Hyunhuy Nam is a 61-year-old citizen of the Republic of Korea ("ROK" or "South Korea"), who presently lives in New Jersey as a permanent resident of the United States.  ECF No. 80 ("Def. Rule 56.1 Statement") ¶ 2; ECF No. 79-5 ("Pl. Rule 56.1 Statement") ¶ 1.  Defendant, the Permanent Mission, is an instrumentality of a sovereign state, operating as a foreign consulate located in Manhattan.  Def. Rule 56.1 Statement ¶ 1; Pl. Rule 56.1 Statement ¶ 2.

### 2.  Hiring

 Plaintiff responded to Defendant's online job advertisement seeking a chauffeur on the website "Hey Korean" and was hired in December 2016.  Pl. Rule 56.1 Statement ¶ 3; Def. Rule 56.1 Statement ¶ 3; Nam's July 28, 2022 Decl. ¶ 5.  As part of Plaintiff's hiring process, the Minister of the Permanent Mission interviewed Plaintiff "to ensure that Plaintiff [was] a safe and reliable driver."  Def. Rule 56.1 Statement ¶¶ 4-6.  Defendant required Plaintiff to submit to "additional procedures for necessary security clearance" including a "detailed background check" in both the United States and South Korea.  *Id.* ¶¶ 4, 7-8.  The Minister personally made the decision to hire Plaintiff.  *Id.* ¶ 9.

Defendant required Plaintiff to sign a "pledge agreement" each year certifying that Plaintiff would not "divulge" "knowledge of all matters that [he] will acquire" as that information would be designated "nationally classified information."  *Id.* ¶¶ 10-11.  Under the agreement, Plaintiff also agreed to submit to a polygraph test if necessary.  *Id.* ¶ 16.  Plaintiff, who can read and understand Korean, was provided this Korean-language pledge agreement annually for five years and signed "knowingly, voluntarily, and without coercion."  *Id.* ¶¶ 12-13, 15.  Plaintiff does not dispute this but alleges that he signed the agreement without reading it.  ECF No. 87-3 ("Pl. Rule 56.1 Counter Statement") ¶ 15.  Plaintiff retained these agreements and "knew" that the agreements were "critically important to his performing his job."  *Id.* ¶¶ 14, 17 (internal quotations omitted).

### 3.  Employment Agreements

Plaintiff also signed yearly employment contracts that were provided in Korean.  Def. Rule 56.1 Statement ¶¶ 19-21.  Plaintiff does not dispute that he signed the contracts but again alleges that he signed them without reading them.  Pl. Rule 56.1 Counter Statement ¶ 21.

Defendant states, and Plaintiff does not dispute, that "[t]he form of the parties' employment contract is a form provided by the Korean government." *Id.* ¶ 50.

The employment agreements contain a provision in which Plaintiff agrees not to disclose "any classified information and facts acquired during his employment." *Id.* ¶ 20. Plaintiff retained these contracts which contained his signature. *Id.* ¶ 22. The employment agreements contained four benchmarks to measure Plaintiff's performance: (1) diligence; (2) responsibility; (3) "ability to perform his job"; and (4) "ability to keep matters secret – top secret." *Id.* ¶ 25.

As a condition of employment, Plaintiff agreed not to disclose the Ministers' movements, individuals with whom the Ministers had meetings, or any overheard conversations. *Id.* ¶ 24. Each agreement contained the requirement of secrecy regarding classified information. *Id.* ¶ 27. Any "[f]ailure to abide by the security guidelines" could result in the termination of Plaintiff's employment. *Id.* ¶ 26 (citations omitted). A breach of the confidentiality clause would also subject Plaintiff "to punishment under the laws of the Republic of Korea." *Id.* ¶ 38.

Plaintiff agreed, pursuant to the employment agreement, to inform Defendant of any changes in his identification status, such as marriage to a foreign national. *Id.* ¶ 28. Plaintiff also agreed "not [to] engage in any act of any kind which may be contrary to the national interest of the Republic of Korea," an agreement Plaintiff believes he upheld. *Id.* ¶¶ 29-30 (citations omitted). Plaintiff believes he "help[ed] the national interest" through his employment at the Mission. *Id.* ¶ 31 (citation omitted).

### 4. Job Duties

While there is some dispute over Plaintiff's job title, it is undisputed that Plaintiff was "non-diplomatic staff" and worked only as a chauffeur for the Mission. ECF No. 78-6 ("Jo

Depo. Tr. Excerpt 1") 46:21-47:2; Pl. Rule 56.1 Statement ¶ 5.[3]  He drove an official car, a 2015 Hyundai Genesis, that was only for his use.  Def. Rule 56.1 Statement ¶¶ 55-56.  Safety was an important concern for Plaintiff as a driver and he "sometimes checked inside his designated vehicle to make sure the car was in good condition."  *Id.* ¶¶ 72-73 (internal quotation omitted).

Initially, Defendant provided Plaintiff with a phone to use at work and covered the cost. Nam's Aug. 29, 2022 Decl. ¶ 9.  However, in either May or June 2018 Defendant stopped providing Nam with a business phone and told him he was not eligible to have the cost of his phone fees compensated.  *Id.*  ¶ 10.  Nam was told that it was a violation of policy for the Mission to provide a phone to a "non-diplomatic employee" or for the Mission to pay for his phone bill.  *Id.*  Nam subsequently asked another Minister for a work phone and was denied. *Id.*; *see* ECF No. 86-3 ("Jo Depo. Tr. Excerpt 2") at 50:20-25.

Plaintiff was an assigned driver for all the Ministers of the Permanent Mission.  Def. Rule 56.1 Statement ¶¶ 53-54.  Ministers "are categorized as high-level officials of the Southern Korean government" who are "very important" and whose work requires high-level security clearance.  *Id.* ¶¶ 58-60.  Any individuals with whom the Ministers meet, and the discussions of those meetings, are considered "top secret or classified information under South Korean law."  *Id.* ¶ 61.  Plaintiff, through his job, learned the routes, destinations, and whereabouts of the Ministers – "top secret and/or classified information" "relevant to [the

---

[3] Plaintiff states that his title was "Chauffeur/Administrative Assistant," but does not provide any evidentiary support, citing only to his complaint.  Pl. Rule 56.1 Statement ¶ 5 (citing to Compl. ¶ 37).  Defendant disputes that this was Plaintiff's title but does not provide contrary evidence.  ECF No. 86-1 ("Def. Rule 56.1 Counter Statement") ¶ 5. Regardless of the title, neither party asserts that Plaintiff performed "administrative assistant" duties; rather Defendant states that it "does not dispute that Plaintiff was hired as a chauffeur and performed his duties as a chauffeur[.]"  *Id.*

Ministers'] safety and other security issues." *Id.* ¶¶ 62-66.  Plaintiff claims that he did not

receive advanced notice of the events, the nature of the events, or the routes until he was asked

to drive to them.  *See* Pl. Depo. Tr., 89:24-90:2.  Plaintiff states that he "just drove when [he]

was asked to drive." *Id.* at 94:2-3.[4]  On at least one occasion Plaintiff drove the U.N.

Secretary General.  Def. Rule 56.1 Statement ¶ 67.[5]

Defendant describes Plaintiff's role as part of a "team" with the Ministers and

counselors "in matters concerning political affairs" in which Plaintiff's role was to support the

Minister.  Def. Rule 56.1 Statement ¶¶ 51-52.  Plaintiff agrees with this statement, but insists

that "his work was limited to the task of driving."  Pl. Rule 56.1 Counter Statement ¶¶ 51-52.

Plaintiff states that even during "high level weeks," an international event when United

Nations member states convene in New York, Def. Rule 56.1 Statement ¶ 77, Plaintiff was not

pre-informed and only received information such as his route and schedule via a call from a

minister the same day.  Pl. Rule 56.1 Counter Statement ¶¶ 63-65.

Plaintiff claims that he was also responsible for driving other members of the

Permanent Mission staff, their families, and guests.  Pl. Rule 56.1 Statement ¶ 4.  *But see* Def.

Rule 56.1 Counter Statement ¶ 4; *see* Def. SJ Mot. at 6-7.  Plaintiff states that his duties

---

[4] Plaintiff's objections that he was not aware of route or location information before he
undertook each drive are nonresponsive to Defendant's 56.1 statements that Plaintiff learned
classified information in the course of his job. Pl. Rule 56.1 Counter Statement ¶¶ 62-66.  Even
if the information was not shared with Plaintiff in advance, the individuals with whom the
Ministers met, where they traveled, and what they discussed could still retain classified status
at the point they were shared with Plaintiff and Plaintiff does not dispute that.  Accordingly,
these facts are deemed admitted.  *See Hartley v. Rubio*, 785 F. Supp. 2d 165, 171 n.1 (S.D.N.Y.
2011) ("[W]e reject as insufficient . . . conclusory or non-responsive objections . . . .").

[5] Plaintiff disputes this statement but his objection is non-responsive; it is also contradicted by
his deposition testimony.  Def. SJ Mot., ECF No. 78-5, Ex. 2 (Pl. Dep. Tr.), 83:13-15; *see
Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not
create an issue of fact by submitting an affidavit in opposition to a summary judgment motion
that, by omission or addition, contradicts the affiant's previous deposition testimony.").

required him to drive ministers, family members, and friends to personal errands and engagements during and beyond normal working hours.  Nam's Aug. 29, 2022 Decl. ¶¶ 14-21, 23-34.[6]

### 5. Wage and Hour Information

Plaintiff was at all times paid in cash.  Def. Rule 56.1 Counter Statement ¶ 22.  Plaintiff contends that he worked 52 to 62 hours per week and received $5,020.00 to $6,055.00 per month in cash.  Nam's July 28, 2022 Decl. ¶ 12.

Plaintiff's annual employment contracts provide Plaintiff's compensation rates which included "monthly regular wages," "a housing subsidy," and a "medical insurance subsidy." *See generally id.*  Plaintiff's contracts also provide for a "yearly bonus" and a "long-term service allowance" of $50 per year of service.  *See* ECF Nos. 78-20 through 78-33 ("2016-2021 Employment Contracts and Translations").[7]  The contracts also set forth Plaintiff's regular hours of 9:00 A.M. to 6:00 P.M., his "off schedule" hourly rates, along with a cap on his monthly "off schedule" hours.  *See id.*; Nam's July 28, 2022 Decl. ¶ 8.  Defendant does not dispute that these are Plaintiff's annual contracts.  Def. Rule 56.1 Counter Statement ¶¶ 11-15.

Despite the use of the term "off schedule" instead of "overtime" in the contracts, Plaintiff contends that the 2016 contract set forth an "overtime" wage of $12 per hour on weekdays and $15 per hour on weekends, and provided a monthly limit of $570 for "overtime

---

[6]  Defendant disputes this testimony claiming that Plaintiff did not support these claims with evidence when he put forward these arguments in his initial motion. Def. Rule 56.1 Counter Statement ¶ 4.  Plaintiff thereafter submitted a declaration that Defendant argues should not be considered.  Def. Reply 5-6.  Since the Court will consider Plaintiff's two declarations, *see supra* at 3-4, the aforementioned facts are uncontested since Defendant has not proffered any evidence to refute that Plaintiff performed personal services for the Ministers, their families, and friends.

[7]  In the 2020 and the 2021 contracts, the "long term service allowance" is not provided.  ECF Nos. 78-31, 78-33.

compensation." Pl. Rule 56.1 Statement ¶ 11. Plaintiff likewise states that his 2017 and 2018 contracts used a formula to determine his "overtime wages," and set a limit of 52 "overtime" hours per month. *Id.* ¶¶ 12-13. Finally, Plaintiff claims that the 2019 and 2020 contracts had an hourly "overtime wage" of $14.76 and $13.29, respectively, with the same 52 hours per month maximum. *Id.* ¶¶ 14-15.

Plaintiff submitted time records labeled "Overtime Verification Ledger" that purportedly show that he was not paid for "overtime" given that his contracts had the aforementioned caps. ECF No. 79-15, Ex. I ("Translated Selection of Hourly Records"); Pl. Rule 56.1 Statement ¶¶ 16-19. Defendant disputes this characterization of the evidence, claiming that Plaintiff incorrectly translated the Korean term in the time records as "overtime" when the term means "off schedule." Def. Rule 56.1 Counter Statement ¶¶ 11-18. Plaintiff does not dispute Defendant's translation but maintains that the time records include the hours that he worked and therefore necessarily show the overtime worked. ECF No. 93 ("Pl. Rule 56.1 Second Counter Statement") at ¶ 86.

### 6. Termination

Consistent with the internal policy of the South Korean Ministry of Foreign Affairs, Defendant informed Plaintiff that he must retire when he reached 60 years old pursuant to the mandatory retirement policy. Def. Rule 56.1 Statement ¶ 41. After Plaintiff's wife lost her job during the COVID-19 pandemic, Plaintiff requested an extension of his employment contract beyond South Korea's retirement age of 60. *Id.* ¶¶ 42-43. After receiving approval from the South Korean government, Defendant extended Plaintiff's employment contract until age 61. *Id.* ¶¶ 43-44. As a condition of the job extension, Plaintiff signed a settlement agreement with the Defendant. *Id.* ¶ 45. The parties agreed as follows:

> The above two sides execute this agreement because they have
> agreed not to assert civil and criminal claims in the future with
> respect to the termination of the employment relationship of the
> local employee (Hyun-Hee Nam) as of June 30, 2021.

*Id.* ¶ 46.

Plaintiff claims he was asked to sign "Down Contracts" accepting 20% reductions in his pay toward the end of his tenure. Nam's August 29, 2022 Decl. ¶¶ 38, 40. Plaintiff asserts that a minister and a counselor thereafter pressured him to resign, and Plaintiff was ultimately terminated on June 30, 2021. *Id.* ¶ 44.

## B. PROCEDURAL BACKGROUND

Plaintiff filed this lawsuit on July 20, 2021 against the Permanent Mission and now-dismissed individual defendants Hyun Cho, Jinho Jo, and Daeyong Chung. *See* ECF Nos. 1, 11. Plaintiff brings nine causes of action. In Count I, Plaintiff brings a claim under the Fair Labor Standards Act ("FLSA") for failure to pay overtime in violation of 29 U.S.C. § 207(a), and failure to keep requisite records in violation of 29 U.S.C. § 211(c). Counts II to V allege various claims under the New York Labor Law ("NYLL") for failure to pay wages weekly, unpaid overtime, unpaid spread of hours pay, and failure to provide wage notices and statements. Count VI alleges age discrimination and Count VII alleges a hostile work environment, both in violation of the New York State Human Rights Law ("NYSHRL"). Finally, Counts VIII and IX allege age discrimination and a hostile work environment in violation of the New York City Human Rights Law ("NYCHRL").

Defendants filed a motion to dismiss the entire action for lack of jurisdiction on September 30, 2021. ECF No. 24. The Court granted the motion in part and denied the motion in part. Individual Defendants Cho, Jo, and Chung were dismissed from the action, but the Court held that the commercial activity exception to sovereign immunity applied to the Permanent Mission and refused to dismiss the claims against it. ECF No. 61.

At the conclusion of discovery, the Permanent Mission filed a motion for summary judgment on July 28, 2022, asserting that it is entitled to judgment as a matter of law because it is immune from suit under the FSIA and because Plaintiff released Defendant from all employment related claims.  ECF No. 78.  Plaintiff filed a cross motion for partial summary judgment against Defendant for failure to pay appropriate overtime wages under the FLSA and NYLL; failure to pay spread of hours premiums under the NYLL; and failure to provide accurate wage notices and wage statements under the NYLL.  ECF No. 79.   Plaintiff does not move for summary judgment on his claims for age discrimination and hostile work environment under the NYSHRL and the NYCHRL.  *Id.*  The parties subsequently filed opposition briefs and replies.  *See* ECF No. 86 ("Def. Opp."); ECF No. 87 ("Pl. Opp."); ECF No. 91 ("Def. Reply"); ECF No. 92 ("Pl. Reply").  The case was reassigned to the undersigned on September 22, 2022.  The Court requested supplemental briefs on damages which were filed on January 13, 2023 (ECF No. 97, "Pl. Damages Br.") and February 3, 2023 (ECF No. 102, "Def. Damages Br.").

## II. <u>SUMMARY JUDGMENT STANDARD</u>

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  "Credibility assessments, choices between conflicting versions of the events, and the

weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "As to materiality, the substantive law will identify which facts are material." *Id.* "In determining whether there are genuine issues of material fact, [the Court is] required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotations and citations omitted).

## III. FOREIGN SOVEREIGN IMMUNITIES ACT

### A. LEGAL STANDARD

Courts in the United States have only one basis for exercising subject matter jurisdiction over a foreign state: the Foreign Sovereign Immunities Act (FSIA). *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). Specifically, 28 U.S.C. § 1604 bars courts from exercising jurisdiction over foreign states unless an enumerated exception in 28 U.S.C. § 1330 applies. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) ("[A] foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies . . . ."). If an exception applies, the FSIA affirmatively provides both personal and subject matter jurisdiction over foreign states. 28 U.S.C. § 1330(a)-(b); *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983) (citing the FSIA and clarifying that both personal and subject matter jurisdiction "turn on application of the substantive provisions of the Act"). "Sections 1604 and 1330(a) work in tandem: § 1604 bars federal and state courts from exercising jurisdiction when a foreign state *is* entitled to immunity, and § 1330(a) confers jurisdiction on district courts to hear suits brought

by United States citizens and by aliens when a foreign state is *not* entitled to immunity."

*Argentine Republic*, 488 U.S. at 434 (emphasis in original).

A defendant who wishes to invoke immunity under the FSIA must "present[] a prima facie case that it is a foreign sovereign[.]"  *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993) (internal citation omitted).  Then, "the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted, . . . although the ultimate burden of persuasion remains with the alleged foreign sovereign."  *Id.* (internal citation omitted).

Under the FSIA's so-called "commercial activity" exception, courts may exercise jurisdiction over foreign sovereigns in three contexts related to "commercial activity," specifically:

> [1] in which the action is based upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act, the commercial character of [which] shall be determined by reference to its 'nature,' rather than its 'purpose.'"  *Nelson*, 507 U.S. at 355-56 (citing 28 U.S.C. § 1603(d)).  Courts must set aside the purpose or "the reason why the foreign state engages in the activity," and look to the "nature" or "the outward form of the conduct that the foreign state performs or agrees to perform."  *Id.*

To determine whether jurisdiction exists under the commercial activity exception of the FSIA, the first step is to identify "the particular conduct on which [the foreign sovereign's]

action is based . . ."  and determine "whether the particular actions that the foreign state

performs (whatever the motive behind them) are the type of actions by which a private party

engages in 'trade and traffic or commerce.'"  *Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555,

560-61 (2d Cir. 2020*) (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614

(1992)).  For example:

> a foreign government's issuance of regulations limiting foreign
> currency exchange is a sovereign activity, because such
> authoritative control of commerce cannot be exercised by a private
> party; whereas a contract to buy army boots or even bullets is a
> "commercial" activity, because private companies can similarly
> use sales contracts to acquire goods.

*Weltover, Inc.*, 504 U.S. at 614-15 (ruling commercial activity exception applies under FSIA

when Argentina issued bonds to pay off debt like a private commercial actor).  The legislative

history notes that commercial activity includes "employment or engagement of laborers,

clerical staff or public relations or marketing agents . . . ."  H. R. Rep. No. 94-1487, at 16

(1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6615.  In contrast, non-commercial employment

includes "diplomatic, civil service, or military personnel . . . ."  *Id.*

     The Act further defines a "commercial activity carried on in the United States by a

foreign state" as commercial activity "carried on" by the foreign state and having a "substantial

contact with the United States."  28 U.S.C. § 1603(e).  "Exactly what constitutes 'substantial

contact' for purposes of the FSIA is poorly defined."  *Pablo Star Ltd.*, 961 F.3d at 565.

Congress has allowed courts to "define the contours" of what constitutes "substantial contact,"

"[h]owever, it is clear that Congress intended a tighter nexus than the 'minimum contacts'

standard for due process."  *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1019 (2d Cir. 1991).

**B. DISCUSSION**

Defendant moves for summary judgment on the grounds that this Court does not have jurisdiction pursuant to the FSIA. Def. SJ Mot. at 11-31; Def. Damages Br. at 4-6. Recognizing that the Court held otherwise at the motion to dismiss stage, Defendant contends that the now-established factual record shows that the commercial activity exception does not apply and Defendant is immune from suit. Def. SJ Mot. at 13-19. Alternatively, Defendant argues that the Court should dismiss the case because Plaintiff signed a settlement agreement with the Permanent Mission in which he waived his employment related legal claims in exchange for an extension of his employment contract beyond South Korea's mandatory retirement age. *Id.* at 27-30. Plaintiff opposes this motion.

**1. The Prior Motion to Dismiss**

Defendant argued previously that it is immune from suit under the FSIA in its earlier motion to dismiss. ECF No. 24 ("Mot. to Dismiss") at 11-18. The Court denied Defendant's motion and held that Plaintiff demonstrated that his employment as a chauffeur satisfied the FSIA's commercial activity exception. The Court found that Defendant's employment of Plaintiff as a dedicated driver for the Mission did not demonstrate a "power[ ] peculiar to sovereigns." *Nam v. Permanent Mission of Republic of Korea to United Nations*, 581 F. Supp. 3d 643, 648 (S.D.N.Y. 2022) (quoting *Nelson*, 507 U.S. at 360). Relying on *Pablo Star*, the Court noted that every aspect of the Permanent Mission's conduct in employing a chauffeur could have been done by a private party for commercial gain. *Id.* The Court also explained that "[t]he employment of a chauffeur is more analogous to the employment of 'laborers, [or] clerical staff'—which constitute commercial activity—than the employment of 'diplomatic, civil service, or military personnel'—which is quintessentially governmental." *Id.* (quoting *Kato v. Ishihara*, 360 F.3d 106, 110 (2d Cir. 2004)).

16

At that stage, too, Defendant disputed that Plaintiff performed personal errands or trips for the staff and their family. *Id.* The Court held that even assuming that Nam's chauffeur services were limited to official business of the Permanent Mission, it *"does not place this employer-employee relationship outside the commercial-activity exception."* *Id.*

The Court found persuasive *Mourmouni v. Permanent Mission of Republic of S. Sudan to U.N.*, No. 20-cv-3603 (JPO), 2021 WL 4461829, at *2 (S.D.N.Y. Sept. 28, 2021), a district court case "with virtually identical facts and claims." *Nam*, 581 F. Supp. 3d at 648-49. In *Mourmouni*, as in the case at hand, chauffeurs for a permanent mission alleged violations of the FLSA and the NYLL against the mission. *Mourmouni*, 2021 WL 4461829, at *1. The *Mourmouni* court held that the commercial activity exception applied and the mission was not immune from suit because the plaintiff's work was not "quintessentially governmental." *Id*. at *2. The *Mourmouni* court held that plaintiff's chauffeur work of "driving the Permanent Mission staff and their families, delivering packages, and maintaining the Permanent Mission's vehicles" "could be and in fact regularly is, performed by private-sector businesses," pointing to corporations who employ car services and in-house chauffeurs. *Id.* at *2-3 (internal quotation marks and citations omitted). Therefore, the *Mourmouni* court held, even though this work for the mission is important, there is "no basis for granting a foreign state immunity." *Id*. at *3.

In the decision on the motion to dismiss, this Court recognized that earlier district court decisions in this district had reached different conclusions but declined to follow them because they were distinguishable and/or issued prior to *Pablo Star*. *Nam*, 581 F. Supp. 3d at 649. For example, the Court found *Figueroa v. Ministry of Foreign Affs. of Swed.*, 222 F. Supp. 3d 304 (S.D.N.Y. 2016) was distinguishable because the plaintiff in *Figueroa* was responsible for driving members of Sweden's royal family but "more importantly" because the court in

17

*Figueroa* did not have the benefit of the Second Circuit's ruling in *Pablo Star*. *Id.* at 649.  This Court reasoned that *Pablo Star* held that in examining the commercial activity exception, courts must look to the activity's "outward form" as opposed to the "purpose of the sovereign's activity." *Id.* (quoting *Pablo Star*, 961 F.3d at 564-65).  The Court found that the *Figueroa* court impermissibly looked to the mission's "purpose" in employing the chauffeur – to ensure safe transport of Swedish dignitaries – rather than the "outward form" which was the employment of a driver. *Id.*  The Court analogized to the employment of a secretary, noting that even if the secretary was employed to further the mission of the foreign state, the commercial activity exception would still apply because the foreign sovereign is acting just as a private party would in employing a secretary. *Id.* (citing to *Zveiter v. Brazilian Nat. Superintendency of Merch. Marine*, 833 F. Supp. 1089, 1093 (S.D.N.Y. 1993)).

This Court further distinguished *Bardales v. Consulate Gen. of Peru in N.Y.*, 490 F. Supp. 3d 696 (S.D.N.Y. 2020) because in that case the chauffeur also provided non-clerical "consular services, and serv[ed] as a direct representative of the Consulate." *Nam*, 581 F. Supp. 3d at 649.  Specifically, the *Bardales* court noted that the plaintiff helped to process Peruvian national identity cards and passport applications, visited hospitals to obtain information about Peruvians being treated, and "attended public events and activities of the Consulate where he was expected to provide services to the public." 490 F. Supp. 3d at 703. In this case, the Court stressed that the pleadings stated that Nam provided only chauffeuring services. *Nam*, 581 F. Supp. 3d at 649.

Finally, the Court also determined that the conduct in question met the threshold for "substantial contact with the United States" necessary for the commercial activity exception. *Id.* at 650.  The Court held that "the hiring, employment, and termination of a driver over the

18

span of approximately five years in New York and New Jersey—[met] the standard for substantial contact." *Id.*

With respect to the settlement agreement, the Court denied Defendant's motion to dismiss because the text of the agreement barred only lawsuits based on Nam's termination, but did not preclude the present lawsuit that included issues about the terms of his employment such as his payment, hours, and a hostile work environment. *Id.*

### 2. The Factual Record on Summary Judgment Does Not Establish Immunity

Defendant now brings a summary judgment motion, arguing again that it is immune from suit under the FSIA based on the evidence that was developed during discovery. Given that the parties do not dispute that the Permanent Mission is a foreign sovereign, Plaintiff has the burden of providing evidence that immunity should not be granted under exceptions to the FSIA, but the "the ultimate burden of persuasion remains with the alleged foreign sovereign." *Cargill Int'l S.A.*, 991 F.2d at 1016. For purposes of summary judgment, the Court will draw all reasonable inferences against the Defendant and in favor of the Plaintiff. *See Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51, 54 (2d Cir. 2017); *Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean*, 667 F.2d 305, 314-15 (2d Cir. 1981).

Plaintiff argues that the commercial activity exception applies because he is a chauffeur who simply drives dignitaries to places when instructed. Pl. SJ Mot. at 10; Pl. Opp. at 11.[8] Defendant contends that the factual record now shows that the commercial activity exception

---

[8] In support of the commercial activity exception, Plaintiff also points to job responsibilities that he supposedly had beyond chauffeuring dignitaries, such as driving other members of the Permanent Mission staff, their families, and guests and performing personal errands and trips beyond normal working hours. Nam's Aug 29, 2022 Decl. ¶¶ 14-21, 23-34. While Defendant disputes this in its brief, it has not proffered any evidence to the contrary. *See supra* at n.6. However, regardless of whether Plaintiff performed personal tasks, the Court finds that the commercial exception applies. *See infra* at 20-26.

does not apply here because "Plaintiff's responsibilities and requisite qualifications

encompassed much more than that of any ordinary chauffeur . . . ."  Def. SJ Mot. at 2.

Defendant argues that Plaintiff's job also involved considerations of secrecy, security, and

diplomatic protocols, which do not pertain to private commercial actors, such that Plaintiff was

acting in a governmental capacity.  *Id*. at 8-10.

### a.  Background Checks and Exposure to Classified Information

Taking each of the supposed new factual considerations in turn, Defendant argues that

Plaintiff became privy to classified information and national secrets, such as where the

Ministers were being driven, with whom they met, and what was discussed in the car.  Def.

Rule 56.1 Statement ¶¶ 24, 27, 58-66.  Plaintiff agreed to keep that information confidential by

signing annual Pledge and Employment Agreements, exposing himself to punishment under

Korean law if he disclosed it.  *Id.* ¶¶ 10-11, 19-20.  Defendant submits that Plaintiff's hiring

process and employment agreements demonstrate how seriously the Permanent Mission sought

to protect the security interests of South Korea.  Def. SJ Mot. at 4-6.  For example, Permanent

Mission subjected Plaintiff to additional scrutiny during his hiring process, including

heightened background checks, and the Minister personally interviewed Plaintiff.  *Id.*  Only

upon satisfying these standards did Plaintiff become privy to "top secret and/or classified

information" such as the "routes, destinations, and whereabouts" of the Ministers Plaintiff

drove.  Def. Rule 56.1 Statement ¶¶ 62-66.

Background-checking employees and exposing them to confidential, and even

classified, information is not enough to convert employment that is fundamentally commercial

into non-commercial activity.  Many employees of a foreign sovereign, who are presumably

background-checked before they are hired – such as clerks or secretaries – may be privy to

confidential information; this alone does not mean that their employment is transformed into

"quintessentially governmental" work.  *See Zveiter*, 833 F. Supp. at 1093 ("The employment of a secretary is hardly within the unique sphere of sovereign authority."); *cf. Pablo Star*, 961 F.3d at 564 (holding there is nothing "quintessentially governmental" about using a photograph to advertise travel or tourism).  For example, in *Mohammad v. Gen. Consulate of State of Kuwait in L.A.*, 28 F.4th 980, 984 (9th Cir. 2022), the Ninth Circuit concluded that the commercial exception applied to an employee who worked for the Consulate of the State of Kuwait as a secretary.  In that case, while some confidential information was locked in a separate room, plaintiff was exposed to confidential information when she acted as a translator, prepared reports for transmission to the Kuwaiti government, and attended high-level meetings. *Id.* at 988.  Despite this exposure to confidential information, the Court looked to the plaintiff's typical duties and held that "[a] person hired for a clerical position does not become a diplomat or civil servant because the sovereign chooses to expose that person to confidential matters." *Id*.  Similarly, that Plaintiff here was exposed to confidential information and was expected not to disclose it does not mean that he was performing a governmental function as opposed to a commercial function.  Indeed, dedicated drivers and car services in the commercial realm may also learn of confidential information in the course of their driving that they are expected to keep confidential.

### b.  Safety

Defendant next points out that the commercial activity exception should not apply because Defendant was responsible for the safety and well-being of the Minister and other high-level officials of the Permanent Mission.  Def. SJ Mot. at 6-7, 18-19.  Plaintiff was issued a security pass during a "high-level week" at the U.N. that would allow him to drive around security barricades at the U.N. headquarters.  *Id.* at 6; Def. Rule 56.1 Statement ¶ 81.  Plaintiff also sometimes inspected the vehicle to ensure it was in good and safe condition.  Def. Rule

56.1 Statement ¶ 73.  Plaintiff drove high-profile individuals, including the U.N. Secretary General, and was responsible for their safety.  *Id.* ¶¶ 58-60, 67.  Defendant also claims that Plaintiff had to work with local law enforcement to maintain security protocols and participated in motorcades after receiving instructions.  *Id.* ¶¶ 69-71.  Defendant argues that a sovereign's decision as to how to best protect its diplomats and dignitaries is "peculiar to sovereignty."  Def. SJ Mot. at 19.  Plaintiff responds that he merely drove, even for "high-level week," and was not informed about the nature of events for which he drove, who he would be driving, and his routes and schedules until the Minister called him the same day.  Pl. Rule 56.1 Counter Statement ¶¶ 69-71, 75-76.

Even if Nam was required to abide by safety protocols and procedures and was responsible for the security of high-level dignitaries, this Court already held at the motion to dismiss stage that this argument conflates the purpose of employing Nam – to safely transport and protect the Minister and others in the Permanent Mission – with the conduct's outward form of employing a driver.  *Nam*, 581 F. Supp. 3d at 648.  As *Pablo Star* cautions, "a very broad characterization of the activity that forms the basis of the claim would tend to conflate the act with its purpose."  *Pablo Star Ltd.*, 961 F.3d at 562.  This Court has already held that hiring a driver is not quintessentially governmental conduct, *Nam*, 581 F. Supp. 3d at 648, and the fact that Nam was hired as a private driver in order to further the purpose of the Mission in protecting its dignitaries and their confidential whereabouts and conversations does not change that holding.  Defendant has presented no new facts that change the prior assessment of this Court that the conduct of hiring a chauffeur, even with the purpose of ensuring the safety and security of high-level officials, is conduct that is not commercial in nature.

### c. Diplomatic Protocol

Finally, Defendant argues that Plaintiff had to follow Korean diplomatic protocol, Uei-jeon, a culturally specific standard of etiquette and protocol when performing his driving duties.  Def. Rule 56.1 Statement ¶¶ 75-76; Def. SJ Mot. at 18.  As Defendant described it, Plaintiff was "responsible for ensuring his charges [the Ministers] were provided the most pleasant experience possible in conjunction with maintaining their security."  Def. SJ Mot. at 7. Plaintiff disputes Defendant's statement that in addition to driving, Plaintiff was assigned tasks involving the administration of "diplomatic protocol."  Pl. Rule 56.1 Counter Statement ¶ 75. Plaintiff asserts that his work was limited to driving and that he "just drove when [he] was asked to drive."  *Id.* ¶¶ 75-76.  However, Plaintiff admitted during his deposition that "when the minister attends international events, . . . [Plaintiff] had to comply with ceremonial orders or protocols that are required for each event[.]"  Pl. Depo. Tr. at 77:14-78:2.

Even assuming that Plaintiff abided by cultural protocols while performing chauffeur duties for high level officials, that is not sufficient to alter the commercial conduct of hiring a designated driver.  Chauffeurs or designated drivers for private entities are expected to provide a pleasant professional experience and may be asked to abide by etiquette and protocols established by commercial companies.  Just because the etiquette and protocols were designated by the governmental entity does not mean that the outward form of hiring a driver is non-commercial or quintessentially governmental in nature.  *Cf. Mukaddam v. Permanent Mission of Saudia Arabia to United Nations*, 111 F. Supp. 2d 457, 463, 466 (S.D.N.Y. 2000) (holding that commercial exception did not cover Mission's employment of plaintiff who wrote speeches for government officials, established a system for registering and responding to correspondence to and from the Mission, drafted correspondence and public statements, wrote memos, letters, faxes and reports to the Ministry of Foreign Affairs in Saudi Arabia, and spoke

with students concerning Saudi Arabia's public positions on international issues, because private parties enter contracts to perform research, writing, and clerical duties), *declined to follow on other grounds*, *Kato v. Ishihara & Tokyo Metro. Gov't*, 360 F. 3d 106, 113 (2d Cir. 2004) (declining to follow *Mukaddam* with regard to assessment of civil service status).

Finally, the Court is not persuaded by Defendant's argument that Plaintiff's employment was governmental in nature because he had duties that "no foreign sovereign would outsource to a ride-hailing or random taxi[.]" Def. Opp. at 7. That is not the test. The question is whether the Mission's full-time employment of a dedicated driver is activity that "can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." *Nelson*, 507 U.S. at 360 (internal quotation marks and citations omitted). Commercial entities can and do hire dedicated drivers – as opposed to hailing random taxis – to safely transport their high-level executives to events, expecting those individuals to keep information learned confidential and to employ etiquette and protocols that are appropriate for the particular destinations and events. *See Nam*, 581 F. Supp. 3d at 648 (noting that private sector businesses like car services and corporations regularly hire "in house executive chauffeurs") (quoting *Mourmouni*, 2021 WL 4461829, at *3).

### 3. Caselaw Cited by Defendant Is Distinguishable or Already Rejected by This Court

The cases upon which Defendant relies are either distinguishable or have already been rejected by this Court. First, Defendant relies extensively upon *Figueroa*, 222 F. Supp. 3d 304. Def. SJ Mot. at 19-20. Defendant states that the facts discussed above show that, as in *Figueroa*, plaintiff's role was "intertwined" with the defendant's sovereign function. Def. SJ Mot. at 20 (quoting *Figueroa*, 222 F. Supp. 3d at 315). This Court has already declined to follow *Figueroa* given the Second Circuit's subsequent decision in *Pablo Star*, *Nam*, 581 F. Supp. 3d at 649, and none of the facts relied upon by Defendant establish, per *Pablo Star*, that

24

the outward form of the conduct – the employment of a driver – is a governmental activity as opposed to a commercial activity.

Defendant next relies on *Crum v. Kingdom of Saudi Arabia*, No. 05-cv-275, 2005 WL 3752271 (E.D. Va. July 13, 2005).  Again, this Court has already declined to follow this out-of-circuit case because it does not account for *Pablo Star* and, just as with *Figueroa*, no evidence has been presented here that causes the Court to revisit that conclusion.  *Nam*, 581 F. Supp. 3d at 649 n.2.  Indeed, insofar as the *Crum* court ruled "simply and clearly" that being employed as a chauffeur for an embassy "does not constitute a 'commercial activity'" as Defendant argues, Def. SJ Mot. at 21-22 (citing *Crum*, 2005 WL 3752271, at *3), this Court rejected that premise as inconsistent with *Pablo Star*.  *Nam*, 581 F. Supp. 3d at 649.[9]

Defendant also argues that this Court should follow *Bardales v. Consulate Gen. of Peru in N.Y.*, 490 F. Supp. 3d 696 (S.D.N.Y. 2020).  Def. SJ Mot. at 22.  This Court has already distinguished *Bardales* because in *Bardales* the chauffeur had other consulate duties.  *Nam*, 581 F. Supp. 3d at 649.  It is undisputed here that, even after the factual record has been developed through discovery, Plaintiff was hired to be a chauffeur for the Mission.  *See supra* at n.3.  Given the standard set forth in *Pablo Star*, hiring a designated driver, even if the *purpose* is to keep the diplomats' information, location, and persons, safe, does not change the fact that the *conduct* of hiring a driver is a commercial activity and not a power peculiar to sovereigns.  Indeed, this Court has already held that "[to] the extent that *Bardales* concluded that chauffeuring itself is quintessentially governmental in nature, this Court disagrees, finding it inconsistent with *Pablo Star*."  *Id.*

---

[9] Similarly, *Butters v. Vance Int'l, Inc.*, 225 F.3d 462 (4th Cir. 2000), cited by Defendant, is from another circuit and is inconsistent with *Pablo Star* because the outward act of hiring a security guard is not a governmental function but is commonly conducted by commercial private entities, even if the purpose of the activity is to protect the governmental entity.

Finally, Defendant contends that *Mourmouni*, 2021 WL 4461829, is an "outlier," should not have been relied upon by the Court at the motion to dismiss stage (or now), and should be distinguished by this Court in favor of the "*Figueroa* line of cases."  Def. SJ Mot. at 24.  This Court declines to revisit its earlier assessment that *Pablo Star* dictates an evaluation of commercial activity more along the lines of *Mourmouni* than *Figueroa*.  *Nam*, 581 F. Supp. 3d at 648-49.

### 4.  Substantial Contact Analysis

The commercial activity exception also requires that the commercial activity has "substantial contact with the United States."  28 U.S.C. § 1603(3).  This Court already held that "hiring, employment and termination of a driver over the span of approximately five years in New York and New Jersey" meets the threshold for substantial conduct.  *Nam*, 581 F. Supp. 3d at 650.  Defendant has presented no facts that establish that Plaintiff was not hired, employed, and terminated by Defendant as a driver in the United States over several years, and therefore, there is no basis to revisit this holding.[10]

For all of these reasons, the Court finds that Defendant is not immune from suit under the FSIA because the commercial exception applies.

## IV. <u>THE SETTLEMENT AGREEMENT DOES NOT BAR ALL OF PLAINTIFF'S NEW YORK CLAIMS</u>

Defendant next claims that the settlement agreement between the parties is valid and enforceable and bars Plaintiff's employment claims under the NYLL, NYSHRL, and

---

[10] The Court further rejects Defendant's argument that Plaintiff's employment "did not involve any acts that would otherwise have any impact on the United States" and his "security-related duties could have been performed in a foreign land."  *See* Def. SJ Mot. at 25.  The question is not whether Plaintiff's job could have been performed elsewhere, but instead a court must look to where it was actually performed and whether that contact is of sufficient degree.  Defendant's maintenance of a commercial employment relationship with Plaintiff in the United States, for activities outside the consulate, and for a significant duration of time meets that

NYCHRL.  *See* Def. SJ Mot. 27-30.  Plaintiff does not contest that he signed the release (Pl. Rule 56.1 Counter Statement ¶ 45), or argue that it is unenforceable.  Instead, he contends that the release does not bar his claims because it covered claims related to his termination only, and his present claims are not related to his termination.  Pl. Opp. at 14-15.

The Court agrees with Plaintiff that the release covers only claims related to his termination.  The release plainly and unambiguously states that the parties "agreed not to assert civil and criminal claims in the future with respect to the termination of the employment relationship of the local employee (Hyun-Hee Nam) as of June 30, 2021."  Pl. Rule 56.1 Counter Statement ¶ 46.  Indeed, the Court previously considered the text of the settlement agreement with respect to the earlier motion to dismiss and found that the agreement was clear on its face and barred only lawsuits regarding Plaintiff's termination.  *Nam*, 581 F. Supp. 3d at 650.  Defendant does not contest on summary judgment that the release is clear and unambiguous but instead argues that it should be read more broadly to "cover[ ] claims relating to Plaintiff's employment and the termination thereof."  Def. SJ Mot at 29.  This Court has already interpreted the plain and unambiguous terms of the release as limited to claims related to termination and therefore the release does not bar Plaintiff's claims related to his employment at the Permanent Mission.  *See Kay-R Elec. Corp. v. Stone & Webster Const. Co.*,

---

threshold. *See, e.g.*, *Shapiro*, 930 F.2d at 1019 (holding that the use of negotiable promissory notes in the United States to raise capital was sufficient to establish substantial connection); *Everard Findlay Consulting, LLC v. Republic of Suriname*, 831 F. App'x 599, 601-02 (2d Cir. 2020) (finding substantial connection when "key contractual negotiations [allegedly] occurred in New York, many aspects of the contract were performed in New York, Suriname paid under the contract by wiring U.S. dollars to U.S. bank accounts, and the contract targeted the U.S. travel market").

*Inc.*, 23 F. 3d 55, 58-59 (2d Cir. 1994) (applying plain and unambiguous terms of a release in the context of summary judgment).[11]

## V.  FAIR LABOR STANDARDS ACT AND NEW YORK LABOR LAW

Having held that Defendant is not immune from suit, nor released from claims, the Court next turns to Plaintiff's motion.  Plaintiff seeks partial summary judgment on a subset of his claims: that the Permanent Mission failed to pay Nam overtime under the FLSA and NYLL; that the Permanent Mission failed to pay spread of hours premiums under the NYLL; and that the Permanent Mission violated NYLL law in failing to provide paystubs and wage notices.  Pl. SJ Mot. 13-17.  Plaintiff also requests prejudgment interest and attorneys' fees and costs.  *Id.* 17-18.

### A.  LEGAL STANDARD FOR UNPAID OVERTIME CLAIMS UNDER THE FLSA AND NYLL

Under the FLSA, employers are required to pay employees "at a rate not less than 1 ½ times [their] regular hourly wage" for all of the hours that they work "in excess of 40 hours per week."  *Christensen v. Harris Cnty.*, 529 U.S. 576, 578-79 (2000) (citing 29 U.S.C. § 207(a)(1)).  An employee "must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011).  The NYLL requires overtime pay that is consistent with the FLSA.  *See* 12 N.Y.C.R.R. § 142–2.2 ("An employer shall pay an employee for overtime . . . in the manner and methods provided in and subject to the exemptions of [the FLSA].");  *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*,

---

[11] As Plaintiff disavows any claims related to his termination, Pl. Opp. at 14, insofar as Count VI of the Complaint seeks damages for "terminat[ion] . . . in violation of the NYSHRL" (Compl. ¶ 155), that portion of the claim is barred by the release.

723 F.3d 192, 200 (2d Cir. 2013) (describing the NYLL as "incorporating" the FLSA definition of overtime).

"[W]hat is required of an employee to discharge this burden will depend to an extent on whether her employer met their recordkeeping obligations . . . ."  *Chichinadze v. BG Bar Inc.*, 517 F. Supp. 3d 240, 252 (S.D.N.Y. 2021).  Under the FLSA, employers must keep records of "the wages, hours, and other conditions and practices of employment" of their employees. 29 U.S.C. § 211(c) (requiring every employer to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him"); *Chichinadze*, 517 F. Supp. 3d at 252 (citing to the same). New York State maintains similar record keeping requirements for employers.  *See* NYLL § 661 (requiring employers to establish and maintain payroll records "showing for each week worked the hours worked, the rate or rates of pay and basis thereof"); *Berrios v. Nicholas Zito Racing Stable, Inc.*, 849 F. Supp. 2d 372, 379 (E.D.N.Y. 2012) (citing the same).  The "duty . . . to maintain accurate records of its employees' hours is non-delegable."  *Kuebel*, 643 F.3d at 363.

In the context of a summary judgment motion under the FLSA, "if an employer's records are inaccurate or inadequate, an employee need only present 'sufficient evidence to show the amount and extent of [the uncompensated work] as a matter of just and reasonable inference."  *Kuebel*, 643 F.3d at 362 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)).  An employee may "meet this burden through estimates based on his own recollection." *Id.*; *see Chichinadze*, 517 F. Supp. 3d at 252 (recognizing that the employee's own testimony may suffice and the "burden is not high" (citations and quotations omitted)).

The policy reason for this approach is to ensure that employees are not penalized for an employer's failure to keep appropriate records. *See Anderson*, 328 U.S. at 687.

Once the employee makes this showing, the burden shifts to the employer to "come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687-88. "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.*

For unpaid wage claims under New York Labor Law, a "similar" burden shifting standard is used. *Chichinadze*, 517 F. Supp. 3d at 253. If an employer does not comply with its record keeping requirements under NYLL, the employer "shall bear the burden of proving that the complaining employee was paid wages, benefits and wage supplements." NYLL § 196-a(a); *Galvez v. 800 Ginza Sushi Inc.*, No. 19-cv-8549 (JPC), 2022 WL 748286, at *7 (S.D.N.Y. Mar. 11, 2022) (noting that New York Labor Law has a similar burden shifting standard and that where employer fails to keep adequate records, the employer has the burden to prove that employee was paid appropriate compensation). Unlike under the FLSA, however, the NYLL does not permit the employer to meet its burden by undermining the reasonableness of the employee's evidence that he was underpaid. *See Galvez*, 2022 WL 748286, at *7; *Chichinadze*, 517 F. Supp. at 253. Instead, the employer must come forward with evidence of the hours worked and amounts paid to the employee. *See Galvez*, 2022 WL 748286, at *7. Therefore, "[i]f an employer cannot satisfy its burden under the FLSA, it cannot satisfy th[is] more demanding burden of the NYLL." *Chichinadze*, 517 F. Supp. at 253 (internal quotation marks and citations omitted).

Finally, although a plaintiff may be "entitled to recover unpaid . . . overtime pay under both the FLSA and the [NYLL], [he or she] may not recover twice." *Cao v. Wu Liang Ye*

*Lexington Rest., Inc.*, No. 08-cv-3725 (DC), 2010 WL 4159391, at *3 (S.D.N.Y. Sept. 30, 2010).

### B.  STATUTE OF LIMITATIONS

The statute of limitations for unpaid overtime claims under NYLL is six years.  *See Moon v. Kwon*, 248 F. Supp. 2d 201, 232 (S.D.N.Y. 2002) (citing NYLL §§ 198(3), 663(3)). All of the violations alleged by Plaintiff were within six years of the filing of his complaint.

Overtime claims under the FLSA are subject to a two-year statute of limitations, extended to three years for willful violations.  *See* 29 U.S.C. § 255(a).  But "a party must affirmatively state any avoidance or affirmative defense, including . . . statute of limitations." Fed. R. Civ. P. 8(c)(1); *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 751-52 (2d Cir. 1992), *as amended* (Sept. 23, 1992) ("A claim that a statute of limitations bars a suit is an affirmative defense, and, as such, it is waived if not raised in the answer to the complaint.").  Defendant did not raise the statute of limitations as an affirmative defense or in its motion for summary judgment.  Accordingly, any argument as to the statute of limitations is waived.  *See Brock v. Wackenhut Corp.*, 662 F. Supp. 1482, 1487 (S.D.N.Y. 1987) (finding "waiver when [defendant] did not include a statute of limitations defense in its answer, did not make a motion to dismiss on statute of limitations grounds, and remained silent when, at the start of trial, the Secretary informed the Court that defendant had failed to plead this affirmative defense").  The Court will therefore consider all the violations alleged for purposes of Plaintiff's FLSA claim, even those beyond three years.  *See Maddison v. Comfort Sys. USA (Syracuse), Inc.*, No. 5:17-cv-0359 (LEK) (ATB), 2018 WL 679477, at *2 (N.D.N.Y. Feb. 1, 2018) (rejecting statute of limitations argument raised for the first time on a motion to dismiss reply brief and considering FLSA claims beyond three year statute of limitations); *Brown v. Presstime Graphics, Inc.*, No. 2:13-cv-425 (WTL) (DKL), 2016 WL 6067885, at *1-2 (S.D.

Ind. Oct. 17, 2016) (considering ten years of FLSA violations because defendant failed to raise statute of limitations as an affirmative defense).

## C.  DISCUSSION OF UNPAID OVERTIME CLAIMS

In evaluating Plaintiff's motion for summary judgment, the Court will draw all reasonable inferences against the Plaintiff and in favor of the Defendant. *See Reyes*, 861 F.3d at 54; *Schwabenbauer*, 667 F.2d at 314-15.  For purposes of his unpaid overtime claims, the Court will first examine whether Defendant has met its burden of maintaining records pursuant to the FLSA and NYLL for purposes of the burden shifting analysis.  Although neither party has briefed whether Defendant has met its record keeping obligations, it appears that Defendant has failed to meet this requirement.  Defendant admits that Plaintiff was paid only in cash.  Def. Rule 56.1 Counter Statement ¶ 22.  The only time records presented to the Court are those submitted by Plaintiff.  Plaintiff initially submitted two exhibits: Exhibit H which is a document in Korean that Plaintiff contends is his "Overtime Verification Ledger" from 2016 to 2021, ECF No. 79-14, Ex. H, ("Hourly Records"), and Exhibit I, which is a partial English translation of three months of those records, ECF No. 79-15 Ex. I, ("Translated Selection of Hourly Records").  Plaintiff then submitted additional untranslated Korean time records as part of his supplemental briefing on damages.  *See* ECF Nos. 97-2, 97-5 (Pl. Damages Brief, Exs. A, D).  Defendant did not submit any contemporaneous records documenting Plaintiff's hours worked or wages paid.

The Court is unable to consider Exhibit H or Plaintiff's Exhibits A and D to the Damages Briefing (ECF Nos. 97-2, 97-5) because neither Plaintiff nor Defendant provided a certified (or any) translation of the exhibits.  The documents are therefore inadmissible under the "well-established rule that a document in a foreign language is generally inadmissible unless accompanied by a certified English translation." *Chen v. Wai? Café, Inc.*, No. 10-cv-

7254, 2016 WL 722185, at *6 n.5 (S.D.N.Y. Feb. 19, 2016); *Heredia v. Americare, Inc.*, No. 17-cv-06219 (RWL), 2020 WL 3961618, at *5 (S.D.N.Y. July 13, 2020) (collecting cases); *see also Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 704-05 (S.D.N.Y. 2014) (excluding from trial exhibits that were not translated into English). In Defendant's supplemental damages brief, Defendant noted that it was "able to retrieve Plaintiff's 'off schedule' wages from a log of approval requests" and referenced Exhibit A to Plaintiff's supplemental damages brief. Def. Damages Br. at 9. Again, those exhibits are untranslated Korean records that this Court cannot consider, and Defendant did not submit any other records for the Court to consider.[12]

The three-month subset of English translated time records in Exhibit I does not indicate that Defendant met its record keeping obligations under applicable New York and federal regulations. *See supra* at 29-30. Setting aside that the Court was presented with only three months of translated time records, Defendant also admits that the time records in Exhibit I only contain entries for "days where Plaintiff worked outside the regularly scheduled hours of 9 a.m. to 6 p.m. and does not reflect any hours he worked less on a different day (or not work at all [sic])." Def. Opp. at 15. Mr. Kim, a representative of Defendant, confirmed that "the way this ledger is written, the method is the following[:] if a person worked from 9:00 to 6:00, then it's left blank because that means that he didn't work overtime for that day, that's what it means." ECF No. 92-3 (Depo. Tr. of Kim) at 19:18-22; Pl. Reply at 12. Defendant has not asserted that any other records exist or that it otherwise has met it obligations under the FLSA. There is no indication that Defendant kept accurate or adequate time records with, among other

---

[12] Defendant argues in its supplemental damages brief that Plaintiff's Exhibit D (which is also Exhibit H of Plaintiff's Summary Judgment Motion) contains "material errors." Def. Damages Br. at 5. The Court cannot evaluate this allegation because the records are written in Korean. In any event, the untranslated records will not be considered by the Court.

things, number of hours worked daily or weekly, total daily and weekly earnings, total wages paid, and the premiums paid for overtime work.  *See* 29 C.F.R. § 516.2; 12 N.Y.C.C.R. § 142–2.6(a)(4); *see, e.g.*, *Moon*, 248 F. Supp. 2d at 218-19 (noting that logbook "comes nowhere close to satisfying the detailed recordkeeping requirements of FLSA and its implementing regulations").[13]

Given that Defendant has failed to meet its record keeping obligations, the Court will determine whether Plaintiff has met its burden to "show the amount and extent of [his] work as a matter of just and reasonable inference."  *Chichinadze*, 517 F. Supp. 3d at 252 (internal citations omitted); *see Kuebel*, 643 F.3d at 364 (concluding that plaintiff had "presented sufficient evidence for a reasonable jury to conclude that he has shown the amount of uncompensated work as a matter of just and reasonable inference" (citations omitted)).  Plaintiff submitted his employment contracts for each year.  *See* 2016-2021 Employment Contracts and Translations.  The employment contracts provide Plaintiff's regular working hours of 9:00 A.M. to 6:00 P.M. from Monday to Friday, and his compensation rates which included, among other things, his "monthly regular wages," "a housing subsidy," and a "medical insurance subsidy."  *See, e.g.*, 2016 Employment Contract at 3; *see generally* 2016-2021 Employment Contracts and Translations.  The contracts also set forth Plaintiff's "off schedule" hourly rates along with a cap on his monthly "off schedule" hours.  *See, e.g.*, 2016 Employment Contract at 3; *see generally* 2016-2021 Employment Contracts and Translations.

---

[13] Plaintiff also testified that one of the Ministers frequently required him to reduce the number of hours Plaintiff recorded.  Pl. Depo. Tr. at 52:15-54:13; Nam's Aug. 29, 2022 Decl. ¶ 35 (noting that despite Plaintiff recording "[his] overtime hours in a time sheet, Minister Lee frequently required [Plaintiff] to change the time to reflect reduced number of hours.  He unilaterally picked the start and end time[s] and requested [Plaintiff] to revise [the] timesheet according to his direction").  Although Defendant did not provide contrary evidence, the Court finds that the records provided are not adequate regardless of this assertion by Plaintiff.

Defendant does not dispute that these are Plaintiff's annual contracts and that he was paid pursuant to those contracts.  Def. Rule 56.1 Counter Statement ¶¶ 11-15.

Plaintiff testified in his deposition that he generally worked from 9:00 A.M. and 6:00 P.M. from Monday to Friday and that "there were many occasions" he worked beyond those hours.  Pl. Depo. Tr. at 50: 13-51:10.  Plaintiff also submitted a sworn declaration where he estimated that "he worked approximately for 52 to 62 hours per week" and was paid "$5,020.00 - $6,550.00 per month (calculated weekly rate at $1,158.46 - $1,511.54) in cash." Nam's July 28, 2022 Decl. ¶ 12.  Again, as the Second Circuit has stated, "[i]t is well settled among the district courts of [the Second] Circuit, and we agree, that it is possible for a plaintiff to meet this burden through estimates based on his own recollection."  *Kuebel*, 643 F.3d at 362.

Finally, Plaintiff relies on Exhibit I, a translation of three months of time records – July 2016,[14] May 2017, and January 2018 – that show when Plaintiff started and stopped working on various workdays, with a column purporting to calculate his "overtime" work hours.  *See* Ex. I, Translated Selection of Hourly Records; Pl. SJ Mot. at 14.  Defendant spends considerable time arguing that the English translation for these records is erroneous and that these time records do not refer to "overtime" hours because the term "□ □ □" [shi-gan-weh] means "off schedule" from the standard working hours during a day, and not overtime in the sense of over 40 hours a week.  *See* Def. Opp. at 15-17; ECF No. 86-5 ("Decl. of Fran S. Yoon," Korean Translator); Def. Damages Br. at 5-6.  Plaintiff does not dispute this translation

---

[14] Exhibit I does not list the year of the July record.  However, the record shows that Plaintiff's hours were capped at $570 and the only months that Plaintiff's off schedule wages were capped at this amount were between July 2016 and June 2017.  2016 Employment Contract at 3.  Therefore, the only month where this record would be consistent with Plaintiff's contract is July 2016.

but continues to maintain that the time records include the hours that he worked and therefore necessarily show the overtime worked.  *See* Pl. Rule 56.1 Second Counter Statement at ¶ 86.

Plaintiff argues that he was not paid adequate overtime – or indeed any overtime pay at all – for the hours that he worked that exceeded the undisputed cap on off schedule hours provided in each year's contract.  *See* Pl. SJ Mot. at 14.  For example, the 2016 contract shows that Plaintiff's off schedule hours were capped at $570 per month.  *See* 2016 Employment Contract at 7.  Plaintiff's testimony that he worked 52 to 62 hours a week means that he worked between 12 to 22 overtime hours a week, or 48 to 88 hours of overtime a month. Given that Plaintiff testified, and Defendant has not refuted, that Plaintiff generally worked from 9:00 A.M to 6:00 P.M. Monday to Friday (with an hour off for unpaid lunch) and additional hours to that 40-hour work week before or after his regular schedule, *see* Pl. Depo. Tr. at 50: 13-51:10, "off schedule" hours would therefore generally be commensurate with his overtime hours, *see* Def. Damages Br. at 4 (noting that "Plaintiff was scheduled to work a total of eight (8) hours per day, with a one-hour lunch break, and with the understanding that he may be required to work 'off-schedule'").  The contract capped his "off schedule" pay at $570 per month, which at his contractual "off schedule" rate of $12-15, would cover at most 47.5 hours of off schedule time ($570/$12 hours assuming all off schedule hours were on a weekday). Therefore, the cap of $570 per month for off schedule hours necessarily means that Plaintiff was not compensated adequate overtime – or received any pay at all – for at least some of the overtime hours that he worked over and above the cap.

This is confirmed by the translated July 2016 time record in Exhibit I.  *See* Ex. I, Translated Selection of Hourly Records at 2.  That record shows that Plaintiff worked in total, about 82 hours of "off schedule" time during the month of July 2016, which is equivalent to the number of hours over 40 hours per week that he worked that month (or his overtime hours).

*Id.*  Despite that, according to the contract and the July 2016 time record, Plaintiff was only paid the cap of $570 in "off schedule" pay.  At the contractual $12/hour off schedule rate, this means that he was paid for only 47.5 hours, and paid nothing for the remaining 34.5 hours of overtime that month.

Similarly, Plaintiff's contract that covered July 2017 to July 2018 capped his payment for off schedule hours at 52 hours a month.  ECF 78-23, Ex. 20 ("2017 Employment Contract") ¶ 5.  Plaintiff provided a translated monthly time record from January 2018 that shows he worked 91 hours and 45 minutes of "off schedule" time.  *See* Ex. I, Translated Selection of Hourly Records at 6.  A review of the hours worked also shows that these "off schedule" hours were the overtime hours that he worked beyond 40 hours per week.  But he was only paid for 52 hours of "off schedule" time, per the contractual cap.  Again, this demonstrates that Plaintiff was not paid adequate overtime – or indeed paid anything at all – for 39 hours and 45 minutes of overtime.

Therefore, Plaintiff's testimony that he regularly worked from 9:00 A.M. to 6:00 P.M. and additional overtime for a total of 52 to 62 hours a week, along with the undisputed contractual caps on off schedule pay in his contracts, demonstrates that Plaintiff was not paid appropriate overtime pay "as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687.  Plaintiff has also shown that his employers had "constructive knowledge" of his overtime work, *Kuebel*, 643 F.3d at 361, as Defendant does not dispute that Plaintiff recorded his hours for his employer's review, *see* Pl. Depo. Tr. at 52:12-54:13; Nam's August 29, 2022 Decl. ¶ 35.

"The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."  *Anderson*, 328 U.S. at 687-88.  Defendant has not

come forward with admissible evidence of the precise amount of work that Plaintiff performed as would be required under the burden shifting standards of NYLL. *See supra* at 33-34.  It has not provided a full translated Exhibit H with Plaintiff's time records, nor has it provided any contemporaneous records of time worked that was not reflected on those records.  In its supplemental damages brief, Defendant submitted an excel spreadsheet "summary document" that it created to purportedly to show the hours that Plaintiff worked and the wages he was paid.  *See* ECF No. 102-2 ("Overtime Summary Spreadsheet").  However, the declaration to which it is attached states that this spreadsheet was "based on data gleaned from exhibits A through D submitted by Plaintiff on January 13, 2023," ECF No. 102-1 ("Feb. 3, 2022 Lim Decl.") ¶ 3, and those records, as stated previously, are untranslated Korean records that this Court cannot consider.  The Court cannot evaluate the accuracy of the spreadsheet given that it is allegedly "gleaned from" untranslated records.  But even if the Court were to consider the spreadsheet, the document confirms Plaintiff's recollection that he generally worked between 52 and 62 hours a week (and many more hours during some weeks).  *See generally* Overtime Summary Spreadsheet.   The undisputed cap on "off schedule" hours would therefore have resulted in underpayment, and indeed, nonpayment, of some of Plaintiff's overtime.  *See supra* at 35-37.

Defendant also argues against the reasonableness of the inference drawn from the employee's evidence.  First, Defendant argues that it sufficiently compensated Plaintiff since it paid Plaintiff for up to 52 hours a month of "off schedule hours" (hours outside of the regularly scheduled 9:00 A.M. – 6:00 P.M. work hours) in accordance with Korean wage laws and "holiday benefits" for any hours in excess of that.  *See* Def. Opp. at 14-16.  Whether or not Defendant paid Plaintiff in accordance with Korean wage laws has no bearing on whether Defendant paid Plaintiff time and a half for all hours over 40 hours a week, under the FLSA or

NYLL as required.  *See, e.g.*, 29 U.S.C. § 207(a)(1).  Defendant does not provide any evidence

that Plaintiff was paid time and a half for all hours worked above 40 hours a week, and the

evidence presented by Plaintiff shows that he was not.  *See supra* at 33-37.

 Defendant's claim that it "provided additional holiday benefits to compensate Plaintiff"

when he worked in excess of the cap of 52 hours a month in off schedule hours does not create

a genuine issue of material fact or meet Defendant's burden of refuting Plaintiff's evidence.

Def. Opp. at 15.  Not only does Plaintiff dispute this, *see* Pl. Rule 56.1 Second Counter

Statement ¶ 85, but the only evidence that Defendant provides in support of this assertion is

deposition testimony of Jinho Jo, a Counselor at the Mission, who disavowed knowledge of

holiday time provided to Plaintiff, *see* Jo Depo. Tr. Excerpt 2 at 61:22-62:21.  Mr. Jo initially

stated that it was his understanding of the employment contracts that if Plaintiff worked more

than the 52 off schedule hours a month, "there will be replacing additional holiday benefits or

other means to replace that."  *Id.* at 62:3-9.  But Mr. Jo immediately disavowed knowledge of

the contract and how Plaintiff's wages were calculated, stating:

> Q. Is that fair to conclude if Mr. Na[m] worked for more than 52 hours off
> schedule, he will not get paid?
>
> A. Honestly speaking, I don't know how it was operated based on this
> contract. In reality the reason that two people came to represent the
> Missions today is because although I know the general maintenance
> management matters, but it's Mr. Kim who is aware of the specific hours,
> how the wages are calculated. These things are what he knows better than
> me so and how much was paid calculated.

*Id.* at 62:10-21.  Defendant provided no testimony from Mr. Kim, nor any other evidence, that

Plaintiff was paid holiday compensation time, nor any evidence whatsoever that such holiday

time was provided at a time and a half rate, as required.  *See* 29 U.S.C. § 207(o)(1)

(compensation time in lieu of overtime must be "at a rate not less than one and one-half hours

for each hour of employment for which overtime compensation is required by this section"); 29

C.F.R. § 553.20 ("Compensatory time received by an employee in lieu of cash must be at the rate of not less than one and one-half hours of compensatory time for each hour of overtime work, just as the monetary rate for overtime is calculated at the rate of not less than one and one-half times the regular rate of pay.").  Defendant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . and may not rely on conclusory allegations or unsubstantiated speculation." *Inclan v. N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 496-97 (S.D.N.Y. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).

In addition, Defendant has not provided any evidence, let alone even argued, that Plaintiff agreed to accept holiday compensation time in lieu of overtime prior to performing the overtime work.  *See* 29 U.S.C. § 207(o)(2)(A)(ii) (requiring that employee agree to be compensated by comp time in lieu of overtime in "an agreement or understanding arrived at between the employer and employee before the performance of the work").  There is no mention of holiday comp time in any of Plaintiff's annual contracts or any writings between the parties.  *See* 2016-2021 Employment Contracts and Translations; ECF Nos. 78-7 through 78-18 ("Defendant's Pledge Agreements"); ECF No. 78-40 ("Settlement Agt.").  And Defendant has not provided any evidence that it informed Plaintiff that he would be paid overtime over 52 hours in the form of holiday comp time prior to Plaintiff working those hours, and Plaintiff did not object freely and without coercion or pressure.  *See* 29 C.F.R. § 553.23(c)(1).  Therefore, Defendant's reference to holiday time does not call into question "the reasonableness of the inference to be drawn" from Plaintiff's evidence.  *Chichinadze*, 517 F. Supp. 3d at 252.[15]

---

[15] It is not even clear whether an employer like the Permanent Mission could offer compensation time in lieu of overtime pay as a matter of law.  Private employers may not offer

Defendant also argues that Plaintiff's employment contracts and Exhibit I should not be considered evidence in support of Plaintiff's case for *overtime* wages, because these documents only describe Plaintiff's "off schedule" pay and record Plaintiff's "off schedule hours," rather than overtime hours.  Def. Opp. at 14-17.  Even if the column in Exhibit I should be labeled "off schedule" instead of "overtime," it nonetheless lists the actual hours worked by Plaintiff which shows the time worked over 40 hours a week.  Indeed, these records <u>underestimate</u> the number of hours worked by Plaintiff given Defendant's testimony that the time record entries only include the days that Plaintiff worked more than 9:00 A.M. to 6:00 P.M.  Depo. Tr. of Kim at 19:19-22 ("[I]f a person worked from 9:00 to 6:00, then it's left blank because that means that he didn't work overtime for that day, that's what it means.").

Aside from the records, Plaintiff has provided a sworn declaration that his regular hours were 9:00 A.M to 6:00 P.M. and that he generally worked 52 to 62 hours a week.  Nam's July 28, 2022 Decl. ¶¶ 8, 12.  The sample of Plaintiff's time records in Exhibit I generally supports this recollection, showing, for example, that Plaintiff worked about 62, 61, 66, and 56 hours a

---

compensation time in lieu of overtime pay; only public agencies are permitted to do so.  *See* 29 U.S.C. § 207(o) (authorizing a "public agency" to offer comp time in lieu of overtime pay); *Adams v. Dep't of Juv. Just. of the City of N.Y.*, No. 93-civ-8042 (PKL), 1996 WL 82404, at *5 (S.D.N.Y. Feb. 26, 1996) ("The use of compensatory time is forbidden to private employers."), *vacated on other grounds*, 143 F.3d 61 (2d Cir. 1998).  It is unclear that the Defendant falls within the definition of a "public agency" set forth in 29 U.S.C. § 207(o), which is defined as "a State, a political subdivision of a State, or an interstate governmental agency."  This definition appears to reference only domestic entities.  *See, e.g.*, *Christensen*, 529 U.S. at 592 (Stevens, J., dissenting) (noting that "[i]n 1985, Congress enacted an exception to that general rule that permits States and their political subdivisions to use compensatory time instead of cash as compensation for overtime").  Defendant has not argued that the reference to an "interstate governmental agency" in the definition of "public agency" covers foreign entities or that the Mission falls under that definition.  Given the lack of evidence articulated above, the Court need not determine whether it does or not.

week in May 2017; and 60, 62, and 65 hours a week in January 2018.  Ex. I, Translated

Selection of Hourly Records.

Defendant next argues that Plaintiff has not shown that he worked overtime for which

he was not compensated appropriately because the time records in Exhibit I only contain

entries for "days where Plaintiff worked outside the regularly scheduled hours of 9 a.m. to 6

p.m. and does not reflect any hours he worked less on a different day (or not work at all [sic])."

Def. Opp. at 15.  This assertion is not sufficient to defeat summary judgment.  As a threshold

matter, if the time records in Exhibit I understated the hours worked by Plaintiff, as Defendant

suggests, it would only create *more* overtime hours for which Plaintiff was not compensated,

given the contractual caps.  In addition, for employees who work regularly scheduled hours,

like Plaintiff, an employer may record when employees work their normal hours ("instead of

the hours worked each day and each workweek[,]") and "in weeks in which more or less than

the scheduled hours are worked, show[] that exact number of hours worked each day and each

week."  29 C.F.R. § 516.2(c).  Defendant's admissions demonstrate that it did not follow these

regulations.  On summary judgment, it is not enough to rely on possibilities or generalizations

about when Plaintiff might have worked less than his normal hours.  *See, e.g.*, *Berrios*, 849 F.

Supp. 2d at 383 (finding that defendant's "attempt to 'chip away' at the total hours grooms

work by stating that grooms *might* arrive later or leave earlier depending on when their

assigned horses go out for training" is insufficient to defeat plaintiff's motion for summary

judgment because it "lacks the specificity necessary to negate the inference Plaintiffs retain due

to Defendants' lack of adequate record-keeping") (emphasis in original).

Finally, Defendant takes issue with the form of Plaintiff's evidence.  *See* Def. Damages

Br. at 6-7.  Defendant argues that Plaintiff's submission of translated records for only three

months out of 59 months is an attempt to "obscure the material facts."  Def. Opp. at 16.

Defendant claims that these "cherry-pick[ed]" records do not establish how much overtime Plaintiff worked from 2016 to 2021, *id.*, and Plaintiff should not be able to rely on his unverified pleadings, or English language declarations that are procedurally deficient given that Plaintiff is a non-native English speaker, *see* Def. Reply at 5-6. The Court does not agree. First, this Court will consider Plaintiff's declarations given, among other things, Plaintiff has attested under penalty of perjury that he reads and understands English. *See supra* at 4. Second, even setting aside the supposedly "cherry picked" sample time records that were presented by Plaintiff in Exhibit I, Plaintiff's sworn declaration that he worked between 52 to 62 hours a week throughout the time he worked for Defendant is sufficient to meet his burden. *See Kuebel*, 643 F.3d at 362 (holding employee recollections sufficient). A plaintiff may rely on "estimates" about the amount worked when the employer has failed to keep accurate or complete records. *See Chichinadze*, 517 F. Supp. 3d at 252-53. Defendant has not presented any employment records, provided translated copies of the time records in Exhibit H to seek to demonstrate the actual hours worked by Plaintiff insofar as they reflected that information, or otherwise proven the precise hours worked by the Plaintiff. *Cf. Kim v. 511 E. 5th St., LLC*, 133 F. Supp. 3d 654, 661 (S.D.N.Y. 2015) (denying summary judgment when defendants successfully undermined the reasonableness of plaintiff's estimates because the business was not open as many hours as plaintiff claimed to have worked).

In sum, the Court finds that Plaintiff has met his burden of showing that he was not appropriately compensated for all of his overtime work given that (1) he generally worked from at least 9:00 A.M. to 6:00 P.M. Monday to Friday and additional hours before and after that, totaling approximately 52 to 62 hours a week; (2) his compensation for off schedule time beyond his regular work hours was capped; and (3) those caps resulted in nonpayment of

overtime hours worked.  Defendant has not provided proof of the precise hours that Plaintiff

worked or undermined the reasonableness of Plaintiff's estimates.

Therefore, the Court grants Plaintiff summary judgment on liability for Counts I and

III, alleging violation of the FLSA and NYLL for failure to pay appropriate overtime pay.

### D.  DAMAGES

Because there is no genuine issue of fact as to whether Plaintiff performed work for

which he has not been paid appropriate overtime as required by statute, the Court will then

evaluate damages.  *See Anderson*, 328 U.S. at 688 (holding that "the damage is . . . certain"

where employee proved that he performed work that was not paid in accordance with the

statutes, and that damages can then be awarded if there is a "basis for a reasonable inference as

to the extent of the damages").  The Court may award damages to Plaintiff, "even though the

result may be only approximate." *Chichinadze*, 517 F. Supp. 3d at 253-54 (quoting *Gonzalez*

*v. Masters Health Food Serv. Inc.*, No. 14-cv-07603 (VEC), 2017 WL 3835960, at \*16

(S.D.N.Y. July 27, 2017)).  In determining damages, the Court first looks to the evidence of the

hours worked by Plaintiff – even if estimates – and the remuneration received by Plaintiff in

order to calculate Plaintiff's regular rate of pay.  *See Kuebel*, 643 F.3d at 362.

The Court relies on the following sources of admissible evidence: Plaintiff's

employment contracts, Plaintiff's declarations, and Exhibit I.  *See* 2016-2021 Employment

Contracts and Translations; Nam's July 28, 2022 Decl.; Nam's August 29, 2022 Decl.; Ex. I,

Translated Selection of Hourly Records.  The Court does not rely on Exhibit H (the Overtime

Verification Ledger), or Exhibit A (ECF No. 97-2)[16] because the documents are untranslated

---

[16] Exhibit D (ECF No. 97-5) appears to be a duplicate of Exhibit H, the Overtime Verification
Ledger, and also will not be considered because it is not translated.

Korean records. *See Sicom S.P.A. v. TRS Inc.*, 168 F. Supp. 3d 698, 709 n.9 (S.D.N.Y. 2016) (collecting cases where courts on summary judgment did not consider evidence that was either not translated or did not have proper certifications of translations).

Because Nam is paid a monthly salary, his regular hourly overtime rate is calculated by adding together "all remuneration for employment," 29 U.S.C. § 207(e); *see* 29 C.F.R. § 778.500, and then "dividing the salary by the number of hours which the salary is intended to compensate[,]" 29 C.F.R. § 778.113 (regulation regarding determining regular rate of pay for salaried workers); *see also* 29 C.F.R. § 778.109 (regulation regarding determination of regular hourly rate of pay). Therefore, to calculate Plaintiff's regular rate of pay for each year, the Court looks to the contractual payments made to Plaintiff: his regular monthly wages, housing payment, medical insurance subsidy, yearly bonus, and Long Term Service Allowance – an annual payment which increased based on the number of years of service. *See generally* 2016-2021 Employment Contracts and Translations.[17]

Defendant calculated Plaintiff's regular wage as $1,900 based solely on Plaintiff's regular monthly wage, but this is inconsistent with the aforementioned federal code and regulations. Def. Damages Br. at 6, Overtime Summary Spreadsheet; *Lynch v. City of New York*, 291 F. Supp. 3d 537, 547 (S.D.N.Y. 2018) ("The employee's regular rate shall include

---

[17] Defendant argues for the first time in its supplemental damages brief that the Court should calculate Plaintiff's wage using the fluctuating workweek method. This method is used for an "employee [that] works hours that fluctuate from week to week" and when "the employee and the employer have a clear and mutual understanding that the fixed salary is compensation . . . for the total hours worked each workweek regardless of the number of hours . . . ." 29 C.F.R. § 778.114(a). The record in this case does not support the use of this method because Plaintiff's employment contracts state that he was expected to work, and was compensated for working, a *regular* 9:00 A.M. to 6:00 P.M. work schedule and was then provided additional compensation for off schedule hours. *See* 2016-2021 Employment Contracts and Translations. Moreover, Defendant has not demonstrated that the parties agreed on a fluctuating workweek method such that Plaintiff would be paid his monthly regular wages even if he did not work his regular schedule. *Id.*

'all remuneration for employment paid to, or on behalf of, the employee,' unless such remuneration falls into a limited series of statutory exclusions.") (citing 29 U.S.C. § 207(e)); *Moon*, 248 F. Supp. 2d at 230-31 (adding all forms of compensation to determine a proper overtime rate for employee which included weekly pay, plus the cost of lodging and meals). Defendant argues that Plaintiff's lodging and health insurance benefits should not be considered as wages "because it was unable to provide such benefits in any other form." Def. Damages Br. at 9. Defendant provides no support for this argument. Moreover, 29 U.S.C. § 207(e) provides a list of exclusions from forms of renumeration. Lodging is not part of that list. While health care contributions could be excluded if the employer made contributions to a "trustee or a third person pursuant to a bona fide plan," 29 U.S.C. § 207(e)(3), that was undisputedly not done here.

Plaintiff's calculation of his regular hourly wage also fails to include all sources of renumeration including his annual bonuses, and additional annual payments. *See, e.g.*, Pl. Damages Br. at 1-3; *McLean v. Garage Mgmt. Corp.*, 819 F. Supp. 2d 332, 339 (S.D.N.Y. 2011) (adding lump sum bonus payment to regular rate compensation since the bonus payment did not correspond to the number of overtime hours worked).

Therefore, the Court has calculated Plaintiff's regularly hourly wage. **Table 1**, below, sets forth Plaintiff's regular hourly rate of pay and statutory overtime rate of pay based on his annual employment contracts, the terms of which are undisputed. *See Padilla v. Manlapaz*, 643 F. Supp. 2d 302, 308 n.7 (E.D.N.Y. 2009) (noting discrepancies in plaintiff's calculations of the hourly range worked and performing Court's own calculations based on plaintiff's recollection of the range of hours worked).

**Table 1: Plaintiff's Regular and Overtime Rate of Pay Based on Employment Contracts**[18]

|  | July 1, 2016–June 30, 2017 | July 1, 2017–June 30, 2018 | July 1, 2018–June 30, 2019 | July 1, 2019–September 30, 2019[19] | October 1, 2019–June 30, 2020 | July 30, 2020–March 31, 2021 | April 1, 2021–June 30, 2021 |
|---|---|---|---|---|---|---|---|
| Regular Wages | $1,900 | $1,900 | $1,900 | $1,900 | $1,900 | $1,710 | $1,710 |
| Housing[20] | $1,450 | $1,450 | $1,450 | $1,450 | $2,000 | *$2,000* | $2,000 |
| Medical Insurance Subsidy[21] | $1,087 | $1,039 | $1,109 | *$1,109* | *$1,109* | *$1,109* | *$1,109* |
| Long-Term Service Allowance[22] | $4.16 | $8.33 | $12.50 | $16.67 | $16.67 | -- | -- |
| Annual Bonus[23] | $158.33 | $158.33 | $158.33 | $158.33 | $158.33 | $142.50 | --[24] |
| Monthly Regular Pay[25] | $4,599.49 | $4,555.66 | $4,629.83 | $4,634.00 | $5,184.00 | $4,961.50 | $4,819.00 |
| Annual Pay[26] | $55,193.88 | $54,667.92 | $55,557.96 | $55,608.00 | $62,208.00 | $59,538.00 | $57,828.00 |
| Weekly Pay[27] | $1,061.42 | $1,051.31 | $1,068.42 | $1,069.38 | $1,196.31 | $1,144.96 | $1,112.08 |
| **Regular Hourly Wage**[28] | $26.54 | $26.28 | $26.71 | $26.73 | $29.91 | $28.62 | $27.80 |
| **Statutory Overtime Rate**[29] | $39.80 | $39.42 | $40.07 | $40.10 | $44.86 | $42.94 | $41.70 |

[18] In **Table 1**, the Court estimates missing information and marks with italics any estimated amounts. As described, these estimates are based on the undisputed information contained in the 2016-2021 Employment Contracts and Translations.

[19] Plaintiff's 2019 Contract was replaced midway through the year in fall of 2019. *See* ECF Nos. 78-27, 78-29. The second contract increased the housing allowance in September 2019. *See* ECF No. 78-29 ("9.20 Re-drafting and re-signing due to increase in housing subsidy."). Therefore, the Court will account for this change in the column entitled "October 1, 2019–June 30, 2020."

[20] For the July 30, 2020–March 31, 2021 time period, Plaintiff's contractual housing allowance is listed as "Actual expenses, subject to a limit." *See* ECF No. 78-31 at 3. The Court therefore estimates the housing allowance as $2,000 based on the preceding October 1, 2019–June 30, 2020 and succeeding April 1, 202–June 30, 2021 contracts. *See* ECF Nos. 78-29 at 4; 78-33 at 3.

[21] Plaintiff's medical insurance subsidy from 2019-2021 is "80% of actual payment." *See* ECF Nos. 78-27 at 4; 78-29 at 4; 38-31 at 4; 78-33 at 3. In 2018, Plaintiff received "80% of the Mission's group plan," but the Court estimates that Plaintiff's medical payments remained the same as the previous year. *See* ECF No. 78-25 at 3.

47

Using the aforementioned regular and overtime rates, the Court then calculated the pay that Plaintiff should have received if he was paid appropriately under the FLSA and NYLL. Because the Court cannot rely on the untranslated Korean time records that Plaintiff presents, *see generally* Pl. Damages Br. (citing to Exs. A, D), the Court estimates that Plaintiff worked approximately 17 hours of overtime each week.  This estimate is based on Plaintiff's affidavit stating that he recalled working 52 to 62 hours a week, *see* Nam's July 28, 2022 Decl. ¶ 12, which means that he worked between 12 to 22 overtime hours a week, and the Court will estimate his weekly overtime hours by taking the midpoint.  *See, e.g.*, *Vazquez v. 142 Knickerbocker Enter. Corp.*, 409 F. Supp. 3d 81, 87 (E.D.N.Y. 2019) (relying on plaintiffs'

---

[22] Plaintiff received a Long-Term Service Allowance of $50 per year of service which is divided by 12 to show a monthly payment in Table 1.  For example, in his second year of service, Nam received $100, which is $8.33 per month.  *See* ECF No. 78-23 at 3.  Defendants stopped paying Plaintiff this allowance beginning with his June 30, 2020 Contract.  *See* ECF Nos. 78-31, 78-33.

[23] For purposes of Table 1, the Annual Bonus (which is 100% of yearly wages, per the terms of the contracts) is divided by 12 months to arrive at a monthly amount.

[24] Plaintiff's last contract lists two forms of bonuses a "performance bonus" to be paid in April and a "bonus (100% of regular wages) will be paid once per year (June)."  ECF No. 78-33 at 1-2.  The Court assumes that neither of these bonuses were paid because the new contract was signed in April and Plaintiff's employment ended in June.

[25] "Monthly Regular Pay" for purposes of Table 1 is the sum of the monthly Regular Wages, Housing, Medical, Insurance Subsidy, Long-Term Service Allowance, and Annual Bonus.

[26] Plaintiff's Annual Pay is calculated by multiplying the Monthly Regular Pay by 12.

[27] Plaintiff's Weekly Pay is calculated by dividing the Annual Pay by 52.

[28] The Court determined Plaintiff's regular hourly wage by dividing his Weekly Pay by 40 hours a week since Plaintiff is a salaried worker and his wages were intended to compensate him for a 40-hour regular schedule.  *See* 29 C.F.R. § 778.113; 2016-2021 Employment Contracts and Translations (compensating Nam based on a regular 40-hour workweek).

[29] The Court determined Plaintiff's statutory overtime rate by multiplying Plaintiff's regular hourly wage by 1.5.  *See* 29 U.S.C. § 207 (a)(1).

recollections of hours worked for purposes of calculating damages on summary judgment where defendants did not present records). As discussed earlier, Plaintiff's estimate is supported by the three translated months of records provided by Plaintiff which show total hours worked ranging from 46 hours to as high as 67 hours. *See* Ex. I, Translated Selection of Hourly Records; *see also supra* at 41. Given this range, the average between 52 and 62 hours is a conservative choice that is supported by just and reasonable inferences from the record. *See, e.g.*, *Cardenas v. Editas Bar & Rest.*, No. 17-cv-5150 (RPK) (RML), 2021 WL 4480570, at *12 (E.D.N.Y. Sept. 30, 2021) (relying on estimates of hours worked by plaintiff to establish liability under FLSA and NYLL and then awarding damages based on the lower end of the estimates); *Padilla*, 643 F. Supp. 2d at 308 (finding that plaintiff can rely on her recollections to establish the number of hours worked where defendant did not have accurate employment records and then "[s]ince plaintiff's recollection was provided as a range of hours that she worked for each shift, [the Court] averaged the hours to establish the approximate time plaintiff worked during each date range").

The Court then determined the monthly overtime pay to which Plaintiff was entitled by multiplying Plaintiff's hourly overtime rate (*see* **Table 1**) for each contract period by 17 hours of overtime each week. The Court then multiplied the weekly overtime amount by 52 weeks to obtain a yearly overtime payment and then divided that amount by 12 to obtain a monthly required overtime payment ("Monthly Overtime Pay"). Finally, the Court added Plaintiff's monthly regular pay to the amount of overtime that Plaintiff should have been paid to calculate the pay that Plaintiff should have received under the statutes if he was paid proper overtime.

**Table 2** illustrates what Plaintiff should have been paid under each contract.

### Table 2: Plaintiff's Required Monthly Pay

|  | July 1, 2016– June 30, 2017 | July 1, 2017– June 30, 2018 | July 1, 2018– June 30, 2019 | July 1, 2019– September 30, 2019 | October 1, 2019–June 30, 2020 | July 30, 2020– March 31, 2021 | April 1, 2021– June 30, 2021 |
|---|---|---|---|---|---|---|---|
| Monthly Regular Pay | $4,599.49 | $4,555.66 | $4,629.83 | $4,634.00 | $5,184.00 | $4,961.50 | $4,819.00 |
| Monthly Overtime Pay | $2,931.93 | $2,903.94 | $2,951.82 | $2,954.03 | $3,304.69 | $3,163.25 | $3,071.90 |
| **Required Monthly Pay** | $7,531.42 | $7,459.60 | $7,581.65 | $7,588.03 | $8,488.69 | $8,124.75 | $7,890.90 |

The Court then compared the aforementioned amounts that Plaintiff should have been paid for his overtime at the statutory overtime rate (**Table 2**) with the maximum amount that Plaintiff could have been paid by Defendant, given the amount and caps Defendant placed on off schedule hours (**Table 3**). In calculating Plaintiff's wages, the Court conservatively assumed that Defendant paid Plaintiff the maximum amount of off schedule pay to which he was entitled under the contracts given the contractual caps.

**Table 3: Maximum Monthly Pay by Defendant to Plaintiff**

| | July 1, 2016–June 30, 2017 | July 1, 2017–June 30, 2018 | July 1, 2018–June 30, 2019 | July 1, 2019–September 30, 2019 | October 1, 2019–June 30, 2020 | July 30, 2020–March 31, 2021 | April 1, 2021–June 30, 2021 |
|---|---|---|---|---|---|---|---|
| Monthly Regular Pay | $4,599.49 | $4,555.66 | $4,629.83 | $4,634.00 | $5,184.00 | $4,961.50 | $4,819.00 |
| Maximum Off Schedule Payment[30] | $570 | $767 | $767 | $767.52 | $767.52 | $691.08 | $691.08 |
| **Actual Maximum Monthly Pay[31]** | **$5,169.49** | **$5,322.66** | **$5,396.83** | **$5,401.52** | **$5,951.52** | **$5,652.58** | **$5,510.08** |

A comparison of **Table 2** and **Table 3** shows that Plaintiff was underpaid each month by the amounts set forth in **Table 4**.

**Table 4:  Plaintiff's Monthly Underpayment by Defendant**

| | July 1, 2016–June 30, 2017 | July 1, 2017–June 30, 2018 | July 1, 2018–June 30, 2019 | July 1, 2019–September 30, 2019 | October 1, 2019–June 30, 2020 | July 30, 2020–March 31, 2021 | April 1, 2021–June 30, 2021 |
|---|---|---|---|---|---|---|---|
| Required Monthly Pay | $7,531.42 | $7,459.60 | $7,581.65 | $7,588.03 | $8,488.69 | $8,124.75 | $7,890.90 |
| Actual Maximum Monthly Pay | $5,169.49 | $5,322.66 | $5,396.83 | $5,401.52 | $5,951.52 | $5,652.58 | $5,510.08 |
| Monthly Under-payment | $2,361.93 | $2,136.94 | $2,184.82 | $2,186.51 | $2,537.17 | $2,472.17 | $2,380.82 |
| **Total Under-payment per Contractual Period[32]** | $28,343.16 | $25,643.28 | $26,217.84 | $6,559.53 | $22,834.53 | $22,249.53 | $7,142.46 |

---

[30] *See* 2016-2021 Employment Contracts and Translations.

Adding together the underpayments for each contractual period, Plaintiff's damages from unpaid overtime were **$138,990.33**.

### E.  LIQUIDATED DAMAGES

Recognizing that he cannot recover liquidated damages for overlapping periods of time under both the NYLL and the FLSA, Plaintiff seeks liquidated damages under only the NYLL for failure to pay appropriate overtime.  *See* Pl. SJ Mot. at 15.  Defendant argues that its good faith belief that it was immune from claims under the FLSA and NYLL based on the FSIA would abrogate any finding of willfulness necessary to impose liquidated damages. *See* Def. Opp. at 20; Def. Damages Br. at 9-10.  For the following reasons, the Court finds that Plaintiff is not entitled to liquidated damages under either the FLSA or the NYLL.

Under the FLSA, courts are generally required to award liquidated damages equal to the actual damages and such "double damages are the norm . . . ." *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008); 29 U.S.C. § 216(b).  Such damages are not meant to be a penalty but are considered compensation for the delay in payment of required overtime payments.  *See, e.g.*, *Herman v. RSR Sec. Servs. Ltd.*, 172 F. 3d 132, 142 (2d Cir. 1999).  However, courts may deny liquidated damages if the employer shows that it "acted in subjective good faith with objectively reasonable grounds for believing that its acts or

---

[31] The Court compares its estimates of Plaintiff's monthly wages, which fall between approximately $5,169 and $5,935, against the amounts Plaintiff claimed in his Affidavit that he received monthly: $5,020.00 - $6,550.00 per month.  Nam's July 28, 2022 Decl. ¶ 12.  The Court finds that its estimates are largely consistent with the estimates that Plaintiff provided.  Again, the Court finds such estimates to be reasonable and therefore appropriate to calculate estimated damages given that Plaintiff was paid in cash and Defendant did not come forth with records setting forth Plaintiff's time worked and wages paid.  *See, e.g.*, *Padilla*, 643 F. Supp. 2d at 308 (where employer did not provide records, awarding damages based on estimates and employee's recollections).

[32]  Each contractual period is either 12, 9, or 3 months, as set forth in the column headings.

omissions did not violate the FLSA." *Barfield*, 537 F.3d at 142 (internal quotation marks omitted).

The NYLL liquidated damages provision has been amended twice since 2009 to ease the burden on employees claiming liquidated damages and has had the effect of aligning the NYLL standard with the FLSA standard. *See Rana v. Islam*, 887 F.3d 118, 122 (2d Cir. 2018). Under NYLL, an employee is entitled to an additional amount of "liquidated damages equal to one hundred percent of the total wages found to be due" "unless the employer proves a good faith basis for believing that its underpayment of wages was in compliance with the law." NYLL § 198(1–a). "While the wording of the FLSA and NYLL liquidated damages provisions are not identical, there are no meaningful differences, and both are designed to deter wage-and-hour violations in a manner calculated to compensate the party harmed." *Rana*, 887 F.3d at 123 (internal citations and quotations omitted).

The Court finds that liquidated damages are not appropriate here. The Permanent Mission has met its burden of showing subjective good faith and objective reasonable grounds for its belief that it did not violate the FLSA or the NYLL. The Permanent Mission relied on significant caselaw in support of its subjective good faith belief that it was immune under the FSIA from FLSA and NYLL claims by Plaintiff. *See* Def. Opp. at 20 (citing *Figueroa*, *Bardales*, *Crum*, etc.). *See, e.g.*, *Kadden v. VisuaLex*, 910 F. Supp. 2d 523, 542 (S.D.N.Y. 2012) (finding no liquidated damages because company president genuinely held belief that graphics consultants were exempt from overtime requirements after going to "considerable lengths" to ascertain whether they were exempt). Because courts are presently divided over whether a mission or embassy's employment of a chauffeur falls within the commercial exception of the FSIA, *see supra* at 17-18, the Permanent Mission's belief that it was immune was objectively reasonable. *See Williams v. Epic Sec. Corp.*, 358 F. Supp. 3d 284, 303

53

(S.D.N.Y. 2019) (finding no liquidated damages where "EPIC had an objectively reasonable basis for its belief that it did not need to compensate for travel time between EPIC's headquarters and worksites"). Therefore, Plaintiff's claim for liquidated damages is denied.

## VI. <u>OTHER NEW YORK LABOR LAW CLAIMS</u>

Plaintiff next moves for summary judgment on two other New York Labor Law Claims: failure to pay spread of hours premium under 12 N.Y.C.R.R. § 146-1.6 (Count IV); and failure to provide wage notices and wage statements in violation of Sections 195(1) and 195(3) of the NYLL (Count V). Pl. SJ Mot. 13-17.

As for Count IV for failure to pay a spread of hours premium pursuant to 12 N.Y.C.C.R.R. § 146-1.6, Plaintiff has provided no legal authority in support of his motion for summary judgment on this claim, and has only provided calculations of the spread of hours premium he seeks. *See* Pl. Damages Br. at 7-9. 12 N.Y.C.C.R.R. § 146-1.6 does not apply to Plaintiff. It only applies to employees who work in "restaurants and all year hotels." 12 N.Y.C.R.R. § 146-1.6(d). Plaintiff does not even allege, let alone prove, that he worked in a restaurant or hotel. Even if the Court were to assume that Plaintiff meant to plead a claim for spread of hours under 12 N.Y.C.R.R. § 142-2.4, this premium is only available to those who are paid the minimum wage. *See Ying Dai v. ABNS NY Inc.*, 490 F. Supp. 3d 645, 658 (E.D.N.Y. 2020) (noting that an employee is only entitled to a spread of hours premium under 12 N.Y.C.R.R. § 142-2.4 only if employee is paid minimum wage); *Williams v. Tri-State Biodiesel, LLC*, No. 13-cv-5041, 2015 WL 305362, at *16 (S.D.N.Y. Jan. 23, 2015) ("[R]ecent case law has been nearly unanimous that the spread-of-hours requirement extends only to workers paid at the minimum-wage level.") (collecting cases and citing to opinion letters from the New York State Department of Labor "interpreting New York's spread of hours provision as applying only to employees earning minimum wage"). Plaintiff does not claim that he was paid minimum wage

and the calculations above regarding his regular hourly wage show that he was paid more than minimum wage.  Therefore, Count IV of Plaintiff's Complaint is dismissed.[33]

Defendant next asserts that Plaintiff should not be granted summary judgment on his claims in Count V for failure to provide wage notices and wage statements under NYLL §§ 195(1) and 195(3), respectively, because the Mission is not a covered "employer" under these sections.  *See* Def. Opp. at 17; Def. Damages Br. at 7.[34]  The Court agrees.  Article 6 of the NYLL under which these sections are included, define "employers" as "any person, corporation, limited liability company, or association employing any individual in any occupation – *but not a governmental agency*."  NYLL § 190(3) (emphasis added).  "Where the statutory language is clear and unambiguous, the court should construe it so as to give effect to the plain meaning of the words used."  *Patrolmen's Benev. Ass'n of City of New York v. City of New York*, 41 N.Y.2d 205, 208 (1976).  Black's Law Dictionary defines governmental agency at the time of the bill's passage as "[a] subordinate creature of the sovereign created to carry out a governmental function.  [It is] frequently, a political subdivision or corporation."  *Governmental Agency*, Black's Law Dictionary (4th ed. 1968).  The Permanent Mission falls within this definition and at least one other court has found that a Permanent Mission qualifies as a governmental agency.  *See Mourmouni*, 2021 WL 4461829, at *4.  Because the Permanent

---

[33] Given this, the Court need not address Defendant's argument that Plaintiff is not entitled to a spread of hours premium based on the definition of "employee" set forth in 12 N.Y.C.R.R. § 142 -3.12(b).

[34]  The Second Circuit has held that a "defense that § 190(3) shields defendants from liability must be affirmatively pleaded pursuant to Rule 8(c)."  *Estate of Hamilton v. City of New York*, 627 F.3d 50, 58 (2d Cir. 2010) (holding that defendant's defense that it was not an employer because it was a governmental agency under Section 190(3) must be pleaded as an affirmative defense, although the Answer could be amended to add the defense), *superseded by statute on other grounds as noted in Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108-09 (2d Cir. 2013).  Defendant has pleaded this affirmative defense in its Answer.  *See* ECF No. 63 at 28.

Mission is a "government agency" and does not qualify as an employer under NYLL § 190(3), Count V is dismissed.[35]

## VII.   PREJUDGMENT INTEREST

Plaintiff further seeks prejudgment interest on any award of unpaid overtime.  The parties agree as to the method of calculating pre-judgment interest: that is, multiplying damages by the number of days between the midpoint of Plaintiff's employment and the date of judgment, then multiplying by the 9% interest rate, and then dividing by 365 days per year. *See* Pl. Damages Br. at 10; Def. Damages Br. at 10; *see also Silva v. Legend Upper W. LLC*, 590 F. Supp. 3d 657, 662 (S.D.N.Y. 2022) (using midpoint of plaintiff's employment as reasonable date for calculating prejudgment interest); N.Y. 8 C.P.L.R. § 5004.   The parties agree on the midpoint of Nam's employment as December 31, 2018.  Pl. Damages Br. at 11; Def. Damages Br. at 13.  The Court will calculate prejudgment interest for 1513 days, or from December 31, 2018 until the date judgment is entered, February 21, 2023.  *See Ying Ying Dai v. ABNS NY Inc.*, 490 F. Supp. 3d 645, 662 (E.D.N.Y. 2020) (calculating date range from midpoint until date of judgment entered).  Therefore, prejudgment interest is **$51,852.91** (($138,990.33x 1513 x 0.09)/365).

## VIII.   <u>NEW YORK STATE AND CITY HUMAN RIGHTS LAW CLAIMS</u>

Neither Plaintiff nor Defendant has moved for summary judgment on Plaintiff's Counts VI to IX under the New York State or City Human Rights laws.  Therefore, the parties will proceed to trial on these claims and should submit their pretrial submissions as set forth below.

---

[35] Plaintiff did not move for summary judgment on Count II for failure to pay promised wages weekly under NYLL Section 191(1)(a).  However, this claim must also be dismissed because it falls within Article 6 of the NYLL, and Defendant is not an "employer" under that article.

## IX. **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment that it is immune from suit under the FSIA and that Plaintiff's employment claims are barred by the settlement agreement between the parties is DENIED.

Plaintiff's motion for partial summary judgment on Counts I and III for unpaid overtime under the FLSA and NYLL respectively is GRANTED.  Plaintiff is awarded **$138,990.33** in damages and **$51,852.91** in prejudgment interest.

Counts II, IV, V, and VI are DISMISSED.

Counts VI to IX shall proceed to trial.  Within 45 days, the parties shall submit a joint pretrial order and additional pretrial materials specified in this Court's Individual Rules.  If at any time, the parties seek a referral to the S.D.N.Y.'s mediation program or to the Magistrate Judge for a settlement conference, the parties should contact the Court via a joint letter.

The Clerk is respectfully requested to close the motions at ECF Nos. 78, 79, 80, 81.

Dated: February 21, 2023
       New York, New York

JENNIFER L. ROCHON
United States District Judge